IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. No. 3:15-CR-00025 (JCH) |
| | : | |
| BRETT C. LILLEMOE, ET AL. | : | |

DEFENDANTS' JOINT RESPONSE TO THE
GOVERNMENT'S SUBMISSION RE: DISCOVERY STATUS REPORT

I.    **Introduction**

Defendants Brett C. Lillemoe, Pablo Calderon, and Sarah Zirbes, by counsel, submit

this response to the Government's Submission Re: Discovery Status Report (Doc. 70), dated

October 30, 2015.

By way of background, the defendants made specific requests for *Brady* material that

they believe to be in the custody of the government and identified 31 employees whose files

should be searched.  The government agreed to some, but not all, of the requests. [1]

Accordingly, a search is underway by the USDA.  The government's Status Report reveals

that while the USDA is following its instructions from the U.S. Attorney's Office, the search

as constructed is unnecessarily (and unhelpfully) broad and not focused on the agreed-upon

requests.

A second concern pertains to the fact that the appropriate scope of any *Brady* requests

is inherently related to the scope of the government's case.  Defendants still have some

uncertainty as to whether the government intends to contend at trial that the defendants

committed fraud by participating in the USDA's Export Credit Guarantee Program (the

"Program" or "GSM-102") as financial intermediaries (rather than as actual exporters and

importers).  Defendants firmly believe that such participation was permitted and was, in fact,

---

[1] A copy of the August 4, 2015 letter from William M. McSwain on behalf of all defendants to AUSAs Durham and McGarry is attached as Exhibit A.  This letter identifies the specific materials for which the government agreed to search (as well as the materials for which the government declined to search).

how most transactions in the Program were effected – with the knowledge and approval of the USDA. Materials at the USDA would confirm this. These materials are the subject of many of defendants' *Brady* requests, including several for which the government declined to search.

In earlier conferences, the Court has addressed the scope of the government's case and has observed that "[t]here's no count that charges as criminal – as a crime, the illegal operation of the financial intermediary . . . ." June 3, 2015 Status Conference Tr. at p. 8, lines 21-23. The government apparently agreed with this assertion, both at that time and at a later phone conference with the Court on September 30, 2015. *E.g.*, *id.* at p. 17, lines 9-12 ("I don't see them trying to prove, and I think I heard him say that they are not going to prove. I don't think that they believe it, that your financial structure was per se illegal.") (statement of the Court); September 30, 2015 Status Conference Tr. at p. 19, lines 25-26 ("If the [question] posed is the government going to attempt to prove or argue that the third party model, whatever that might be, is and of itself fraudulent, the answer is no. We represented that to the Court in an [earlier] court proceeding, and we'll represent it to the Court again.") (statement of AUSA Durham).

As discussed below in section III, however, certain comments by the government seem to contradict this position and have left defendants no choice but to seek exculpatory materials on this issue. To the extent that the scope of the government's case can be confirmed as *not* including allegations that actions inherent to acting as financial intermediaries were fraudulent, defendants may be able to narrow their *Brady* requests (and consequently the USDA search). Conversely, if the government intends to contend at trial that the defendants committed fraud by acting as financial intermediaries, many of the *Brady* requests the government rejected are in fact relevant, and we suggest that this should be briefed and resolved while the USDA search is ongoing, rather than after it concludes.

Another unresolved issue relevant to the scope of the USDA search is the question of which of the hundreds of the defendants' GSM-102 transactions the government will raise at trial. The indictment identifies only two transactions, both alleging document alterations – what we'll refer to here for convenience as the "Cool Express" transaction (or GSM-102-821940), involving whiting-out and stamping of documents, and the "Grove" transaction (or GSM-102-821945), involving the shading of documents – but the government referenced the possibility of an additional 8-10 transactions at the June 3, 2015 status conference. Later, the government provided defendants with a list of 33 transactions it intends to raise at trial, without any explanation as to why those transactions are relevant to the case.[2] Defendants are left to wonder what the government is alleging was fraudulent: is it all of the transactions in which the defendants engaged, or only a subset? And if the latter, what are the determining factors? The scope of the *Brady* review (as well as necessary discovery and the length of the defense case) rests almost entirely on the answer to these questions.

