**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 3:15-CR-25 (JCH)** |
| | : | |
| | : | |
| **BRETT C. LILLEMOE, et al.** | : | February 26, 2016 |

**MEMORANDUM OF LAW IN SUPPORT OF
PABLO CALDERON'S MOTION FOR DISCLOSURE OF
SPECIFIC BRADY MATERIAL AND FOR BILL OF PARTICULARS**

Defendant Pablo Calderon and co-defendants Brett Lillemoe and Sarah Zirbes were charged in the Indictment with a conspiracy to commit wire fraud and bank fraud, and various substantive counts, based on their participation in the United States Department of Agriculture ("USDA") Export Credit Guarantee Program ("GSM-102" or the "Program").

Mr. Calderon, by counsel, respectfully moves this Court for the entry of an Order requiring the Government to search for and disclose additional arguably exculpatory material in the possession, custody or control of the USDA, pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the dictates of Kyles v. Whitley, 514 U.S. 419 (1995), United States v. Bagley, 473 U.S. 667 (1985), United States v. Agurs, 427 U.S. 97 (1976), Brady v. Maryland, 373 U.S. 83 (1963) and their progeny, Fed. R. Crim. P. 16, and the Standing Order on Discovery.

Mr. Calderon also moves this Court pursuant to Fed. R. Crim. P. 7(f) and the Fifth and Sixth Amendments to the United States Constitution for an order directing the Government to provide a bill of particulars on the Government's allegations regarding certain additional GSM-102 transactions, not involving the defendants and not described in the Indictment, about which the Government has indicated that it intends to present evidence at trial.

### Background

The Foreign Agricultural Service ("FAS") of the USDA administers the Program on behalf of the Commodity Credit Corporation ("CCC"), pursuant to 7 U.S.C. § 5622 and 7 CFR § 1493. The Program guarantees billions of dollars of credit per year. The credit is extended by the private financial sector in the United States to approved foreign banks through the refinancing of irrevocable documentary letters of credit ("LCs") issued in connection with exports of U.S.-origin agricultural products. CCC issues the credit guarantees as determined by FAS. CCC guarantees payments due from approved foreign banks to the named exporter of the Program guarantee or, more commonly, to its assignee, i.e., a bank in the United States.

The Program only applies to eligible countries or regions, as selected by CCC. Similarly, CCC determines the agricultural commodities that qualify for guarantees. CCC qualifies U.S. participants in the Program. U.S. and foreign banks must also meet established criteria and be approved by CCC to participate. CCC determines and monitors credit limits for each of the approved foreign banks. CCC does not determine importer eligibility.

As part of the process of obtaining a Program guarantee, the named exporter submits an application and pays CCC a fee calculated on the dollar amount guaranteed. Fee rates can vary based on a number of factors, including the country risk that CCC is undertaking and the repayment terms of the loan extended to the foreign bank. As administrator of the Program, FAS approves or denies Program applications.

After a Program guarantee is issued, the foreign bank issues a dollar-denominated, irrevocable LC, at the request of the named importer or intervening purchaser on the Program guarantee and in favor of the named exporter, which also is usually confirmed by a bank in the United States (the guarantee assignee) agreeing to extend credit to the foreign bank.

The Program allows the foreign bank to refinance its obligations under the LC and repay the U.S. bank on deferred terms as stipulated in the language of the LC. If the foreign bank fails to make a payment, the holder of the guarantee (normally the U.S. bank) may submit a notice of default to CCC and seek payment on the claim.

The history of the Program and its implementation by the USDA are important context for the discovery motions here. The Program became effective on September 25, 1980. 45 Fed. Reg. 64894, 64894-64901 (Oct. 1, 1980) (codified as amended at 7 C.F.R. § 1493). The Final Rule Summary reads as follows:

> **SUMMARY.** This rule sets forth the terms and conditions of Commodity Credit Corporation Export Credit Guarantee Program to provide protection to U.S. exporters or their assignees which must be banks or other financial institutions in the United States against payment defaults by foreign banks when purchases of U.S. agricultural commodities are made on a deferred payment basis. The rule authorizes CCC to enter into payment guarantees with U.S. exporters upon payment of a fee. Usually the proceeds that may be due under the payment guarantee will be assigned to a U.S. bank that actually finances the export sale in order for the exporter to realize the proceeds of sale prior to the time the deferred payment comes due in accordance with the foreign banks letter of credit or related obligation. By transferring the risk of loss due to defaults in payment by foreign banks from U.S. exporters and U.S. financing institutions to CCC, the rule is intended to: (1) facilitate exportation; (2) forestall or limit declines in exports; (3) permit exporters to meet competition from other countries; and (4) increase commercial exports of U.S. agricultural commodities. 45 Fed. Reg. at 64895.