In the interest of making the USDA search as efficient, relevant and complete as possible, defendants request that these concerns be addressed in the scheduled conference call with the Court on December 2nd. The following discussion is intended to assist the Court in evaluating the government's status report and related issues.[3]

## II.    The Government's Search as Constructed Is Overbroad and Lacks Focus.

The USDA is undertaking a substantial search. However, the search appears to be unnecessarily broad and not reasonably calculated to identify and retrieve the particular categories of potential *Brady* material agreed upon by the parties. The government's report describes a search for "any and all documents . . . that relate to the allegations in the

---

[2] A copy of the government's July 10, 2015 letter with the list of the 33 transactions is attached as Exhibit B; the defendants' July 21, 2015 response is attached as Exhibit C.

[3] Counsel for defendants reached out to the government several times after the government's status report was filed to ask questions and discuss concerns, but a "meet and confer" could not be scheduled due to government counsel's schedule constraints.

3

indictment;" "any documents that would tend to prove or even disprove the allegations in the indictment;" "any documents relating to the defendants in this case;" and "documents related to the entities the defendants' [sic] control" [listing 12 entities, including four not even mentioned in the indictment].   Given that the defendants and their entities engaged in hundreds of USDA-related transactions involving thousands of bills of lading over the course of the more than seven-year period covered by the indictment, much of the material retrieved by this search will be irrelevant.   The time needed for the USDA to undertake this search will likely be compounded by the time the defense will need to wade through a mountain of largely irrelevant materials.   The search could be significantly narrowed if the identified employees were asked to identify documents pertaining to the specific searches requested by the defendants.

III.   **Many of the Requests Declined by the Government Are Relevant Only if the Government Intends to Pursue Certain Allegations, and This Should Be Resolved Before the USDA Search Concludes.**

        In order to communicate defendants' concerns about the scope of the government's case and, consequently, the appropriate scope of the USDA search, we submit here an overview of (1) relevant aspects of the GSM-102 program; (2) the pertinent allegations of the indictment; and (3) the comments by the government that give rise to defendants' uncertainty despite the government's apparent agreement not to make "the third party model" part of its fraud allegations at trial.

        A.        **Overview of the GSM-102 Program**

        The Foreign Agricultural Service ("FAS") of the USDA administers the Program on behalf of the Commodity Credit Corporation ("CCC").   "The GSM-102 program provides credit guarantees to encourage financing of commercial exports of U.S. agricultural products. By reducing financial risk to lenders, credit guarantees encourage exports to buyers in countries – mainly developing countries – that have sufficient financial strength to have

foreign exchange available for scheduled payments."  USDA/FAS website,

http://www.fas.usda.gov/programs/export-credit-guarantee-program-gsm-102 (visited

November 30, 2015).

The Program guarantees billions of dollars of credit per year.  The credit is extended

by the private financial sector in the United States to approved foreign banks through the

refinancing of irrevocable documentary letters of credit ("LCs") issued in connection with

exports of U.S.-origin agricultural products.  The Program applies only to eligible countries

or regions, as selected by CCC.  CCC also determines the agricultural commodities and

products that qualify for guarantees.

The Program allows the foreign bank to refinance its obligations under the LC and

repay the U.S. bank on deferred terms.  If the foreign bank fails to make any payment

covered by the GSM-102 guarantee, the holder of the payment guarantee (normally the U.S.

bank) may submit a notice of default to CCC and seek payment on the claim.