Initially, the authority of § 1493 was the Commodity Credit Corporation Charter Act of 1948:

> Sec. 5. Specific Powers. — In the fulfillment of its purposes and in carrying out its annual budget programs submitted to and approved by the Congress pursuant to the Government Corporation Control Act (31 U. S. C., 1940 edition, Supp. V, 841), the Corporation is authorized to use its general powers only to . . . (f) Export or cause to be exported, or aid in the development of foreign markets for, agricultural commodities. Ch. 704, § 5, 62 Stat. 1070, 1072 (1948) (current version at 15 U.S.C. § 714c(f)).

The Agricultural Trade Act of 1978 ("1978 Act"), Pub. L. No. 95-501, authorized CCC loans to finance U.S. agricultural exports, referred to as "direct credit," as opposed to CCC guarantees for privately obtained financing as under the Program. However, the 1978

Act was amended by the Food, Agriculture, Conservation, and Trade Act of 1990 ("1990 Farm Bill"), explicitly authorizing CCC guarantees as had already been implemented in the Program. See Pub. L. No. 101-624, § 1531 (1990) (current version at 7 U.S.C. § 5622). From 1991 onwards, the 1978 Act was included in the authorities of the Program, in particular 7 U.S.C. § 5622. In 1994, 7 C.F.R. § 1493 underwent a major revision ("1994 Revision"). 59. Fed. Reg. 52866, 52866-86 (Oct. 19, 1994). Thereafter the Program regulations remained virtually unchanged until December 18, 2014, including the period covered by the indictment.[1]

It is important to stress that since inception, Program regulations required that CCC guaranteed loans finance the purchase of the U.S. commodities by the foreign buyer. The Summary of the 1980 regulations, quoted above, states that the guarantees are meant to "provide protection . . . against defaults by foreign banks when purchases of U.S. agricultural commodities are made on a deferred payment basis." 45 Fed. Reg. at 64895. Title II, Sec. 201 of the 1978 Act, was named "Commodity Credit Corporation Financing of Deferred Payment Sales."[2] Pub. L. No. 101-624, § 201 (1978). Further, the 1990 amendment of the 1978 Act states that CCC "may guarantee the repayment of credit made available to finance commercial export sales of agricultural commodities," 7 U.S.C. § 5622(a) (as amended by Pub. L. No. 101-624, § 202(a) (1990)), and also sets the limit of CCC guarantee usage: "The Commodity Credit Corporation shall finance or guarantee under this section only United States agricultural commodities." Id. at 5622(f) (as amended by Pub. L. No. 101-624, § 202(f) (1990)). The 1994 Revision contains references to guarantees for credit "available to finance an export sale;" to "financing of foreign purchases of U.S. agricultural commodities

---

[1] In 1997, the definition of "U.S. agricultural commodity" was amended but the change is not material to our arguments. See 62 Fed. Reg. 24560, 24561 (May 6, 1997).

[2] Section 201(b) reads: "Exporters who . . . must provide such deferred payment terms in order to meet sales competition from other nations, or to make additional export sales, may apply to the Commodity Credit Corporation for financing such sales."

on credit terms;" or to "secure financing of the exports," 45 Fed. Reg. at 52867, which is consistent with the authority of 7 U.S.C. § 5622.[3]

The Program has always relied on a typical mechanism used in trade finance to extend deferred payment terms to a foreign purchaser of exported goods, namely an LC. See 7 C.F.R. § 1493.1 (as amended by 45 Fed. Reg. at 64898); 7 C.F.R. § 1493.1 (as amended by 59 Fed. Reg. at 52877). An LC is a payment instrument that involves the banks of both the exporter and the importer. Payments are intermediated by the banks in two steps: the foreign buyer pays the foreign bank on deferred payment terms and the foreign bank pays the exporter's U.S. bank mirroring the same terms.[4] The LC instrument, however, covers only the second step: the payments of the foreign bank to the U.S. bank. Financing of payments by the purchaser to the foreign bank are beyond the purview of an LC[5] and such payments are not covered by Program guarantees, which only secure the payments of the foreign bank to the U.S. bank. Therefore, by design and since inception, Program guarantees are only a partial credit enhancement to purchases "made on a deferred payment basis" as required under the enabling legislation. This feature of Program guarantees is essential to the manner in which participation in the Program evolved in the ensuing 35 years. One response to the notice of proposed rulemaking found in 45 Fed. Reg. 37854, 37854-58 (June, 5, 1980) was particularly prescient:

> One commentator suggested that the proposal should not be adopted because CCC has no mechanism for determining the credit-worthiness of foreign importers. CCC's coverage applies to the risk of default by a foreign bank and a default by the importer is of no direct concern to CCC. All transactions will be supported by a letter of credit from the importer's bank and the bank will be obligated to pay regardless of whether it receives payment from the importer. 45 Fed. Reg. at 64895.