While the stated purpose of the Program is to encourage the financing of U.S.

commodity exports to selected foreign markets, in most cases the Program does not finance

physical exporters or importers.  Instead, the Program guarantees loans from U.S. banks to

foreign banks in selected emerging market regions.  There is no Program requirement that the

foreign banks loan the money to an actual importer or otherwise use the funds to directly

finance the purchase of U.S. agricultural exports, and in the vast majority of cases the foreign

banks do not do so.

Such loans are accomplished with so-called "synthetic" LCs.  In many synthetic LC

transactions, neither the GSM "Exporter" nor the GSM "Importer" is in any way involved in

the export of the physical goods; instead, they use the shipping documents of unrelated U.S.

exporters to create the synthetic LCs.  In the structured trade finance industry, this practice is

referred to as "renting trade flows."

In contrast with traditional LCs, synthetic LCs do not pay for the purchase of goods. When a foreign bank issues a synthetic LC, it does not extend credit to the "buyers," as it does when it issues a traditional LC.  If the funds are guaranteed by the U.S. government, as in the case of Program transactions, the interest rate to the foreign banks is dramatically reduced.  A helpful description of a synthetic LC can be found in *Fortis Bank (Nederland) N.V. v. Abu Dhabi Islamic Bank*, 936 N.Y.S.3d 58 (N.Y. Sup.Ct. 2010).

When a GSM Exporter rents a trade flow, the GSM Exporter obtains the right to use the shipping documents of another party's U.S. export sale in a synthetic LC transaction under the Program.  In exchange, the GSM Exporter pays a "rental" fee.  Depending on who retained the right to rent the trade flow in the course of the physical sale, the GSM Exporter will rent the flow either from the physical seller (the bill of lading shipper, "Actual Exporter") or the physical buyer (the bill of lading consignee, "Consignee").  The rental agreement is typically documented as a simultaneous and offsetting sale and repurchase, with the net effect being that the GSM Exporter does not purchase the goods but obtains the right to use the shipping documents for a GSM transaction.  Whether it is the Actual Exporter or the Consignee that receives the rental fee, the cash payment is an added incentive that makes the physical transaction more attractive, thereby effectuating the goal of the GSM-102 program to encourage U.S. exports to emerging market countries.

**B.      Allegations in the Indictment**

The indictment alleges that the defendants made material alterations to bills of lading "by whiting out portions of the documents and stamping the word 'original' on the documents," Count One, ¶ 40, and by "adding shading on certain sections of the bills of lading," *id.*, ¶ 41.  The indictment also alleges that the defendants concealed that their companies were affiliated.  *Id.*, ¶¶ 29-33.  These are what we understand the Court to have referenced in prior conferences as the "garden variety fraud" allegations.  What is unclear,

however, is whether the government contends that defendants' structuring of GSM-102

transactions using synthetic LCs and rented trade flows, as described above, was part of the

alleged fraud. The "manner and means" section of Count One expressly includes actions that

are inherent to synthetic LC transactions and/or rented trade flows, alleging that defendants:

- "would and did seek to access bills of lading and other shipping documents for shipments of agricultural products that they did not physically ship and for which they did not participate in the physical movement of the products in any capacity by, among other ways, sending e-mails to various exporters offering to engage in "mirror" transactions through which the conspirators and their companies would pay for the shipping documents for commodities that had been or would be shipped by other entities." (¶ 34)

- "would and did access bills of lading and other shipping documents for shipments of agricultural products that they did not physically ship and for which they did not participate in the physical movement of the products in any capacity, by entering into simultaneous buy-sell contracts with exporters . . . ." (¶35)

- "would and did make arrangements to pay for the bills of lading and other shipping documents for shipments of agricultural products that they did not physically ship and for which they did not participate in the physical movement of the products in any capacity, by paying a small fraction of the actual export sales price per metric ton of the underlying agricultural commodity in order to purchase copies of the shipping documents." (¶36)

- "would and did send e-mails to exporters requesting that the exporters send [ ] 'copies of the signed bills of lading' and offer to pay a small fraction of the actual export sales price per metric ton of the underlying agricultural commodity." (¶ 37)