---

[3] The public comments received by FAS leading up to the 1994 Revision are summarized in the same Federal Register entry. Regarding §1493.10, FAS received no comments. See 59 Fed. Reg at 52868. It is apparent that this section provoked no controversy among U.S. exporters, producer associations, U.S. financial institutions, a trade association, and one other U.S. Government agency which submitted comments.

[4] Usually, the exporter and the U.S. bank "negotiate" the LC, meaning the U.S. bank pays the exporter up front and assumes the exposure to future payments by the foreign bank.

[5] The arrangements between the foreign buyer and the foreign bank are usually documented in a so-called Trade Credit Agreement ("TCA").

In hearings leading up to the 1990 Farm Bill, the Program was the target of sharp criticism due to then-recent $3 billion Program losses in Iraq and a general perception of mismanagement. As a result, the Bill required a general tightening of CCC controls and mandated "regular audits of program transactions to determine compliance with program objectives and requirements," Pub. L. No. 95-501, § 403 (1990) (amending 7 U.S.C. § 5663(a)(3)).[6] Since the 1994 Revision established routine exporter audits by FAS, those audits only request (1) evidence that the goods are of U.S. origin and that they actually shipped in the allowed period of time to the allowed destination as documented by photocopies of BLs, certificates of origin, and proof of entry to the intended destination; (2) documents showing an LC was issued showing deferred payment is extended to the foreign bank and that the exporter actually received payment; and (3) sales contracts and commercial invoices between the parties specified in the guarantee applications.

The glaring absence in this list is that FAS does not require, and never has, any evidence that the foreign banks extended deferred payment terms to the purchasers of U.S. exports. The audit procedures are not designed to verify a critical condition mandated by law. Likewise, when FAS processes claims on guarantees for defaulted loans, it does not require any information on the payment terms of the foreign purchaser.[7] The records that FAS obtained, either through routine exporter audits or when CCC paid defaulted guarantees, only show that (1) loans were made to foreign banks, and (2) for every dollar loaned, a dollar of U.S. agricultural product was exported.

By Program regulations FAS has audit power to inspect not only all the books and records of Program transactions but also "records that pertain to transactions conducted outside the Program, if, in the opinion of [CCC,] such records would pertain directly to the review of transactions undertaken by the exporter connection with the payment guarantee," 7

---

[6]  7 U.S.C. § 5663 is an explicit authority of 7 C.F.R. § 1493.
[7]  The required documentation for claims is listed in 7 C.F.R. § 1493.300.

C.F.R. 1493.191(a), and exporters are explicitly required to "maintain and make available all records pertaining to . . . extension of credit for agricultural commodities exported in connection [to GSM-102]." 7 C.F.R. § 1493.530(e) (emphasis added). However, since the 1994 Revision, FAS auditors have never asked a Program exporter for evidence that credit is "extended" to the purchaser of the goods.

The reason FAS never inquires about the ultimate use of funds is simple. The fact is, with one notable exception, foreign banks do not extend Program financing to purchasers of U.S. exports.[8] The Program couldn't have survived for a day, let alone for more than 20 years, had FAS not ignored the language of the law. This state of affairs begs a host of questions starting with how the Program actually works, why the Program is so popular, and why FAS steadfastly praises the Program in Farm Bill hearings.

Program transactions can be fully understood only by inspecting complete sets of documents, including those willfully ignored by FAS. A key document is the LC. As intended by the regulations of 1980 and thereafter, Program LCs should effect payment for goods and defer foreign bank payments to the U.S. bank in the context of deferred payments to the foreign bank by the purchaser. What a prevalence of Program LCs actually do, however, is defer payments of the foreign bank without paying for the commodities, by using a "structured trade finance" technique, a "synthetic" LC.[9] The other key document is the photocopy of a bill of lading ("BL"). BLs are issued when goods ship and serve as title of the

---

[8] The exception is exports to Korea. Korean law requires that domestic banks receiving loans guaranteed by foreign governments and in connection with imports (e.g., Program guaranteed loans), mirror the same terms in loans to the importers. Korea is exceptional in another regard. Korean industry is mostly organized in huge industrial groups, "chaebols," and the importers of U.S. agricultural products have sufficient credit lines through their financially powerful parents. Importers can and do finance their purchases whether Korean banks get financing backed by foreign governments or not.

[9] Structured trade finance is a sub-industry of trade finance which creates many tens of billions of dollars of commodity-linked loans every year. The distinction between traditional and structured trade finance is that traditional transactions actually finance commodities, whereas in structured transactions, the use of funds is unrelated to the referenced goods. The purpose of structured transactions is to create loans that can be classified as "trade finance" which otherwise not would be. All U.S. bank assignees of Program guarantees, by definition, practice structured trade finance, and in particular both Deutsche Bank and CoBank have structured business outside the Program. A helpful description of a synthetic LC can be found in Fortis Bank v. Abu Dhabi Islamic Bank, 936 N.Y.S.3d 58 (N.Y. Sup.Ct. 2010).

goods when in transit. A substantial proportion of Program transactions involve photocopy BLs of sales between parties that don't appear in Program guarantees and LCs. Participants who use such photocopy BLs in Program transactions are "financial intermediaries" in the sense of the term that was used in this Court. In structured trade finance, the technique is called "renting trade flows."