- "would and did send emails to foreign banks, including International Industrial Bank (IIB) in Russia, and offer to enter into agreements with the foreign banks to provide them capital that would be made available to them from a U.S. financial institution through the use of the GSM-102 program." (¶38)

- "would and did enter into agreements with foreign banks, including [IIB] in Russia, and would and did obtain letters of credit from the foreign banks to be used in connection with shipping documents and with the guarantees from the GSM-102 program, to obtain capital for the foreign banks from U.S. financial institutions." (¶ 39)

Immediately after these allegations, the indictment alleges actions the defendants

purportedly took "to create the appearance of legitimacy," ¶¶ 40, 41, clearly implying that the

actions alleged in ¶¶ 34-39 were not legitimate. At later points in the indictment, the

allegations again include actions that are simply part of synthetic LC transactions, *e.g.*, that defendants:

- "would and did prepare and execute documents termed 'commercial invoices' purporting to represent sales of agricultural commodities between entities that they controlled as well as between entities that they controlled and other entities." (¶42)

- "would and did provide the large amount of capital to the foreign banks in exchange for a percentage fee for themselves and their various entities." (¶45)

C.     **Relevance of the Scope of the Government's Allegations to the *Brady* Search**

The above-described allegations give rise to many of defendants' *Brady* requests. There is substantial material at the USDA that would demonstrate its knowledge and acceptance of the synthetic LC practice and rented trade flows not only with respect to defendants, but also other program participants, as well.  If the government intends to contend, argue or even imply at trial that defendants' participation in the GSM-102 program as financial intermediaries using synthetic LCs and rented trade flows was fraudulent or illegitimate, this material is exculpatory and must be produced.  Some of this material is encompassed by requests the government has declined.  On the other hand, if the government clearly confirms that it will *not* contend, argue or imply at trial that the fact that defendants participated in the GSM-102 program as financial intermediaries using synthetic LCs and rented trade flows was in itself fraudulent or illegitimate, then the *Brady* requests (and the USDA search) can potentially be narrowed.  The resolution of this issue will also have a direct, significant bearing upon discovery in general and the length of trial.

D.     **Attempts to Clarify What the Government Alleges to be Fraudulent**

As the Court will recall, defendants have repeatedly sought to have this issue resolved.  The government has indicated at times that its case pertains only to the "garden variety fraud" allegations in the indictment.  However, the government has also made statements that appear to suggest the contrary.  For example, the government has referred to

"false or fake inventory" as being part of the alleged fraud, apparently referencing the common practice by financial intermediaries of renting trade flows under the Program. *E.g.,* June 3, 2015 Status Conference Tr. at p. 19, line 12.

The government has also alluded to "false papers," which could conceivably include not only the alleged "garden variety" document alterations but also the documents that are routinely prepared as part of a synthetic LC transaction. The indictment itself alleges that the defendants "prepare[d] and execute[d] documents termed 'commercial invoices' purporting to represent sales of agricultural commodities," Count One, ¶ 42, suggesting that those ordinary commercial documents used in most transactions under the Program were fraudulent and misleading because they reflected a synthetic LC transaction and did not depict the physical sale of the goods. Thus, defendants remain uncertain as to the scope of the government's case. Consequently, the scope of the appropriate *Brady* search and required disclosures are also unclear.[4] This issue should be resolved before the USDA concludes its

---

[4]  Relevant excerpts from the prior conferences include:

June 3, 2015 Tr., beginning at p. 8, line 7:
THE COURT: He said based on the meeting, that the prosecution intends to argue that the defendants' participation in the program as a financial intermediary as opposed physical exporters or importers of products was by itself illegal.
MR. McGARRY: If I can comment on that.
THE COURT: Please.
MR. McGARRY: Not to be overly formalistic, the Indictment is the charging document. The Indictment charges them with conspiracy, wire fraud, bank fraud and money laundering so – and he puts in italics was by itself illegal. Not to be overly formalistic, we need to prove the counts as charged in the Indictment. We need to prove each and every element as you're going to instruct the jury.
THE COURT: There's no count that charges as criminal -- as a crime, the illegal operation of the financial intermediary, is there?
MR. McGARRY: There's no RICO count, correct. So we did have a meeting. We talked a couple of hours went back and forth. The analogy I used as one knows I try to come up with helpful analogies. If somebody buys a ski mask in Tampa in July, that in and of itself is not illegal. If somebody buys a ski mask in Tampa in July and then that exact same ski mask is worn in a bank robbery, the government would put on evidence that the defendant went and bought a ski mask in July in Tampa.
THE COURT: You are not going to argue that buying the ski mask was an illegal act. You are going to argue that the defendant bought the ski mask to use in an illegal act.
MR. McGARRY: Correct. That it was a manner and means, if you will.

Beginning at p. 19, line 3:
MR. DURHAM: Your Honor, I don't have much in the way of disagreement with what's said. I want to make sure that the record is clear that counsel understands that the government is not going to take the position that everything they were doing as intermediary was perfectly legal. If they made false submissions or misleading submissions –

search in order to avoid having to go back to the agency again later for another time-consuming, supplemental search.

Relatedly, while the indictment identifies only two transactions, the government has told the defendants in correspondence that it intends to offer evidence at trial concerning at least 33 transactions (two of which are the "Cool Express" and "Grove" transactions identified in the indictment).  *See* Exhibit B.  The defendants have pressed the government repeatedly in an effort to understand why the government intends to offer evidence on so many transactions – especially if the government does *not* intend to argue that the third party model is itself illegal or illegitimate.  None of these transactions (except for Cool Express and Grove) appears to involve alleged document alterations, and about half of the transactions use GSM numbers for Archer Daniels Midland (ADM) deals, so it is unclear why these would be on the list at all.  *See* Exhibit C.  In response to the defendants' questions about why these transactions are relevant to the case, the government has declined to discuss it.  For example, in a July 27, 2015 phone conference, the government simply stated that "we don't want to talk about our theory," "we're not going to narrow our evidence," and "we're not going to cabin ourselves."  Without more information about why the government plans to introduce

---

Beginning at  p. 19, line 12:
MR. DURHAM: They created false or fake inventory.
THE COURT: The entity isn't the crime.  It is the false papers they sent using that entity to send them, right?
MR. DURHAM: Exactly.

Beginning at p. 24, line 14:
MR. DURHAM: We'll comment on that.  We're willing to and obviously state the government's position, we're claiming that this secured transaction is per se illegal.  They're saying that's not --
THE COURT: Is or isn't?
MR. DURHAM: Is not.  On the other hand, if it is the defendant's claim that what we were doing is per se legal in all instances, we'll go down a different rabbit hole because a suggest by counsel this goes on all the time.  Fake inventories are created all the time.

September 30, 2015 Tr., beginning at p. 18, line 21:
MR. DURHAM: There are sort of like an objection at trial to the question being compound.  There's some things Mr. Tween said we wouldn't take issue with.  There are others we [would] take issue with.  For example, if the suggestion of the Court is his client and the other defendants in this case made it known to USDA and other government entities, they were mere financial intermediaries, we would take issue with that.  They represent themselves to be something different than that.  If the [question] posed is the government going to attempt to prove or argue that the third party model, whatever that might be, is and of itself fraudulent, the answer is no.  We represented that to the Court in an [earlier] court proceeding, and we'll represent it to the Court again.

evidence on these 33 transactions, it is impossible for the defendants to know what *Brady* materials need to be disclosed, or even what this case is really about or what the defendants need to defend at trial.  It cannot be the case that the government can simply refuse to address these issues because they prefer not to "cabin themselves."

## IV.   The Defendants Are Concerned about the Government's Apparent Reliance on Potential Fact Witnesses to Determine What Is Exculpatory.