Like with any financial transaction, one must "follow the dollar" to grasp the essential economics of Program transactions. When FAS audits a transaction or processes a claim for default, it only verifies payment by the U.S. bank to the exporter. FAS does not require any certification or evidence of when the importer pays the foreign bank. In fact, in most Program transactions, bank records show that within a few days of receiving the funds, sometimes the same day, the exporter actually pays the importer and the importer pays the foreign bank.[10] From the ultimate destination of the funds it is obvious that the purpose of a Program transaction is neither to pay for nor finance the goods but rather to create a loan to the foreign bank, meaning the foreign bank indirectly receives funds upfront from the U.S. bank and repays the funds when the Program guarantee expires. It is also clear that the "purchaser" is not a purchaser of goods, but merely a conduit for the interbank loan.[11] In the meantime, during the tenor of the loan, the foreign bank uses the funds anyway it chooses, whether it be for real estate deals or for financing agricultural imports from Argentina or for any other use, all of which contravene the language of 7 U.S.C. § 5622(f).[12]

---

[10] There are variants to the actual payments as described above, but all the variants have the same effect, namely the foreign bank receives the funds upfront. The exporter may directly pay the foreign bank on behalf of the importer, the exporter may pay a proxy of the foreign bank, or the U.S. bank may directly pay the importer or even the foreign bank.

[11] A minority of Program LCs function as payment for goods and the purchasers on the LCs are the actual importers. Like for transactions in Korea, it is the case for a fraction of Program transactions in Turkey and very few other exceptions. However, excluding Korea, all those exceptions resemble the case of Turkey in that the importers pay the foreign banks upfront and the financing is for the foreign banks, not for the foreign importers.

[12] During the decade before 2010, Brazilian banks received billions of Program-guaranteed loans from U.S. banks. All the while at the World Trade Organization, Brazil was challenging the U.S. for subsidies of cotton exports, the Program being a prominent part of the controversy. The U.S. lost the dispute and agreed to pay hundreds of millions of dollars in penalties to the Brazilian cotton industry. The irony is that the U.S. was

The last piece of the puzzle is the fee the foreign bank pays the Program participant, either directly or through a proxy. The foreign bank is willing to pay the fee because the Program guarantee reduces the interest rate on the loan, sometimes drastically, in analogy with a borrower of a residential mortgage who pays "points" to reduce the mortgage rate. The value to the foreign bank is analogous to the value to a subprime borrower if she paid a treasury rate on her mortgage.

Simply put, a Program transaction monetizes the value of a Program guarantee by selling credit enhancement to a foreign bank. In the process of creating the low-interest loan to the foreign bank for use unrelated to U.S. exports, the Program participant receives a cash subsidy. The participant has several choices for the use of the cash. If the participant is also the exporter of the goods, it can keep the cash and improve its bottom line. It can pay more to the U.S. producer it bought the commodity from, thereby incentivizing more U.S. production. It can discount the price paid by the purchaser, thereby making U.S. exports more competitive, increasing sales and the U.S. share of the international market. It can do a combination of all three. It is important to emphasize that the transaction where the purchaser of the goods pays the participant/exporter is totally separate from the Program transaction. In one transaction the participant/exporter sells and ships the goods and in a separate transaction it utilizes photocopies of the BLs in a Program synthetic LC in which no commodities are actually "sold." Nonetheless, even if the Program transaction does not conform with 7 U.S.C. § 5622(f), it can serve the purpose of the Program as per 7 U.S.C. § 5622(b).

In many Program transactions the participant does not export the goods and acts as a "financial intermediary." The participant obtains the right to use photocopies of BLs in the transaction from either the exporter or the importer of the U.S. goods. In exchange it pays a fee. In other words, the Participant "rents" the trade flow and pays the rental fee which is a

---

penalized for unfair trade practices, in particular for a program that was a major funding source for dollar-starved Brazilian banks, which in turn funded the country's own cotton industry, a competitor to U.S. cotton exports.

direct cash benefit to a party to the physical transaction. If the financial intermediary pays the rental fee to the importer, the rental fee is a discount to the purchase price. Price discounts make the U.S. exports more competitive, thus increasing sales and the U.S. share of the international market. If the financial intermediary pays the rental fee to the exporter, the exporter receives a cash subsidy as it would if it were an exporter/participant, albeit reduced by the margin of the financial intermediary. As in the case when the participant is also the exporter, when the participant acts as financial intermediary, the transaction can serve the purpose of the Program.