A separate but related concern arises from the USDA's disclosure that the government asked it for "any documents that would tend to prove or even disprove the allegations in the indictment," instead of asking for a response to the specific substantive *Brady* requests agreed upon by the parties.  Although Mr. Bonner is an attorney, determining what evidence "proves or disproves" the allegations in the indictment is an analysis that is not fair or appropriate to ask him (or any other USDA employees) to make.

Mr. Bonner and the identified employees at USDA may well be fact witnesses at trial. On its face, the indictment alleges that the structuring of transactions under the Program "for shipments of agricultural products that [the defendants] did not physically ship" was part of the "manner and means" of the conspiracy.  *See* Count One, ¶¶ 34-39.  If potential fact witnesses are (or have been) shown the indictment, they may read it to allege that synthetic LCs and rented trade flows were not permitted under the Program.  This could have a chilling effect on their testimony if, as defendants believe, they approved such transactions and/or were aware that the defendants were acting as financial intermediaries.  The defense has requested that the government identify any potential fact witnesses who have been shown copies of the indictment, as this constitutes potential *Giglio* material.  The government has not responded to this request.

## V.     CONCLUSION

In the conference call on December 2nd or in whatever time and form the Court deems appropriate, defendants respectfully request that the following issues be addressed:

(1)     The unfocused and (in some respects) overbroad nature of the USDA search as currently constructed, which is not reasonably calculated to identify and retrieve the particular categories of documents requested by the defendants;

(2)     The scope of the government's case, *i.e.*, whether the government contends that the allegations in the indictment describing actions inherent to synthetic LC transactions and rented trade flows were part of the alleged fraud;

(3)     If the government does so contend, we request that a schedule for briefing the issue of *Brady* requests declined by the government should be set (ahead of the general discovery motion schedule) so that the issue can be resolved before completion of the USDA search effort; and

(4)     The scope of the government's case in terms of the transactions alleged to be part of the fraud should be defined in order to narrow the search and/or avoid the need for a supplemental search.

(5)     The government should disclose whether it is asking potential fact witnesses to analyze the indictment to determine what materials are exculpatory.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Elizabeth A. Latif
Elizabeth A. Latif (ct29055)
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103
(860) 275 0166
elatif@daypitney.com

William M. McSwain
James J. Williamson
Jennifer B. Dempsey
*Admitted Pro Hac Vice*

</div>

Drinker Biddle & Reath LLP
One Logan Square, Ste. 200
Philadelphia PA 19103
(215) 988-2700
william.mcswain@dbr.com
james.williamson@dbr.com
jennifer.dempsey@dbr.com

Attorneys for Defendant Brett C. Lillemoe

/s/ Douglas M. Tween
Douglas M. Tween
Linklaters LLP
1345 Avenue of the Americas
New York, NY 10105
(212) 903-9072
douglas.tween@linklaters.com

Attorney for Defendant Pablo Calderon

Ann C. Flannery
Ann C. Flannery
*Admitted Pro Hac Vice*
Law Offices of Ann C. Flannery, LLC
1835 Market Street, Suite 2700
Philadelphia, PA  19103
(215) 636-9002
acf@annflannerylaw.com

Attorney for Defendant Sarah Zirbes

**CERTIFICATE OF SERVICE**

I, James J. Williamson, counsel for defendant Brett C. Lillemoe, hereby certify that on

November 30, 2015, I caused a true and correct copy of the foregoing Defendants' Joint

Response to the Government's Submission Re: Discovery Status Report to be served by the

Court's electronic filing system upon all counsel of record, including:

Michael S. McGarry
U.S. Attorney's Office
157 Church Street
New Haven, CT 06510
(203) 821-3751
michael.mcgarry@usdoj.gov

John H. Durham
U.S. Attorney's Office
157 Church Street
New Haven, CT 06510
(203) 821-3751
john.durham@usdoj.gov

/s/ James J. Williamson
James J. Williamson