A U.S. exporter that rents its flows to a financial intermediary always has the option of participating directly in the Program and receiving the full cash subsidy. For a host of practical reasons, however, direct participation is not viable for most exporters, who lack the banking expertise involved. Financial intermediation therefore makes the benefits of the Program accessible to a vastly larger group of exporters than that of direct participants, and furthers the purpose of the Program.

Whether a participant uses its own shipping documents or those of other exporters, it is crucial that it not use the same portion of a shipment for different guarantees. Otherwise the "connection" between the Program guarantee and U.S. export is lost; part or all of a guarantee is issued without there being a corresponding export, the benefit of the cash subsidy is dissociated from exports and that does not serve the purpose of the Program. This issue is referred to as "double dipping." When a participant rents a flow, it should have confidence that it is acquiring the exclusive right to utilize the shipping documents and that the flow is not being used in the Program by the actual exporter or being rented out to some other participant.[13] The one-dollar-shipped-to-one-dollar-loaned rule must hold. In the past, when FAS paid claims on defaulted guarantees, it carefully screened transactions to assure it

---

[13] There are many reasons why a participant may not use a particular flow of its own and rent it to another participant that will use it in the Program.

did not pay twice on the same shipment. Further, it has communicated to participants its policy of sanctioning double-dips.

Regarding the practice of renting trade flows and financial intermediation, more than one participant privately sought and obtained approval for the practice when it started in 2002.[14] Since then, in audits and claims FAS has always approved transactions where neither party to the BLs is related to the parties of the Program transaction, a sure sign the flows are rented. FAS has never asked any participant about arrangements between the parties of the export sale and the parties of the Program transaction.[15] In March 2009, Mr. Lillemoe and an attorney for Globex International, Inc., a U.S. exporter of poultry and meat, met with FAS seeking clarification on the practice. FAS allowed the transaction to proceed. All these facts point to three conclusions. First, FAS ignores the language of 7 U.S.C. § 5622 in that a majority of Program transactions does not guarantee U.S. exports. Second, FAS enforces the one-dollar-shipped-to-one-dollar-loaned rule. Third, FAS permits financial intermediation.

For more than 15 years, through GTR LLC ("GTR") and various other entities, Mr. Lillemoe participated in the Program. GTR has been a registered exporter under the Program since 2007 and GTR's predecessor Global Trade Resources LLC, of which Mr. Lillemoe was a principal, became a registered exporter in 1999. Mr. Calderon began to participate in the Program in 2008, working in concert with Mr. Lillemoe, and stopped in 2010.

Between 1999 and 2012, FAS approved and CCC issued more than 500 GSM-102 guarantees to GTR and affiliates thereof. Every one of the transactions executed under those guarantees utilized rented trade flows. Neither GTR nor any of its affiliated companies has ever appeared anywhere on a single BL, certificate of origin, veterinary certificate, weight or quality certificate, or any other document related to the physical export of a shipment.

---

[14] Both Cargill, Inc. ("Cargill") and Archer Daniels Midland Company ("ADM")— and possibly other participants as well — have in the past sought guidance from FAS regarding renting flows.
[15] The only exception was when FAS investigated Mr. Calderon and Mr. Lillemoe.

<u>Argument</u>

I.   **Motion to Compel Disclosure of Additional <u>Brady</u> and <u>Giglio</u> Material**

Mr. Calderon moves to compel the Government to expand its review for materials requiring disclosure under <u>Brady</u> and <u>Giglio</u>. Notwithstanding the good faith efforts of the parties to reach an agreement on discovery, the Government has declined to search for several categories of information that may contain highly relevant and exculpatory information within the control of the USDA. In particular, Mr. Calderon seeks an order directing the Government to expand its search of materials within the USDA's control to include certain relevant materials related to events that occurred prior to the start of the indictment period in 2007, and certain materials involving GSM-102 transactions with third-party competitors.

In <u>Brady</u>, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. Information "favorable to an accused" includes not only affirmatively exculpatory evidence, but also information that impeaches the credibility of the Government's witnesses. <u>See</u> <u>Giglio</u>, 405 U.S. at 154-55; <u>Bagley</u>, 473 U.S. at 676-77.

Defense counsel's efforts to secure appropriate disclosures pursuant to <u>Brady</u> and <u>Giglio</u> are well documented and familiar to the Court. <u>See</u> Letter from William McSwain to John Durham and Michael McGarry, dated June 19, 2015 (Exhibit 1); Letter from Douglas Tween to John Durham and Michael McGarry, dated June 25, 2015 (Exhibit 2). In particular, Mr. Calderon's attorney presented to the Government a 19-item list of specific requests designed to ensure sufficient review for exculpatory material under <u>Brady</u> and <u>Giglio</u> based on the charges and Mr. Calderon's anticipated defenses. According to the Government's Discovery Status Report, the USDA has conducted a search for documents responsive to five of Mr. Calderon's requests (Items 3, 4, 8, 9d, and 9e). <u>See</u> Calderon Resp. to Government's

Submission re: Discovery Status, ECF No. 73, at 1. Responsive material has been produced to Defendants in a series of productions, most recently on February 19, 2016.

However, the Government has repeatedly denied its responsibility to conduct searches for the materials contained in Mr. Calderon's remaining requests for information prior to the indictment period or involving GSM-102 transactions with participants other than the Defendants themselves. Responding in a letter dated July 10, 2015 (Exhibit 3), the Government stated that it was "not agreeing to make all the requested searches as many of them seem to be irrelevant, outside the relevant time frame, overly broad and directed at a defense theory of the case." In particular, the letter stated that the Government "simply do[es] not share your view that the prosecution team is obligated to search for documents related to a conference call that may have happened in 2002 or 2003 with other entities and other individuals not involving the named defendants and any coconspirators and where there does not appear to be any relevance to the crimes charged in the indictment."

The Government's position here ignores the particular relevance of these narrowly tailored requests to Mr. Calderon's defenses to the crimes charged. Mr. Calderon's defense is based, in part, on showing that certain of his actions (e.g., the use of multiple companies and multiple bank accounts) were consistent with the prevailing interpretation of 7 C.F.R. § 1493 governing GSM-102. Information during and prior to the indictment period is material and potentially exculpatory where it reflects that the Defendants' interpretation of those regulations and actions were consistent with FAS's intentions, actions, rulings and guidance to participants under GSM-102. These additional searches for potential Brady and Giglio material are particularly appropriate to the extent that, as described below, the Government has identified GSM numbers for transactions involving other participants as a reference for evidence that it intends to discuss at trial.

These materials may be highly exculpatory, and Brady requires that evidence relating to such events be searched. In United States v. Certified Envtl. Servs., Inc., the Second Circuit held that evidence predating the period of the indictment by many years was relevant and admissible at trial to show state of mind. 753 F.3d 72, 90 (2d Cir. 2014). In particular, the Court found that evidence that predated the charged conspiracy by five years was relevant where "it concerned the nature of an ongoing regulatory requirement and, according to the defendants, informed the creation of a consistent company policy." 753 F.3d at 90. Relatedly, the Second Circuit also found on review that the Government had an obligation to disclose under Brady related materials in the possession of an EPA agent reflecting the existence of a "Cheat Sheet" that supported the theory that the defendants had operated under a good-faith belief that their conduct was consistent with EPA regulations. 753 F.3d at 88.

Furthermore, third-party communications are admissible to show the defendant's good faith and demonstrate a lack of intent to defraud. In United States v. Litvak, the Second Circuit held that communications between the defendant's managers, approving of other employees' similar conduct, were relevant in determining whether the defendant held an "honest belief that his actions . . . were proper." 808 F.3d 160, 190 (2d Cir. 2015); see United States v. Brandt, 196 F.2d 653, 657 (2d Cir. 1952) ("Culpable intent or lack of good faith is not merely an element of the crime of fraudulent use of the mails; it is in fact practically crucial where as here the scheme and the mailing are admitted.") (citations omitted). Evidence that the USDA had approved of similar deals in interactions with third parties is therefore not only relevant to good faith but also highly exculpatory.

In particular, Mr. Calderon refers to his narrow requests on the following five issues for which the Government has refused to search and provide appropriate disclosure:

1. Relating to audits or claims conducted by FAS from 2007 to the present, any submitted photocopy BLs which

    a. were stamped or otherwise marked explicitly as "Copy," "Certified Copy," "Certified True Copy," "Non-Negotiable" or "Copy Non-Negotiable;"

    b. were in no way stamped or otherwise marked "Original," "First Original," "Second Original," etc.; and/or

    c. the "Consignee" field and "Notify" field on the BL was either blank or stated "To Order," and nothing more.

2. Relating to guarantee allocations where one or more companies applied with multiple related entities, allocation worksheets for all participants (equivalent to that starting on Bates page USDA_FAS-0003942 of the Government discovery). Specifically, the worksheets for the following allocations:

    a. in or about April 2011 for the Eurasia and Russia regions;

    b. in or about March 2010 for the Eurasia and Russia regions;

    c. in or about October 2011 for the Eurasia and Russia regions;

    d. in or about August 2009 for the South America region;

    e. in or about April 2009 for the South America region; and

    f. in or about April 2009 for the Caribbean region.

3. Relating to the policy issues enumerated in item 5 below, any records of meetings and/or communications with program participants, from 2002 to the present, including but not limited to:

    a. a conference call between ADM and FAS personnel on or about October 2002, which included General Counsel David (D.J.) Smith, Mr. Lillemoe, J.D. Longwell of ADM, and Martha Keplinger and Larry McElvain of FAS;

    b. a conference call held on or about October 24, 2002, between Mr. Smith and Mr. Longwell and Ms. Keplinger;

    c. any meetings or conference calls attended by ADM attorney James (Jim) Shafter and/or Ms. Keplinger in 2003 regarding the use of poultry exports under the GSM-102 program for Russia; and

    d. any discussions with Mark Rowse regarding Agency determinations set forth in a letter to Mr. Lillemoe dated December 28, 2012.

4. Relating to use of rented trade flows in Program transactions (i.e., where the BL parties are unrelated to the guarantee parties), any records of communications or meetings with BL shippers or consignees, from 2002 to the present, including but not limited to

    a. a meeting with Ignacio Calle of PROINSA (Colombia) and Cargill personnel in the presence of Ms. Keplinger in 2002;

    b. a conference call with personnel of Georgia Pacific and Cargill personnel in 2002 or 2003; and

     c.   communications between Mr. Rowse and AJC International and Grove Services Inc.

5. Relating to internal FAS discussions on Program policies and procedures from 2002 to the present, records of meetings or communications covering the following topics:

     a.   the interpretation and application of 7 CFR § 1493.10 under the regulations that were in effect prior to December 18, 2014;

     b.   the interpretation and application of 7 CFR § 1493.40(a)(3) under the regulations that were in effect prior to December 18, 2014;

     c.   the nature of the commercial relationship between the named importer of a Program guarantee and any consignee on a BL presented in a LC related to the guarantee;

     d.   the nature of the commercial relationship between the named exporter of a Program guarantee and any shipper on a BL presented in a LC relating to the guarantee;

     e.   whether the exporter on the guarantee must ship the goods to the importer on the guarantee; and

     f.   the nature of the complete contract string between the U.S. exporter/shipper and the final buyer in the foreign country.

Each of these requests narrowly targets highly relevant and potentially exculpatory information believed to be in the possession of the USDA. The Court should therefore require the Government to expand its search of materials within the USDA's control to include the materials covered by these requests and to make appropriate disclosures consistent with its obligations under <u>Brady</u> and <u>Giglio</u>.

## II.    Motion for Bill of Particulars

Mr. Calderon also seeks a limited bill of particulars for certain of the 33 guarantee transactions for which the Government has indicated that it intends to present evidence at trial. In particular, defense counsel believes in good faith that as many as 15 of those 33 appear to reference transactions awarded to competitors. While defense counsel is not engaging in a fishing expedition or seeking a preview of the Government's evidence, Mr. Calderon requires additional information to determine the nature of the charges for these specific transactions and to adequately prepare a defense.

A bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure is proper to allow a defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). Although the Government "need not particularize all of its evidence" related to a charged conspiracy, the Court has discretion to order a bill of particulars to allow the defendant to adequately prepare to realistically meet the specific charges against him. United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988).

The Court has already required the Government to narrow and disclose the range of transactions it will present at trial other than the two charged in the Indictment. During a hearing on June 3, 2015, defense counsel raised a request for the Government to identify which of the hundreds of transactions the defendants were involved in would be presented at trial. Tr. at 20–22. Describing this as a "reasonable" request, Tr. at 21, the Court asked the Government how many GSM transactions beyond the two described in detail in the Indictment would fit in this basket. Tr. at 38–39. At the time, the Government estimated that its evidence would be "probably drawn from eight or ten transactions." Tr. at 39. The Court directed the Government to identify these eight to ten transactions, explaining "if later you throw in another one, two, whatever, they have at least got the eight or ten under their belt. […] They don't have to do fourteen. They only have to do four or six at worse case scenario." Tr. at 43.

On July 10, 2015, the Government notified defense counsel by letter of 33 uncharged transactions that the Government "intend[s] to discuss and/or draw evidence from" at trial. Letter from Michael McGarry to defense counsel dated July 10, 2015 (Exhibit 4). This list of transaction numbers is significantly broader than the eight or ten transactions identified

during the hearing. Moreover, Defendants' diligence on these transactions has raised more ambiguity than clarity on the Government's charges and intended evidence here. In particular, defense counsel in good faith belief have determined that the GSM transaction numbers provided refer to at least 15 transactions where the defendants were not involved in the underlying transaction.[16] These transactions are particularly problematic because the government has presented very little in discovery related to those documents – including the GSM applications, LCs, LC registration information, credit agreement between the LC applicant and the foreign bank, contractual agreements with end buyers, etc.

The Court should require a bill of particulars where (as here) it is necessary to ensure that the defendant is advised "of the specific acts of which he is accused." United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990) (citation omitted). The Second Circuit has emphasized that "a bill of particulars or other adequate disclosure is appropriate where a conspiracy count covers a complex series of events over a number of years." United States v. Barnes, 158 F.3d 662, 666 (2d Cir. 1998). While the government can satisfy its obligations through discovery and other pre-trial disclosures, the Second Circuit has been clear that "such material may not be automatically relied on by the Government as an adequate substitute for a straightforward identification in a bill of particulars." Davidoff, 845 F.2d at 1155.

In Bortnovsky, the Second Circuit reversed the defendants' convictions for a scheme to defraud the Government through the submission of false insurance claims related to a series of burglaries. 820 F.2d at 573-574. In particular, the Court found that the district court had abused its discretion in denying the defendants' motion for a bill of particulars specifying which of the insurance claims were fraudulently based on staged burglaries and which of the many invoices identified by the government were falsified. Id. at 574. The court found that this hindered the defendants' preparation of a defense by forcing them to explain numerous

---

[16] These transactions include GSM 819164, 819215, 819927, 819370, 819366, 819788, 819365, 819368, 819822, 819809, 819811, 819802, 819822, 820026, and 821350.

additional events and documents unrelated to the conduct that the Government alleged was fraudulent. Id. at 574-75. Moreover, the Government "did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some 15 burglaries would be demonstrated to be staged." Id. at 575.

Cases in the District of Connecticut have similarly required a bill of particulars to give additional detail on the allegations in the Government's evidence. See, e.g., United States v. Ganim, 225 F. Supp. 2d 145, 155 (D. Conn. Sept. 12, 2002) (requiring limited bill of particulars where the indictment and disclosure gave the defendant insufficient notice of the actual or constructive benefits alleged under "honest services" mail fraud); United States v. Calhelha, 456 F. Supp. 2d 350, 366 (D. Conn. Oct. 11, 2006) (requiring a bill of particulars to identify all of the relevant aliens charged in a conspiracy to encourage, harbor, and transport aliens illegally into the United States and specify the illegal activity alleged for each).

Mr. Calderon respectfully submits that the Court here should exercise its discretion to require the Government to provide further information on the nature of the charges to be presented in relation to these 15 unrelated transactions. The two transactions charged in the Indictment are based on a theory of harm involving alleged alteration of particular BLs used to obtain guarantees. To the extent that almost half of the guarantees that the Government intends to prove up at trial relate to transactions that were awarded to other competitors, the Government would appear to have either made a mistake in identifying these transactions or intended to rely on conduct of a different nature to support its charges. Defense counsel will need additional details on these transactions to adequately prepare a defense, particularly if the government intends to introduce new theories of harm for fraudulent conduct beyond those identified in the Indictment.

### III.    Additional Motions

Mr. Calderon also joins any and all other motions brought by his co-defendants. Finally, to the extent that the Government provides further discovery, Mr. Calderon reserves the right to supplement his Motion for a Bill of Particulars, to bring additional pre-trial motions as deemed necessary by that discovery, and/or to preclude introduction of those materials or information at trial.

### Conclusion

For the reasons set forth above, this Court should grant Mr. Calderon's Motion for disclosure of specific Brady materials to enter an Order requiring the Government to search for and disclose additional arguably exculpatory material in the possession, custody or control of the USDA. This Court should also exercise its discretion to grant Mr. Calderon's Motion for a bill of particulars to require the Government to provide sufficient particularity on the nature of the charges pending against him to effectively prepare his defense.


Respectfully submitted,


/s/_____
Douglas M. Tween
Linklaters LLP
1345 Avenue of the Americas
New York, NY 10105
(212) 903-9072
douglas.tween@linklaters.com

Attorney for Defendant Pablo Calderon

## CERTIFICATE OF SERVICE

I, Douglas M. Tween, counsel for defendant Pablo Calderon, hereby certify that on

February 26, 2016, I caused a true and correct copy of the foregoing Memorandum in

Support of Motion for Disclosure of Specific Brady Material and for Bill of Particulars to be

served by the court's electronic filing system upon:

Michael S. McGarry
U.S. Attorney's Office – NH
157 Church Street
New Haven, CT 06510
(203) 821-3751
michael.mcgarry@usdoj.gov

John H. Durham
U.S. Attorney's Office – NH
157 Church Street
New Haven, CT 06510
(203) 821-3751
john.durham@usdoj.gov

Elizabeth Latif
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103
(860) 275 0166
elatif@daypitney.com

William McSwain
*Admitted Pro Hac Vice*
Drinker Biddle & Reath LLP
One Logan Square, Ste. 200
Philadelphia PA 19103
(215) 988-2775
william.mcswain@dbr.com

James T. Cowdery
Cowdery Ecker & Murphy
280 Trumbull St # 22
Hartford, CT 06103
(860) 278-5555
cowdery@cowderymurphy.com

Ann C. Flannery
*Admitted Pro Hac Vice*
Law Offices of Ann C. Flannery, LLC
1835 Market Street, Suite 2700
Philadelphia, PA 19103
(215) 636-9002
acf@annflannerylaw.com

/s/_____

Douglas M. Tween
Linklaters LLP
1345 Avenue of the Americas
New York, NY 10105
(212) 903-9072
douglas.tween@linklaters.com