1          UNITED STATES DISTRICT COURT

2             DISTRICT OF CONNECTICUT

3    _____
     United States of America    )April 11, 2016
4              Government    )2:00 p.m.
     v.                           )
5    Brett C. Lillemoe, et al    )3:15cr25(JCH)
                 Defendants.  )
6    _____)

7
                              141 Church Street
8                              New Haven, Connecticut

9              HEARING

10

11
     B E F O R E:
12             THE HONORABLE JANET C. HALL, U.S.D.J.

13   A P P E A R A N C E S:

14
     For The Government  :
15                         Michael S. McGarry
                           John H. Durham.
16                         U.S. Attorney's Office
                           157 Church St., 23rd floor
17                         New Haven, CT 06510

18
     For the Defendant
19   Brett C. Lillemoe    William M. McSwain
                          Drinker, Biddle & Reath
20                        One Logan Square
                          Suite 2000
21                        Philadelphia, PA 19103-6996

22
                          -- continued --
23

24

25

```
 1   Pablo Calderon            Douglas Michael Tween
                               John Eichin
 2                             Linklaters LLP
                               1345 Avenue of the Americas
 3                             New York, NY 10105

 4   Sarah Zirbes             Ann C. Flannery
                               Law Offices of Ann C. Flannery, LLC
 5                             1835 Market Street
                               Suite 2700
 6                             Philadelphia, PA  19103

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1           THE COURT:  Good afternoon to you.  We're here this

 2   afternoon in the matter of United States of America versus

 3   Brett Lillemoe, et al.  3:15cr25.  If I can have appearances

 4   please.

 5           MR. MCGARRY:  Good afternoon, your Honor, Mike

 6   McGarry from the U.S. Attorney's Office for the United States

 7   of America.  With me today at counsel table is Assistant

 8   United States Attorney John Durham and Special Agents Steve

 9   West.  Mr. West from the FBI and Michael Renahan from the

10   IRS.

11           THE COURT:  All right.  Good afternoon to all of

12   you.

13           MR. MCSWAIN:  Bill McSwain for Mr. Lillemoe who is

14   seated behind me.

15           THE COURT:  Good afternoon to both of you.

16           MR. TWEEN:  Douglas Tween on behalf of defendant

17   Pablo Caldaron.  Also in the room from my firm is John

18   Eichin.

19           MS. FLANNERY:  Good afternoon.  Ann Flannery for

20   Sarah Zirbes.  Ms. Zirbes, as your Honor may recall, is on a

21   previously scheduled trip that your Honor approved so her

22   absence is not due to lack of any interest in the case.

23   She'll be anxious to be here.

24           THE COURT:  Good afternoon to you.  We have quite a

25   bit to cover this afternoon.  I spent quite a bit of time
```

1    reading a lot of material.  I have a number of matters on my

2    mind I guess about what I have read.  So to the extent

3    counsel is able to, I would very much appreciate it if you

4    would attempt to respond to my question.  If you feel that,

5    you know, I'm not asking the right question which is very

6    possible or that you need to explain your answer to my

7    question, you can ask me for the opportunity to do all of

8    those things, but I certainly would appreciate an answer to

9    my question.

10           I'm going to start -- well, before I start, I was

11   going to start with the government to be certain that I

12   understood the status of matters.  But before I begin, I have

13   learned painfully that I often come out and launch into what

14   I spent days preparing, only to have some lawyer meekly stand

15   up and report the government withdrew the charges, the

16   defendant decided to plea, all of the motions are moot, pick

17   one of those things.  Therefore, I didn't have to say

18   anything.  I will ask if anyone wants to say anything at an

19   earth shattering level before I begin my specific questions

20   before me.  I don't see anybody moving so I will begin.

21           I like to start with the government, Attorney

22   McGarry or Attorney Durham, who is going to handle answering

23   my questions or will it matter?  This is a general question

24   about the motions.  Mr. Lillemoe's counsel suggests it is not

25   clear -- this is in their reply -- that you have actually

1    disclosed all of the documents you received from the USDA

2    disclosed them to the defense.  Am I correct in drawing the

3    conclusion that you have indeed disclosed all the documents

4    you received from the U.S. Department of Agriculture?

5              MR. MCGARRY:  Yes.

6              THE COURT:  And I guess my question is did you do so

7    by the deadline set by my order?

8              MR. MCGARRY:  I believe there was a week or so which

9    we were still trying to process them through our system so

10   when you say your deadline, my hesitancy in just saying yes

11   or no, I'm not sure if we touched base with the Court or the

12   court staff to let you know we were running about a week or

13   so behind, but it was either by the deadline or within a week

14   or so after the deadline that we produced everything.

15             THE COURT:  I don't have my hand or the memo open to

16   the page, but I have a pretty strong recollection that some

17   defendant represented that six figures of documents were

18   produced a week, if not two weeks after the deadline.  Would

19   that be a misimpression that I got?

20             MR. MCGARRY:  I didn't count the documents.  I know

21   the process was to take them and receive them from the USDA.

22   They came in batches of things that are referred to I think

23   sometimes as tifs, sometimes as PDFs.  Our paralegal and our

24   IT staff would process them.  I know they had to split them

25   up.  That kind of crashed our system a couple of times

1  because of the volume so there was a large volume.

2         I'm not disputing that and then they were encrypted

3  under the new Department of Justice encryption rules that

4  discovery needs to be encrypted.  That delayed the process.

5  It may have been a week or two after your initial February 1

6  date.  I'm not quibbling with that.

7         And then they were put on what is I'm told is a

8  cloud process where the defendants are able to access it.  I

9  think it is called something USA where they are able to

10 download it from a cloud server.

11        So it may have been a week or so afterwards, but it

12 was not from any lack of effort from the people in our

13 office, and it was not because of the USDA.  They got us the

14 stuff, then we tried to process as quickly as we could.

15        THE COURT:  Do I take it you have no idea how many

16 documents were produced after the court-ordered deadline?

17        MR. MCGARRY:  Correct.

18        THE COURT:  No idea.  Could have been two documents

19 or could have been 200,000 to your knowledge?

20        MR. MCGARRY:  I could find out if you would like me

21 to contact our IT department.  When you use the word

22 document, IT people and paralegals have different definition

23 of the documents.  Mr. Bonner's staff may have put them all

24 together.  That might be considered a document.  You and I

25 might consider a two-page letter to be a document.  The IT

1    staff might consider it a document the way that it was

2    scanned and uploaded so.

3           THE COURT:  Did you represent to the defendants or

4    me at some point that you were going to review the documents

5    from the USDA?

6           MR. MCGARRY:  I think you asked were they going to

7    come to our office for a stop in our office for I forget

8    exactly the verb.  I said they would come through our office

9    and our office processed them, yes.

10          THE COURT:  So your office processed them, but no

11   one looked at what they were?

12          MR. MCGARRY:  Our paralegals with us looking over

13   their shoulder of them, went through them on the screen.  We

14   did not print them out and go through page by page as one

15   might do a close document search of looking at every single

16   page.

17          THE COURT:  I guess I need you and this is an

18   open-ended question to explain to me why so many documents

19   were produced that were redacted.

20          MR. MCGARRY:  The USDA produced us redacted versions

21   of the documents.  They felt -- their attorneys made the

22   decision that there were certain things that were privileged

23   and that there were certain documents that had either trade

24   secrets, commercial information, permanent identifying

25   information in them that they felt when they started the

1    process that it was incumbent upon them to produce them to us

2    in redacted form.  We also told them that we were talking to

3    the -- part of that because there's a civil lawsuit as well.

4    And we told them we were working with counsel in

5    explaining as Mr. McSwain indicated, he would work with us to

6    get a protective order.  They were concerned about that.  And

7    so they first produced to us, they produced to us in essence

8    over the period of time, two tranches, I don't know if that's

9    the right word.  Two groups, here's a redacted version and

10   secondly, here is coming an unredacted version of what you

11   are getting.  Our first production was the redacted

12   version.

13           THE COURT:  The out-of-time late production was

14   redacted even though you were well into developing and

15   signing a protective order?  Do you have any idea what kind

16   of waste of time that was generated by your production of

17   redacted documents which I gather now have all been produced

18   in unredacted form or am I wrong about that?

19           MR. MCGARRY:  They have all been produced in

20   unredacted form.

21           THE COURT:  Why wasn't that done in the beginning?

22           MR. MCGARRY:  We didn't have the protective order in

23   place.  Our understanding with the USDA counsel until we had

24   a firm agreement in place, it was going to be under a

25   protective order.

1          THE COURT:  Maybe in the motion you should have

2    filed asking me for more time because you were late in

3    producing documents, you could have included that explanation

4    and asked for further time until the protective order was

5    signed.

6          MR. MCGARRY:  I could have done that.  What I put in

7    a letter to counsel is that we're acting under the good faith

8    assumption that there's going to be a protective order.  We

9    were quibbling or negotiating words, paragraphs, expressions.

10   But everyone was in general agreement on the principle.

11         THE COURT:  Your statement we're acting under the

12   good faith presumption we'll have a protective order is

13   nonsensical because you then produced documents as if you

14   didn't have a protective order.

15         MR. MCGARRY:  I don't know if that's accurate.  I

16   think at that point we started rolling out the unredacted

17   ones as well.

18         THE COURT:  Well, then you really produced late

19   because their memos came in February 26, they are attaching

20   all kind of redacted documents.  I presume they did not have

21   in their hand unredacted at that time.  Am I wrong in that

22   presumption?

23         MR. MCGARRY:  I think before they filed the motions,

24   they had the unredacted ones uploaded to the cloud at lease

25   the process would have begun.

```
1              THE COURT:  What would the date have been?  In other
2    words, the day before their memos were due.
3              MR. MCGARRY:  I don't have the answer to that
4    question, your Honor.  To some extent --
5              THE COURT:  The next time you violate one of my
6    orders on a deadline, there will be a sanction, number one.
7    You can make a motion to extend the time.  I'm here.  I will
8    act on it.  But if you are not going to comply by the
9    deadline, there will be a sanction.  Number two, I have
10   forget number two --
11             MR. MCGARRY:  If I may on number one, again I think
12   to some extent the issue is moot because we produced all of
13   the documents.
14             THE COURT:  Of course it's moot.  I got a memo like
15   this.  90 percent of it has to do with redaction of
16   documents.
17             MR. MCGARRY:  I believe we had spoken with or
18   emailed chambers.  If my recollection is incorrect, I
19   apologize.  I think we said, Look, we're moving forward
20   towards getting the protective order.  I don't think we're
21   going to make the deadline, and I think we had informed the
22   Court.  Perhaps I agree with you we could have made a motion
23   to extend the deadline, but it is my recollection that we
24   alerted your staff that the February 1 deadline which I think
25   Mr. Bonner at some point said he was hopeful.  The whole
```

1    process with the encrypting, with the breaking up of the

2    documents with the system as I explained it to you, I believe

3    that I did inform the parties and the Court that we were

4    probably not going to make a deadline.

5         I apologize if you think I should have made a formal

6    motion to extend the deadline, but given the fact that we're

7    looking at trial in October and that everyone in our office

8    was working hard to get the documents, it didn't seem that I

9    needed to trouble the Court with asking you to rule on a

10   formal motion to extend the deadline of a week or so when

11   everyone was working towards that deadline and counsel well

12   knew about it.  Defense counsel.  So I apologize.

13        THE COURT:  Well, maybe I owe you an apology, if you

14   did all of these things which I'm sure you did, Attorney

15   McGarry, but that's not the way to do it.

16        From now on this case you communicate with me, not

17   with chambers, not with Bernadette, not my law clerk.  You

18   communicate by a motion.  It's not a very lengthy motion.  It

19   could have easily been done.  You are not burdening me.  I'm

20   not dealing with the 200,000 documents.  I'm not sitting

21   there looking at those and trying to upload them to the

22   cloud. I'm sitting here with nothing else to do.  I'm happy

23   to look at a two-page motion to extend.  Then I have a record

24   on the docket.  I know.  Why did I extend that.  Why didn't

25   they get that done on time.  I will go read it and it will

Case 3:15-cr-00025-JCH   Document 107   Filed 04/20/16   Page 12 of 144

12

```
1    tell me and I will refresh my memory.  Now, to refresh my
2    memory, well, Caleb wasn't the law clerk.  I have to find the
3    law clerk who was the law check at the time or talk to Bern
4    or maybe Diahann.  What happened?  Did somebody call.  Now I
5    remember.  Why would I want to do that?  I would rather have
6    a motion on the CMECF, then I can look and refresh myself.
7    Then I'll know I was mistaken because I didn't remember.
8    Okay?
9              MR. MCGARRY:  Fair enough.
10             THE COURT:  I will start with Attorney McSwain on
11   your motion.  Mr. Lillemoe's motion I should say.  Am I
12   correct that now that they -- if you agree I guess.  I guess
13   I should ask you that first.  Do you have any reason to think
14   they have not disclosed all of the documents they
15   received from the USDA in response to the request they put to
16   the USDA which was responding in part to your request?
17             MR. MCSWAIN:  I think there were two issues that
18   remain that weren't moot that we want to have addressed
19   today.
20             You addressed both of them.  One is that the
21   government has said on the record they have reviewed and
22   produced all the material that they received from the USDA
23   and presumably reviewed that material for Brady material as
24   well.
25             Secondly, I heard Mr. McGarry also say they have now
```

produced unredacted versions of all previously redacted

documents so the two issues in our motion are resolved for

purposes of the record.  I don't mean to belabor this too

much.

        I think it is important to clarify the record and

dates and the like laid out in the motion.  The original

deadline was February 1.  The government did make a

production during that week of February 1 when we were still

working on the protective order but the vast majority came on

February 18.  18 days after the original deadline.  Those

materials produced on the 18th also replete with redactions.

        THE COURT:  When was the protective order motion

made?

        MR. MCSWAIN:  February 12.  The motion was filed on

February 12, your Honor.

        THE COURT:  When did I sign it?

        MR. MCSWAIN:  February 16.  When we received the

documents on February 18, the majority on the 18th they had

redactions.  We filed our motion on February 26.  We did not

receive unredacted version until we filed our motion after

February 26.

        THE COURT:  You made two statements about two issues

remaining which you think have been resolved.  I agree

entirely.  I heard Attorney McGarry say they produced -- I

heard the second thing clearly.  I heard part of the first

1    but not what you read.  I don't believe he said what you said

2    as to the first.  I understood clearly that all documents

3    produced by the USDA to the government have been produced to

4    you in unredacted form.  That's clear from Attorney McGarry.

5    He's not standing up to correct me.

6              However, with respect to reviewed all the documents,

7    I don't know that he said he reviewed them all.  I don't

8    think he did, in the sense that I would call review where I

9    sit down and read every page.

10             Second, you said as part of that first issue, he

11   reviewed them for Brady.  I don't believe he has reviewed

12   them for Brady because he hasn't reviewed them so how can he

13   review them for Brady if he hasn't review them.  And I think

14   his answer, I think the answer you're wanting him to say that

15   and his refusal to say it is that he doesn't need to review

16   it for Brady.  If he produced everything, what's the point of

17   him reviewing it for Brady.

18             MR. MCSWAIN:  Point well taken.

19             THE COURT:  So the second thing I wanted to raise to

20   the extent I thought most of your motion was moot.  I think

21   there's other aspects of Some of the other motions which I'm

22   sure you would join in that aren't, but as far as my question

23   to you on your original motion are moot.

24             There's one thing, though, in your reply that I

25   wanted to the address.  I will address it with the

1    government, page 7 of your reply.  You reply to the

2    government's opposition you make the statement that "the

3    government has not voiced any objection" to your proposal,

4    meaning Lillemoe's proposal, to seek the materials by

5    subpoena which I see that you are seeking to do.  You wrote

6    "you interpret the government's silence on this point coupled

7    with their suggestion defendants pursue subpoenas" as a

8    commitment not to oppose such a motion.  I will get that on

9    the record at some point this afternoon as to their position

10   with your motion for subpoenas.  I would suggest that when

11   they suggest you can pursue subpoenas, that's probably a

12   suggestion that they would not in principle oppose it.

13   That's a reasonable inference for you to draw.

14           However, I would like to suggest that silence should

15   not be a basis for any inference to draw that the government

16   agrees nor should it be used against you.  The government

17   shouldn't take your silence as confirming your agreement with

18   something they say.

19           I have painful memories of litigants on the opposite

20   side of me as a litigator writing five and seven and ten page

21   long single-space letters to me this is happening, this

22   happened, you didn't do this and you didn't do that so I'm

23   going to go jump off a bridge and you are going to pay me a

24   million dollars for that.  Later in court saying she agreed

25   to pay me a million dollars because I jumped off the bridge.

1          I didn't answer the letter because I could spend my

2    whole life answering letters from lawyers like that.  I don't

3    know whether the government views your letter or your

4    suggestion that way or how they view it, but I think that if

5    you want someone to agree with you on something, will you not

6    oppose my motion, you should point blank put that question,

7    then I would say to the government I would expect that there

8    will be even in a long drawn out litigation like what I

9    expect this is going to be, communication has to go both

10   ways.  If you ask the defendants a question, I presume you

11   expect an answer.  If they ask you a question, I presume you

12   will expect an answer.  I don't think whether it is -- if the

13   proposal was in your original motion papers and they in their

14   opposition didn't say anything about it, that might be a

15   closer question inferring they agree.  Because of my very

16   long time ago experience as a litigator, I don't like that

17   idea that silence equals agreement.  I don't think it does.

18        MR. MCSWAIN:  Understood.  I think it is relevant

19   that in their reply papers, the issues came up.  They have

20   encouraged us to go the subpoena route.  It is a point well

21   taken.

22        THE COURT:  If they encouraged you, it is reasonable

23   in your motion you could have said when this was raised in

24   our briefing, the government didn't express any opposition,

25   but you don't know their position.  Thank you.

1           Then I guess I have some questions for Attorney

2    Tween, Mr. Caldaron's I will call it Brady motion if I could.

3    In your reply to the government's opposition at pages 2 and

4    3, you argue that the Department of Agriculture and FAS work

5    "hand in -- not the Department of Agriculture.  The U.S.

6    Attorney's Office and FAS at Agriculture work "hand in hand"

7    that the investigation begin at FAS and they worked closely

8    together during a five-year investigation.  What would be the

9    basis for that statement, sir?

10          MR. TWEEN:  Quite a lot of the discovery produced

11   that we have obtained in this case gives that indication.

12   For one can example which I think that I think is pretty

13   dramatic and pretty stark that we put into our papers, the

14   government has conceded that Agent Kathy Redmond who is a

15   special agent with the USDA OIG is part of the prosecution

16   team.  But they have drawn the line there and they have

17   basically taken the position that no one else at the USDA is

18   a member of the prosecution team.  I think is what we're

19   seeing is that clearly the prosecution team goes far beyond

20   that.

21          One example which is really dramatic to my way of

22   thinking are there are 81 memos written by Ms. Redmond of her

23   conversations with either Mr. Rowse or Mr. Doster to the key

24   people involved in the program at the USDA.  Not just the raw

25   number which is far beyond what an agent does when they are

1    interviewing witnesses or potential witnesses.  I have seen

2    302s for 2, 3, 4, 5, 10 witness interviews, but I think just

3    numerically 84 suggest really far more than that and

4    working --

5              THE COURT:  What does it suggest?  It suggest

6    there's a lot of emails.  It suggests this investigator

7    contacted a lot of people, but I don't know why it suggests a

8    joint investigation in the sense of Brady.

9              MR. TWEEN:  I think it suggests Mr. Doster and

10   Mr. Rowse, for instance, were clearly members of the

11   prosecution team.  The fact that they are working hand in

12   hand with agent Redmond and have 84 documented conversations,

13   not to mention scores and scores of emails between them

14   really shaping, steering, and guiding the government

15   investigation in a way that suggests that they were integral

16   members of the prosecution team.

17             THE COURT:  Timewise when did these emails occur in

18   relationship to when the U.S. Attorney's office came on the

19   stage?

20             MR. TWEEN:  I can't say when exactly the U.S.

21   Attorney's Office became involved, but I know that these

22   communications started in 2010 and run all the way through to

23   2015 so really to my knowledge the entire period of the

24   investigation.

25             THE COURT:  Doster and Rowse are in the FAS part of

1  agriculture?

2          MR. TWEEN:  Yes.

3          THE COURT:  Doster and Rowse is telling the OIG how

4  to do their investigation that sounds rather odd to me.  I

5  though the nature of OIG, they were supposed to be

6  independent of the department and its peoples and they were

7  supposed to conduct investigations. It sounds rather odd to

8  have the target of the investigation be directing the

9  Inspector General.

10         MR. TWEEN:  But very much I think that's what was

11 happening, your Honor, from the very beginning.  What's most

12 revealing is the details of these conversations, these

13 emails.  There's one email for instance that's appended

14 somewhere and I will find it.  This is one of the emails that

15 was originally redacted and the redaction fight was over, but

16 it is an email among three or four people inside of FAS

17 essentially trying to come up with some jurisdiction to say

18 that my client and the co-defendants were somehow violating

19 this GSM102 program and at the end of the day, Mr. Bonner who

20 is the general counsel of the agency, someone who we had on

21 phone here, essentially writes, I'm paraphrasing, look, I see

22 what they are doing, I have scoured the regs and maybe this

23 is something for you to reconsider the next time you rewrite

24 the program regs.  I can't find anything they are doing

25 that's violating the program.  It just shows that there's --

1          THE COURT:  What does that have to do with the joint

2    investigation?  Did I miss the connection there?  I saw the

3    email.  I don't know why that tells me that the person in OIG

4    was doing a joint investigation on one hand with two people

5    in FAS and with the U.S. Attorney on the other hand, I don't

6    know what that supports that agreement.

7          MR. TWEEN:  I think a couple of things.  It will

8    show that the agency to a great degree sort of steered the

9    investigation towards our clients and away from anyone else.

10   I think there are reasons that will come out later as to why

11   the agency may have been incentivized to do that including

12   reasons that sort of --

13         THE COURT:  You say that FAS steered the

14   investigation to your clients.  I quickly reviewed your memo

15   and your reply because I thought I had forgotten something.

16   I don't see a whole lot in there about joint investigation.

17   I saw the reference to the 81 memos or emails, but I don't

18   see shaping, steering, guiding, steering arguments in there.

19   I don't see -- all I know is right now, hopefully I will know

20   a lot more in a few minutes from the government, but all I

21   know is there's an officer of Inspector General in the

22   Department of Agriculture which I understand to be generally

23   an independent part of the department and that someone in

24   that office undertook an investigation.  Whether it was

25   referred by FAS or not, I don't know that, but that's fine.

1    That doesn't mean they are steering it.  They could say,

2    look, we think these people are doing something wrong.   It

3    is up to OIG to conduct the investigation.

4         From that point forward, I don't see anything that

5    shows me FAS was conducting an investigation at the time that

6    the U.S. Attorney's Office was involved.  If I'm missing it,

7    you need to point it out to me.

8         MR. TWEEN:  For instance, there was in 2009 or 2010,

9    there was a visit to my client's home by FAS purportedly as

10   an audit, except rather than auditing select transactions

11   that had always been their practice in the past, they took

12   every transaction, every piece of paper for the year 2009.

13        MR. DURHAM:  Could the Court inquire if counsel is

14   representing that's some kind of criminal investigation?

15   That would seem to be very distinct and odd if it's done

16   routinely opposed to the criminal investigation.

17        THE COURT:  I think he's suggesting it isn't

18   routine.  If you let me try to carry the ball here, I heard

19   2009.  My understanding is the government is not involved at

20   this point. The government being the U.S. Attorney but I need

21   to establish those things with you or 2010 I guess.  We'll

22   find out.

23        When in 2010, sir, so I can ask the government when

24   they started and again the record should reflect when I say

25   "government," I mean the U.S. Attorney's Office for the

```
 1   District of Connecticut.
 2          MR. TWEEN:  So the audit was in March of 2010 and to
 3   my knowledge, the memos documenting conversations between
 4   Special Agent Redmond and Mr. Doster and Mr. Rowse begin two,
 5   three, four months before that in January.
 6          THE COURT:  Do you know did you receive discovery or
 7   I will ask the government if it was confidential, when did
 8   this investigation start at Agriculture?  Obviously it
 9   started at Agriculture.  That's not usual.  It had to start.
10   Why did it start?  Who started it?  Was it a random rock that
11   OIG started to lift up and look under?  Or was it FAS thought
12   there were issues and they referred it to OIG.  That's
13   perfectly reasonable.  Doesn't make FAS run the
14   investigation.  If you can tell me, if you know, otherwise I
15   will ask the government about it.
16          MR. TWEEN:  I think you should ask the government
17   that question because I don't know that we have perfect
18   visibility.
19          THE COURT:  That's fine.  Let me turn to the
20   government.  Obviously I'm starting with what I review as the
21   joint investigation issue because if there's no joint
22   investigation, I think unless anybody wants to disagree with
23   me, then the Brady issue is a different issue.  But I don't
24   know yet if there's a joint investigation here because I
25   don't know enough about it.  I need somebody from the
```

1  government's side to make various representations to me so I

2  can come to a conclusion about whether there's a joint

3  investigation.

4          So on page 7 of your opposition, the U.S. Attorney's

5  Office represents in Note 4 that the U.S. Attorney's Office

6  has been working with agents of the FBI, the IRS CID, and the

7  USDA Inspector General's Office.  My question is when did

8  your work with any of those entities begin?

9          MR. DURHAM:  Your Honor, with respect to the

10  chronology I don't want to make a mistake or make any

11  misrepresentation to the Court, but it was well after the

12  audit had been done.  I believe and I will go back to check

13  to make certain we're not providing -- unintentionally

14  providing any misinformation to the court.  I believe it was

15  sometime around March of 2011 that the FBI started to I think

16  became involved in this and then they would come to the

17  United States Attorney's Office.

18          THE COURT:  How is it that we're in Connecticut?

19  Remind me of that.  One of the defendants is in Connecticut?

20          MR. DURHAM:  Yes, Mr. Caldaron is in Connecticut.

21          THE COURT:  Do you remember when the first contact

22  of the FBI to the U.S. Attorney's Office was?

23          MR. DURHAM:  We would have to check our records but

24  it would have been in 2011.

25          THE COURT:  Do you know when the audit was done?  I

1    assume it is an audit done by OIG or the Department of

2    Agriculture or an FAS audit.

3            MR. DURHAM:  I believe it was FAS audit was done

4    prior to that time.

5            THE COURT:  Was it a routine audit?

6            MR. DURHAM:  I believe that's the case, yes, your

7    Honor.  I think there was something that triggered it.  I

8    think that in connection with their business they had an

9    extraordinarily high percentage of monies that were turned

10   back.  There were cancellation fees.  They were inordinately

11   large.  Somewhere in the neighborhood of 4.5 million dollars.

12   I believe that's what's triggered it.

13           THE COURT:  Why is there a cancellation fee?

14           MR. DURHAM:  They had gotten the guarantees, then

15   they essentially weren't able to carry it through so they had

16   to pay cancellation fees.

17           THE COURT:  Do you know when the FAS audit began?

18   Is March 2010, correct?

19           MR. DURHAM:  I'm not certain.  I know it occurred a

20   long time prior to when we opened our case.  One moment.

21   Special Agent West best recollection was sometime around

22   February, March, 2010, your Honor.

23           THE COURT:  And when the FAS conducted its audit in

24   February or March of 2010, was the OIG at the Department of

25   Agriculture involved?

1          MR. DURHAM:  My recollection is they were not

2     involved.  That's consistent with Special Agent West's

3     recollection.  It was an administrative audit being done.  To

4     our knowledge, OIG was not involved at that time.

5          THE COURT:  Who ran the audit at FAS?  These two

6     people whose names I have heard mentioned?

7          MR. DURHAM:  Mr. Royce and Mr. Doster they would

8     have been auditors.

9          THE COURT:  Auditors from the FAS?

10         MR. DURHAM:  Yes.

11         THE COURT:  How did OIG get involved and when?

12         MR. DURHAM:  The FAS auditors made a referral to

13     OIG.  I will have to get the date for your Honor when that

14     occurred.

15         THE COURT:  The auditors at FAS made a referral to

16     OIG?

17         MR. DURHAM:  Yes.

18         THE COURT:  They made some sort of report or

19     finding?

20         MR. DURHAM:  That may very well be in the discovery.

21     I'm not aware of it.  It may be in discovery we provided to

22     counsel.

23         THE COURT:  My understanding is and correct me if

24     I'm wrong, that you have been treating the OIG people

25     involved as part of the investigation team for Brady

1    purposes, so whatever is in the offices of the OIG and the

2    Department of Agriculture, files sent over to them in

3    connection with the audit report and referral and things of

4    that nature, those would be reviewed for Brady and disclosed

5    as you find them.

6            MR. DURHAM:  There's an OIG case agent he was

7    referred to previously Agent Redmond.  That's who we have

8    been dealing with.  Special Agent Redmond is a certain part

9    of the prosecution team, yes.

10           THE COURT:  But I had a second part to my question.

11   If she's part of your prosecution team, presumably I will

12   start with her files, but I would also include the office's

13   files, have been reviewed for Brady material and Brady

14   material has been produced; is that correct?

15           MR. DURHAM:  Yes, your Honor.  Special Agent Redmond

16   all of her files.  She's produced materials to us.  Those

17   materials have been produced to the defense.

18           THE COURT:  So I'm clear, when you say Special Agent

19   Redmond has reviewed her files and produced it just like you

20   reviewed your files and Attorney McGarry views his files and

21   the special agent of the FBI reviews his files, it would

22   include anything in your office, the FBI office or her

23   office.  Would you agree with me?

24           MR. DURHAM:  Yes.

25           THE COURT:  If the boss had a file and had

1    materials that were unique, not in your file, those would be

2    reviewed and if Brady or otherwise discoverable would be

3    produced, right?

4           MR. DURHAM:  Special Agent Redmond is a one-person

5    office in New Hampshire so whatever files there are have been

6    reviewed and produced for any Brady that's there.

7           THE COURT:  She's the OIG person?

8           MR. DURHAM:  She's the OIG person.

9           THE COURT:  She does report to somebody in

10   Washington presumably.

11          MR. DURHAM:  I would think so.  I report to somebody

12   in Washington ultimately.

13          THE COURT:  You are not in a one person office.  You

14   report to somebody across the corridor here.

15          MR. DURHAM:  Yes.

16          THE COURT:  I don't know.  I'm not making your Brady

17   decisions for you, but I would think that you want to be sure

18   there's nothing else in her office, meaning the office of OIG

19   that isn't Brady, that she doesn't have in her own files.

20          MR. DURHAM:  I believe that happened.  To be certain

21   we'll double check to make absolutely certain.

22          THE COURT:  Once the U.S. Attorneys Office for the

23   District of Connecticut became involved sometime in 2011, who

24   in that office was responsible for this possible prosecution

25   at the time?

1      MR. DURHAM:  In the U.S. Attorney's Office, Attorney

2   McGarry was running the investigation.  I joined at a later

3   point in time.

4      MR. DURHAM:  For a short period of time, Assistant

5   United States Attorney Kaplan was involved.  He's no longer

6   involved.

7      THE COURT:  I want to ask that from the time the

8   matter became a matter in the U.S. Attorney's office which I

9   assume that led to pre-grand jury, then grand jury

10  investigation and then return of indictment over what sounds

11  like a couple of years, right?  That was a while, four years.

12     MR. DURHAM:  Yes.

13     THE COURT:  That in connection with any activities

14  of the U.S. Attorney's Office that were part of or steps

15  precedent to and leading up to the return of the Indictment,

16  any investigation undertaken by the U.S. Attorney's Office

17  was anyone from FAS involved in that investigation?

18     MR. DURHAM:  Other than as witnesses, no, your

19  Honor.

20     THE COURT:  This agent, now Special Agent Redmond,

21  she's assisted you; is that correct?

22     MR. DURHAM:  That's correct.

23     THE COURT:  But no one from FAS contributed to,

24  participated in, directed, steered, suggested how to

25  investigate this case was part of the investigation.  None of

```
 1    those statements are correct statements to this case?

 2              MR. DURHAM:  That would be correct, your Honor.

 3              THE COURT:  So unlike in Gutpa, for example, the

 4    case in the Southern District went to the Circuit but in the

 5    Southern District opinion talk about joint investigation,

 6    there weren't interviews conducted by FAS and Attorney

 7    McGarry?

 8              MR. DURHAM:  That's correct.

 9              THE COURT:  Or an FBI agent and an FAS employee?

10              MR. DURHAM:  That's correct.

11              THE COURT:  Were there interviews done -- from the

12    time the FBI was involved, were there interviews done by FAS

13    that were shared with the U.S. Attorney or the FBI?

14              MR. DURHAM:  Not where they would be acting as our

15    agents.

16              THE COURT:  I don't know what that means.

17              MR. DURHAM:  There are no instances in which we

18    asked FAS folks to do an interview for us.  Nothing of that

19    sort occurred.

20              THE COURT:  Just a moment please.  Just one more

21    question I thought of.

22              MR. DURHAM:  I have one thing that I want to clarify

23    the record.  At some point in time, the Defendant Lillemoe on

24    his own went down to talk to FAS folks.  I think it was

25    Mr. Rowse.  At that point I think there was an FAS or
```

```
 1   Department of Agriculture lawyer who sat in on that.  I'm not
 2   sure if that falls in any of the categories your Honor is
 3   interested in or not.
 4          THE COURT:  It wasn't part of any ongoing
 5   investigation by FAS at the time?
 6          MR. DURHAM:  That's correct.
 7          THE COURT:  Was there an ongoing FAS investigation
 8   after they set it to OIG and they in turn sent it to FBI.
 9          MR. DURHAM:  Not that I'm aware of.  My recollection
10   is that Mr. Lillemoe went because he wanted to discuss with
11   the FAS people his program and his business and moving
12   forward, but that was not part of the investigation.
13          THE COURT:  I'm sure I will hear from the
14   defendants, but let me continue to finish this up with you.
15   So the essence of what I have heard is that as part of an
16   audit of defendant's companies or company, the FAS audit
17   report raised some red flags I will call them.  As a result
18   of that, a referral was made from the FAS over to the OIG to
19   further investigate the matter.  At that the point FAS was
20   now a source of information perhaps.  Its people would get
21   interviewed but it was not conducting an investigation any
22   further past the audit and the recommendation to OIG.  Is
23   that a fair statement?
24          MR. DURHAM:  That's correct, yes.
25          THE COURT:  OIG picked the ball up, conducted an
```

1    investigation through the person of Special Agent Redmond.

2         MR. DURHAM:  Yes, your Honor.

3         THE COURT:  Anyone else in OIG involved in the

4    investigation?

5         MR. DURHAM:  As your Honor said, she has the a

6    superior and so forth but the person that we have dealt with

7    is Special Agent Redmond.

8         THE COURT:  Presumably as a result of her

9    investigation she then made a referral to the FBI because of

10   the finding she came up with.  Is that a fair statement?

11        MR. DURHAM:  I think initially referred to the IRS

12   and then the IRS was working with the FBI.

13        THE COURT:  Then they come -- at this point her

14   investigation was completed at lease for the time being.  She

15   then gets recruited to your team as the special agent.

16        MR. DURHAM:  I think she has jurisdiction in her

17   capacity.  She's an 1811 employee I believe.  So she's been

18   working jointly with the IRS and the FBI.

19        THE COURT:  She worked with the agent.

20        MR. DURHAM:  Yes, your Honor.

21        THE COURT:  But at that point it wasn't the OIG's

22   investigation.  It had become the FBI's investigation to

23   which she was in effect detailed or whatever the right word

24   is.

25        MR. DURHAM:  I don't know how they keep that on

1    their books.  The FBI is running the investigation.

2           THE COURT:  At some point the FBI came to whatever

3    conclusion it comes to that causes it to pick up the phone

4    and call the U.S. Attorney's Office.  Is that correct?

5           MR. DURHAM:  That's correct.  As your Honor knows

6    they're looking for records and so forth and so on at some

7    point they come for grand jury subpoenas for records and

8    that's how this came in the normal course.

9           MR. TWEEN:  I have two follow-up questions along the

10   lines you were asking whether FAS was ever asked to obtain

11   documents from third parties in connection with the

12   investigation.  So FAS has audit power and they have the

13   ability to compel participants in this program to give them

14   assess to all kind of documents.  The question would be

15   whether that happened in connection with this investigation

16   and then my second question would be similar in that it would

17   be did FAS sua sponte come forward with documents or leads or

18   whatever you have to the agent in turn to be brought to the

19   prosecution?  Because I think there's a difference between

20   sort of a witness which is somewhat more passive and responds

21   to questions that it is asked and an investigator who sort of

22   proactively goes out and tries to find evidence of

23   wrongdoing.

24           THE COURT:  I will ask the government to answer the

25   questions.  I'm not sure I'm doing what witnesses do all the

```
 1    time that I tell them not to do.  I'm reading into your
 2    questions.  I'm not sure I buy on to what you are suggesting.
 3    We'll get the answer so the record is complete.  Do you know
 4    if FAS was asked to get documents from third parties using
 5    their audit powers?
 6              MR. DURHAM:  If they did, they did that on their
 7    own.  We obtained our documents by way of subpoena.
 8              THE COURT:  Grand jury subpoena?
 9              MR. DURHAM:  Yes, your Honor.
10              THE COURT:  Do you know if FAS did it on their own
11    in sense came forward sua sponte with materials that it
12    thought would be helpful like the concerned citizen.
13              MR. DURHAM:  I don't know anything related to being
14    a concerned citizen, a whistle blower, maybe documents
15    produced in response to the subpoena or interviewing
16    witnesses and the like which could have been obtained without
17    our knowledge and certainly not at our direction through
18    whatever the third party process is.
19              THE COURT:  Thank you.  I will go back to Attorney
20    Tween on your discovery requests.  In -- I will ask the
21    questions I have.  If I conclude there's not a jointly under
22    taken investigation here, I guess let's hypothetically assume
23    that I concluded that, counsel, that in effect FAS is not
24    part of this investigation as that is used in whatever,
25    Gutpa, I have other cases I looked at. I looked at Martone.
```

1    I looked at a bunch of them.  Upton.  Whatever.  Let's assume

2    I find they are not part of a joint investigation, would you

3    agree with me that to the extent the government agreed to go

4    to the Department of Agriculture to ask for documents for

5    you, that was very nice.  Quote unquote, but they have no

6    obligation under Brady to get any possibly exculpatory

7    material from FAS.

8            MR. TWEEN:  I would unwilling have to say that I

9    agree with that proposition, your Honor.  I think at that

10   point it would be incumbent upon us.

11           THE COURT:  Then try to get.

12           MR. TWEEN: Try to get it through subpoena.

13           THE COURT:  I haven't reached that the conclusion

14   but I wanted to ask.

15           With respect to your specific requests, I was struck

16   and I appreciate your -- I won't call it conceding.  That

17   will probably pain you too much.  I do appreciate when

18   counsel recognizes they don't have a leg to stand on if a

19   question is asked and they acknowledge it.  You just earned

20   some credibility points with me.

21           MR. TWEEN:  I'm sure I will squander them at some

22   point.  I'm glad to have them in the bank now.

23           THE COURT:  Between page 13 and 15 in your memo in

24   support at 13 you say that your requests are "narrowly

25   tailored" and yet in your third and fourth request you seek

1    records "including but not limited to" certain specific

2    communications.  That's page 15.  I used to employ that

3    phrase as a civil litigator, trial lawyer.  I have grown to

4    hate it as a judge dealing with discovery disputes in civil

5    cases.  You can use it in a criminal case, but I don't think

6    you can describe that as narrowly tailored.

7           MR. TWEEN:  As part of that, we're aware of three

8    meetings and we listed the three in order to point the

9    government and FAS to just what we're looking for.  If

10   there's a fourth meeting where the similar, the same thing

11   happened, then we would not want to give up on that but as

12   far as a search goes, I will be satisfied if they searched

13   for those three meetings.

14          THE COURT:  Okay.  You asked for records from '07 to

15   the present showing bills of lading that have a, quote, copy

16   stamp on one hand and also seek documents that have no stamp.

17   I think that's at 14 to 15 of your memo.  How is that -- how

18   are those materials, those documents, material to the case?

19          MR. TWEEN:  Well, your Honor, one of the critical

20   questions, one of the government's primary allegations that

21   they hung so much on is an allegation in certain instances,

22   bills of lading were materially altered by a stamp of copy

23   being covered up and replaced by a stamp that's says

24   original.  I believe if FAS had a practice and a policy of

25   accepting bills of lading for payments as valid that were

1    stamped copy, then that that goes directly to the question of

2    materiality and whether or not the alterations that our

3    clients are alleged to have made, were in fact material or

4    not.  If a bill of lading is valid whether it is stamped or

5    copy or copy or copy nonnegotiable or some other thing valid

6    for purposes of this program no matter what it is, stamped,

7    then I think that calls into question the materiality of the

8    alleged alterations.

9         THE COURT:  On your request number one you ask

10   for -- sorry.  On the same request you make a representation

11   that the U.S. Agriculture, that the U.S. Attorney would only

12   have to review, I suppose FAS would only have to produce 1500

13   pages of documents I think you said relating to 150

14   transactions or something like that.  How do you know that?

15        MR. TWEEN:  It is an estimate of the number of

16   audits that FAS conducted in that period with the average of

17   ten guarantees or ten bills of lading per guaranteed

18   transaction being ballpark numbers.

19        THE COURT:  That part of it I don't have so much of

20   a problem with it.  I guess I don't understand or appreciate

21   probably the program well enough, but why would they only be

22   looking at audited audits.  You said something you estimated

23   the number of audits to be 150 in this eight-year time period

24   or roughly eight year time period.  Why is it only audits

25   that they were looking at.  You didn't say it that way.

1              MR. TWEEN:  Those are the documents that FAS sees

2      and presumably if there's a problem with the way it is

3      operating, then they essentially in the audit, they disallow

4      it and they refuse to pay on that --

5              THE COURT:  Is everything audited?

6              MR. TWEEN:  Not at all, only a small fraction.

7              THE COURT:  That's what I thought.  So in your

8      request you don't limit it to audits, do you?  Maybe you do

9      and I didn't write it down.  You do.  You say relating to

10     audits.

11             Fine.  Now I understand what you are saying and why

12     your assumption is what it is.  Thank you.  I didn't write

13     that down the audited part down.

14             You asked for records of guarantee allocations

15     "where one or more companies applied with multiple

16     approximately related entities."  And I will confirm this

17     with the government when they are on their feet, but I have a

18     recollection last year.  We had this dance a lot.  Getting

19     kind of sick of it.  I recollect at some point the government

20     at least, I think the government said that they didn't view

21     the multiple related entities as per se illegal but that it

22     is like when you allege somebody was in a conspiracy to rob a

23     bank and pleading in the indictment that four people got in

24     the car with firearms heading towards the First Savings Bank

25     of New Haven.  Forget the firearms.  Getting in the car isn't

1    illegal, but it is a means and an efforts by which they

2    accomplish their conspiracy to rob a bank which of course,

3    that may be illegally.  I don't know that, I'm not really

4    sure I understand why FAS records of guarantee allocations

5    where one or more company applied with multiple related

6    entities is material, relevant, likely to be Brady.

7            MR. TWEEN:  I think they have gone beyond what you

8    just said, your Honor.  They have said several times it is

9    still ringing in my ears that the defendants did that in

10   order to improperly mislead and cause FAS to award them an

11   oversupply of guarantees that they otherwise would not have

12   been able to get and would not have been entitled to.  They

13   have said that several times.  I recall it pretty recently

14   maybe in connection with this briefing.  And so --

15           THE COURT:  Unless you are asking them -- you

16   basically are.  You want to know every transaction for these

17   various months and years in various regions of the world that

18   involved guarantees with multiple entities.  I presume what

19   you are going to argue to the government, to the jury, that

20   there were, I don't know, 100 transactions in April with

21   multiple entities so how can our use of multiple entities in

22   that month be illegal?

23           MR. TWEEN:  If you look at Exhibit A of our reply

24   papers.  The type of spreadsheet I'm talking about is four

25   pages long.  It is basically is how.

1          THE COURT:  Unfortunately I don't -- is this it?  Is
2     that the one with writing on it, a lot of numbers and stuff?
3          MR. TWEEN:  Correct.
4          THE COURT:  I got it.
5          MR. TWEEN:  It is basically sort of, you know, it is
6     how a particular guarantee when one was issued, how it was
7     ultimately allocated.  The takeaways here are that you have
8     companies that are clearly related so you have Cargill
9     Financial Solutions being awarded eight or ten, you have
10    Cargo Financial Services been rewarded eight or ten.
11    Midwestern Trading Group doesn't show up in the time is a
12    affiliated company.  This is one instance of a company
13    bidding, if you will, with multiple related entities.  FAS
14    clearly aware of it because they have got the spreadsheets
15    that show this is an acceptable -- that showed that was
16    happening and it was an acceptable practice.  One that was
17    fostered by FAS because of changes to the rules at various
18    points in time.  So in order for us to rebut this claim that
19    our clients were overissued guarantees through deceptive
20    practice of bidding with multiple-related entities, this goes
21    a long way towards showing that.  We're talking about six
22    spreadsheets of about four pages each.
23         THE COURT:  Can you point me to the paragraph in the
24    indictment where I will see that as an allegation that it was
25    part of the conspiracy?  I see the part that you materially

1    altered shipping documents.

2         MR. TWEEN:  I would say 29 to 33.  So they establish

3    multiple entities with separate names, they created the

4    appearance that the entities operated independently.  They

5    used multiple bank accounts to create the experience that

6    they were separate and they changed the footer on document or

7    documents to make it more difficult for the GSM officials to

8    recognize that they were related companies.

9         THE COURT:  With respect to your Request four and

10   five about certain meetings concerning rented trade flow, and

11   FAS's interpretation of the controlling statutes, I guess,

12   you know, I kind of look at the indictment maybe it is just

13   because it is what I -- I don't know -- I had a lot of fraud

14   cases.  I guess My eyes tend to settle on paragraphs 43, 44

15   where it talks about materially alter shipping documents,

16   things like that.  I don't know -- have they alleged

17   somewhere that that criminal conduct was -- that it was the

18   part of the crime charged here to use a rented trade flow

19   model?  I didn't think they were doing that.

20        MR. TWEEN:  I thought and this is the issue that we

21   have talked about many times, but I thought that we were past

22   that and the government was not going to argue that renting

23   trade flow was illegal or fraudulent.

24        THE COURT:  Right.  So why would you need Brady

25   material about meetings concerning rented trade flow or the

1    FAS interpretation of a statute with respect to the rented

2    trade flow business model?  Why would that be Brady material?

3    It is -- I know this isn't a good analogy somebody will give

4    me a better.  Lets say it was my bank robbery again.  It was

5    part of the conspiracy it would be alleged that they went and

6    bought a Buick.  I don't think -- they are not saying it is a

7    crime to buy a Buick, but it is a crime to agree to get into

8    a car, a Buick, to drive to a bank to rob it, right, so I

9    don't think we would find any Brady material about buying a

10   Buick wouldn't be very helpful.  I don't understand why this

11   request would be Brady or relevant or material.

12         MR. TWEEN:  Maybe this is a point where I can get a

13   little more in the credibility bank.  Clearly our request

14   here go from what I believe are pretty narrow and tailored to

15   broader.

16         THE COURT:  I would agree with that.

17         MR. TWEEN:  The government has said it is going to

18   put in this kind of evidence as context and so to the extent

19   they do, this is context.  I guess it depends on what

20   happened six months in the future and just how far the

21   government tries to go.

22         THE COURT:  That's why I'm here, right?  That's why

23   you are here to remind me what I will forgot I said today or

24   last July, but we can always go check the printed record of

25   Terri of what the government said.  What I will do is ask the

1   government when we get the specific requests, if they would

2   make a note to themselves to tell me if I'm misunderstanding

3   their view of various allegations in the indictment as to

4   what is the illegal -- when did the crime happen versus a

5   description of how or the means and methods of doing it much

6   of which is probably perfectly legal like buying the car to

7   go rob the bank.

8          So your third request was for records from 2002 to

9   the present between the defendant and certain FAS personnel.

10  I guess again I would ask how is it relevant what happened

11  back in 2002?  Even if hypothetically someone at FAS said go

12  right ahead and alter those footers, go right ahead and

13  change the name, go right ahead and alter the documents so

14  they aren't what they purport to be or go ahead and use them

15  a second time.  Let's assume that someone at FAS said all of

16  those things in 2002, I don't know, then in '05 they

17  completely change the program so I will have a trial about

18  what happened in 2002 and then undue what happened in '02 and

19  '05 until we get to the time of the charged conspiracy that's

20  '07.

21         MR. TWEEN:  Let me suggest that if the meeting in

22  2002, the person that was there reported to Mr. Lillemoe that

23  FAS said XYZ that would go I submit to Mr. Lillemoe's good

24  faith in terms of believing whether or not he could do --

25         THE COURT:  I would ask what if the meeting took

1    place in 1985 or 1977 or 1962 or 1955, at what happen point

2    is not relevant to what happens in 2007?

3              MR. TWEEN:  I don't know for a legal matter it is

4    ever not relevant because it is really old.  You would have

5    to look more at the facts of what we're talking about.  Here

6    again we have suggested three specific meetings of which

7    we're four, of which we're aware to shape that inquiry.

8    Again I don't think we're suggesting that they need to review

9    every meeting that ever took place.  We have pointed to three

10   or four given them the dates and the participants so we

11   focused it somewhat narrowly.

12             THE COURT:  All right.  Again I'm struck by the

13   breadth of your request four and five, Internal FAS

14   discussions of program policies and procedures from '02 to

15   the present.  That wouldn't go to Mr. Lillemoe's state of

16   mind if it is internal.  Even if I narrowed it to the

17   subjects you asked for that seems to be a rather extensive

18   and broad request about the records of an entire federal

19   government agency.

20             MR. TWEEN:  It is, your Honor.  This one is much

21   broader.  There's no conceding that.

22             THE COURT:  If I can turn to the government on these

23   specific requests.  Am I correct that -- let's start with the

24   use of multiple related entities.

25             MR. MCGARRY:  It might be helpful if I jump in.  It

1   might save you.  There's an email from Mr. Lillemoe to Pablo

2   Caldaron which reads in relevant part don't say anything

3   about me in your discussions with CCC so they view you as an

4   independent operator.  It is an email.  So regardless leaving

5   aside whether other people were speeding on the Merritt

6   Parkway to go down to Bridgeport as far as they can, if this

7   defendant was speeding and he got pulled over, then he was

8   speeding.

9           THE COURT:  Will the witnesses from the agriculture

10  department of FAS say I presume you are going to call them to

11  prove materiality.

12          MR. MCGARRY:  As to this point, your Honor, the

13  defense it is a statement in furtherance of the conspiracy

14  from one co-conspirator to another supports the fact they are

15  trying to portray themselves independent operators.

16          THE COURT:  I understand that.  But let's assume I

17  am in the bank robbery again and instead of telling --

18  instead of writing in my note to get my money from the teller

19  that I'm driving a Buick, I tell them that I'm driving a

20  Toyota.  It doesn't make a matter of difference to the teller

21  what I'm driving, right?  That's a terrible analogy.  Does it

22  matter to the Department of Agriculture?  They my want to

23  cover it up.  They might want to think they don't want to

24  have people know they are related.  I don't know that it

25  proves it is material to the Department of Agriculture.

1          MR. MCGARRY:  It is my understanding, your Honor

2     that the allocations of the guarantees are impacted by or

3     affected by if there are parties, I don't know the exact word

4     but acting together, acting in concert.

5          THE COURT:  What about the Cargill in these?  First

6     is he correct that MidWestern Trading is a Cargill associate?

7          MR. MCGARRY:  I think the short answer to you right

8     now is I don't know.  It is not necessarily relevant to the

9     case.

10          THE COURT:  I don't know.  Are you saying that is

11     part of the means and the method -- I will back it up.  Is it

12     part of the fraud that they kept from the FAS the fact that

13     they were related entities when they applied for guarantees?

14          MR. McGARRY:  It is part of the fraud and part of

15     our evidence of their intent and their state of mind that

16     they took steps to appear as if they were independent.

17          For instance, in a different email why don't you get

18     rid of the footers for Zangbo and S-Cross or  Southern Cross,

19     a little risk mitigation so their mind set, their intent to

20     deceive is to appear as if they are not --

21          THE COURT:  This is part of the fraud, the

22     conspiracy to commit fraud, the actual fraud itself is not

23     just altering documents, but it is also saying I'm me and you

24     are you, but we really are one in the same?

25          MR. MCGARRY: Right, and I think it may be a good

1   metaphor --.

2            THE COURT:  Did you mean to say right to that

3   question?

4            MR. MCGARRY:  Withdrawn.  Let me answer your

5   question this way.

6            THE COURT:  I would like to have you answer yes or

7   no.

8            MR. MCGARRY:  I think it is a step.  It is --

9            THE COURT:  It is part of the scheme.

10           MR. MCGARRY: Part of the scheme.

11           THE COURT:  It proves state of mind.

12           MR. MCGARRY:  Proves state of mind.  A good analogy

13   that we could use if we go to our mortgage fraud cases that

14   we had a lot of in this district, if somebody is real estate

15   agent or and they are trying to get a lot of listings, if

16   they apply, if they appear to be Press Cuozzo but they also

17   appear to be Century 21 and they also appear to be Brauer,

18   then they have got -- they can perhaps seems like less

19   applications to the mortgage company that these are coming

20   from different real estate companies, maybe it is not the

21   same person.  They don't give it as much scrutiny.  It is by

22   appearing to be independent it is not here's another Brett

23   Lillemoe, it's somebody from Zangbo.  That's why they say A

24   little risk mitigation.

25           THE COURT:  What about the rented trade model is

1    that part of the scheme?  Is that illegal or is it just a

2    means that they used that aided them along their path to the

3    ultimate commission of fraud?

4              MR. MCGARRY:  I think it is the second one.  I think

5    we have said it is not our intent.  We're not saying it is

6    per se illegal.

7              THE COURT:  You are not going to argue that.

8              Mr. McGARRY:  We're not going to argue that it is

9    per se illegal.  But this is how I think as we said the

10   indictment returned from the grand jury it says what it says.

11   This is how they conducted the business of trying to get

12   bills of lading and I think we put in one of our files in the

13   fall to this point where I think I think I printed out.  It's

14   Somewhere on this table.  Where there are emails to the

15   Department of Agriculture that says can I expand the time

16   frame of which I can use these guarantees because we're

17   finding it hard to move our stockpiles of corn which is

18   different than saying I bought a bill of lading from some guy

19   in Russia, can I use that outside the time period?  That

20   particular email in that particular instance it is appearing

21   as if they have stockpiles of corn.  I don't know exactly

22   what was in the defendant's head but if they're asking for

23   leniency on the time frame, perhaps if somebody is more

24   willing -- the Department of Agriculture might be more

25   flexible if they think they are actually having trouble

1    moving product.  That's different than saying I bought some

2    paper and it is not expired.  I think it is how they

3    operated.  We're not arguing whatever the third party means

4    we are not arguing it is per se illegal, but this is the

5    steps they took and what they did.

6         THE COURT:  Can you make a note of what you want to

7    say.  When I'm finished with him, I will be happy to hear

8    it.

9         MR. MCGARRY:  One of the reasons the defendant makes

10   all these motions so the government stands up in April and

11   says what they are going to argue in October and November.

12   It is the steps to avoid scrutiny by appearing to be

13   independent.  By appearing to have stockpiles of corn, and

14   one of them says we had under contract, this is another

15   email, to Mark, to the individual Mark Rowse as an anecdote

16   which you and John spoke shortly after physical year 2009

17   announcements.  "We had under contract with only one end

18   buyer more than enough exports of corn to Columbia alone to

19   complete the entire South American GSM if they were awarded

20   to us."

21        A few lines down, every U.S. exporter in the

22   business of selling corn to South America experienced the

23   same issue.  Where he writes this buyer of corn has been

24   imported into Columbia by that buyer since October 1st but

25   rather than the U.S., 95 percent came from South America,

1    mostly Argentina.  I'm looking for the other part.

2            So normally we would allow a rare extension to the

3    shipment period for contracts not registered in the GSM We

4    attached this in our early filing.  Part of how they operated

5    in some sense one of the arguments to avoid scrutiny was to

6    talk about the shipping of product as opposed to the buying

7    of paper.

8            THE COURT:  Let's go back to my question was about

9    multiple related entities.  Is there a regulation in this

10   program, is there a law, are there policies and procedures,

11   that say if an entity is related, altogether you can't exceed

12   X transactions?

13           MR. MCGARRY:  There will be testimony I believe that

14   there's a policy that the amount of registrations you would

15   be allocated at the window, if they use that term, is going

16   to be impacted by the pro rata share and being related as

17   compared to being independent impacts the amount of

18   guarantees that one would be allocated.

19           THE COURT:  Okay.  The third request of Mr.

20   Caldaron's motion is that records meetings from the '02 to

21   the present between the defendant and certain FAS personnel

22   be provided.  While the request is very broad, he does

23   identify three specific meeting dates.  Your answer seems to

24   be this is too old, it is pre-indictment time, et cetera.

25   Why couldn't it be exculpatory?

1     MR. MCGARRY:  Number three on the first one says on

2  or about October 2002 so it is not a specific meeting date.

3  It is a specific month in 2002.

4     THE COURT:  I'm looking at the request three on page

5  15 of Calderon's memo of law.  It says 3a.  A conference call

6  on or about October of '02.  B, conference call on or about

7  October 24.  Then gets pretty broad.  The last one is the

8  December 28, '12 discussions following the letter.

9     MR. MCGARRY:  I think they already have the stuff

10  from 2012.

11     THE COURT:  So we'll focus on A and B.

12     MR. MCGARRY:  C is 2003.  That's pretty broad.

13     THE COURT:  Let's talk about the two that aren't

14  broad.  Why couldn't those be exculpatory?  If, in fact, at

15  the meeting someone from FAS --

16     MR. MCGARRY:  We're talking about B, again a

17  conference call held on October 24 between a Mr. Smith and

18  Mr. Longwell and Ms. Keplinger who I believe is one of the

19  deceased employees.  I don't see any of the defendant's names

20  there.  A conference call where they are not present, I don't

21  see how it is the material as to either the defendant's state

22  of mind or the defendant's intent as to what was told to

23  somebody else at a conference call.

24     THE COURT:  All right.  What about A?

25     MR. MCGARRY:  A, I guess apparently Mr. Lillemoe was

1      on the call sometime in October of 2002.  Again Ms.

2      Keplinger has passed away and again I think that's relatively

3      old.  If Mr. Lillemoe remembers at that meeting that somebody

4      told him hey, use a little white out and stamp original where

5      it says copy, I guess he's free to testify about that and be

6      cross-examined about it.

7             THE COURT:  You shouldn't have to produce notes of

8      FAS people from that meeting that might either confirm or at

9      least alert the defendant he'll be met with disputation by

10     the Department of Agriculture personnel about what happened

11     at the meeting?

12            MR. MCGARRY:  I believe we spoke with Mr. Bonner

13     about this request at some point.  If I can have a minute.

14            MR. TWEEN:  To give a little context to those

15     meetings, Mr. Lillemoe was worked at ADM at the time and

16     Mr. Longwell was his immediate supervisor.

17            THE COURT:  Thank you.

18            MR. MCGARRY: Already having been produced is an

19     email from Brett Lillemoe to Mado Sing and some other

20     individuals where he writes in relevant part if it is some

21     type blessing of an entire structure that Madero wants, then

22     forget it.  If they want a categorical answer to whether the

23     party registering the sale with CCC needs to be the shipper

24     on the BL then we may be able to get something in email from

25     the operation department of CCC answering that question.  It

1    would be the best to ask the questions themselves directly to

2    CCC via telephone, but I would want them to ask that question

3    and nothing more.  Just an innocuous clarification.  Let's

4    discuss before we cut them loose.  This is an October 3, 2011

5    email which is attaching, again this has been produced, an

6    October 24, 2002 which is the meeting we're talking about,

7    email memo to file from DJ Smith talking about that meeting,

8    so JD confirmed with Martha the substance of the previous

9    conversation among Martha, Larry, and Brett Lillemoe, JD and

10   myself where Martha and Larry instructed ADM as to the manner

11   in which to complete the application.  And that's been

12   produced.

13        THE COURT:  I guess to finish it, what if there are

14   other emails or memos about that meeting at the Department of

15   Agriculture?

16        MR. MCGARRY:  So in the email Mr. Lillemoe writes

17   the problem is that CCC does not want to put any blessing in

18   writing, not even an email.  We went through the same thing

19   in 2002 with ADM lawyers and the best we could get was an

20   internal memo of a phone conversation with CCC from ADM

21   general counsel.  See attached copy.

22        So apparently Mr. Lillemoe has searched high and low

23   for this previously and the best he could get was this

24   internal which has been produced.  So apparently he's been

25   trying to get it in writing.  He says the best we can get, we

1 went through the same thing.  The problem is CCC does not

2 want to put any blessing in writing.  So again it seems that

3 we are being asked under the guise of Brady to go and try to

4 find a unicorn that thinks exists which said --

5    THE COURT:  That's a different answer.  That's an

6 answer that.  Maybe it isn't.  Are you saying that you looked

7 for it and there's nothing more or are you relying on an

8 email from '11 that says we looked for everything and this

9 what we found and there's nothing more.

10    MR. MCGARRY:  We're relying in part on that but also

11 if I go back to the filing that Mr. I think Attorney Bonner

12 prepared for the court, I think it would have turned up in

13 their search.

14    THE COURT:  Let me ask that.  Did someone search at

15 FAS for emails or minutes that would recount what occurred at

16 this meeting in 2006?  Was such a search undertaken or not?

17 I thought the government had said you weren't going to look

18 for anything --

19    MR. MCGARRY:  I don't think we went back that far.

20 I'm trying to recall from his memo to the court whether

21 references to Lillemoe itself was a separate search term, the

22 word Lillemoe as compared with if you --

23    THE COURT:  I know what you are saying, sir, but you

24 are not telling me whether that was the case or not the case.

25 I'm getting a long explanation about computer searching but

1    not an answer whether it was searched.

2         MR. DURHAM:  I don't think they went that far back.

3    I think hard copies in Iron Mountain some place.  The

4    question is this is being represented this is Brady.  It is

5    not Brady.

6         THE COURT:  That's what I'm asking if it is Brady.

7         MR. DURHAM:  It is not Brady so.

8         THE COURT:  Why isn't it Brady, though?  Let's

9    assume we didn't have the email from '11 that recounts this

10   is all we can get in '02 it doesn't say anything that's

11   terribly exculpatory.  Let's assume that didn't exist.  All

12   we know there's a meeting.  Mr. Lillemoe is saying they are

13   blessed at this meeting.  Wouldn't it be exculpatory to find

14   records of what was said at that meeting?

15        MR. DURHAM:  Depend upon what it is they purport to

16   say they were blessed to do.

17        THE COURT:  To use multiple entities with the rented

18   trade model, and they can talk in jargon as if they were the

19   growers of the product or the sellers of the product even

20   though they don't touch a blade of grass. Let's say it said

21   that.

22        MR. DURHAM:  If that's what they said, he can

23   testify to that.  Would it be exculpatory if you went back to

24   2002?  Probably not.

25        THE COURT:  Why not?

1          MR. DURHAM:  You go down this rabbit hole whatever

2     it was that Mr. Lillemoe may have said at that time

3     concerning the third party model.  We're not arguing the

4     third party model.

5          THE COURT:  Everything in your indictment is in

6     there except the materially falsely altering of documents.

7     Everything else was blessed in that session.  If that in fact

8     exists, isn't that Brady?

9          MR. DURHAM:  It is hard to concede that Mr. Lillemoe

10     honestly told the FAS people what they were doing and that

11     got blessed.  In theory they could have said we're going to

12     alter documents.  Is that okay if we substitute altered

13     documents for the original is that okay?  They said we were

14     told that's okay.

15          THE COURT:  One of the requests they have asked the

16     first one is for '07 to the present bills of lading from

17     audits that have a copy stamp or no stamp.  In other words,

18     all bills of lading unless they say original I suppose.  If

19     they say copy or have nothing on them, why isn't that Brady?

20     You are making a point that they changed the stamps.

21          MR. DURHAM:  Why wouldn't that be Brady?

22          THE COURT:  Because it shows it didn't matter to the

23     Department of Agriculture whether it says copy or not.  They

24     accept transactions no matter what.

25          MR. DURHAM:  I know what the motion says.

1          THE COURT:  No, that was my answer to your

2     question.

3          MR. DURHAM:  The reason that would not be material

4     is because it doesn't matter whether it says copy or

5     original.  What matters is what's called for in a letter of

6     credit so if it said it has to be an original document, how

7     is it exculpatory that in some other situation unrelated to

8     this if copies were acceptable, something was stamped a copy.

9     That wouldn't make it exculpatory.

10         THE COURT:  Because if the person who has been

11    defrauded in the government's view, if part of the

12    government's theory of the fraud is that a misstatement was

13    made about a certain subject, that's the fraud or part of the

14    fraud.  And in reality the recipient of this fraudulent

15    statement, i.e., FAS couldn't careless whether they said that

16    or didn't.  They were still processing the application.  Then

17    it is not material, is it?  Materiality means it has a

18    tendency, I will not get this exactly right, but a tendency

19    to effect your decision, i.e. your decision whether to let

20    them do what they want to do, right, approve their guarantee

21    thing.  If it doesn't matter to the person making that

22    decision, then how is it material?  How do they show it

23    doesn't matter?  How else would you show something is

24    material or not material?  You will show it by having a

25    person get on the stand and say here are our rules and

1    regulations.  Here's our policy manual.  This is what we're

2    supposed to do.  Yes, by the way that was material to me.

3    But if they get on cross-examination and show to that witness

4    47 transactions involving people other than the defendant, in

5    which what the witness just said was material to them, in

6    fact wasn't material because let's say it is supposed to be

7    on pink paper, that's what the regs say, that's what the

8    policy says, that's what the witness will say, that's what

9    the head of the section will say it and he'll say it to the

10   jury it was material that it be on pink paper.  They get up

11   and they show 47 transactions and it wasn't on pink paper and

12   this guy approved all 47, you don't think that's probative of

13   whether it is material?  Am I missing something?

14          MR. DURHAM:  I think so.  I think we're going down

15   the rabbit hole that counsel wants the Court to go down.  On

16   October 19, 2009, just to bring some reality to the

17   situation, Mr. Lillemoe himself writes, that with respect to

18   the GSM regulations, they require copies of original BL's,

19   bills of lading, nonnegotiable copies are not acceptable.  He

20   knows what's acceptable and what's not acceptable.  They are

21   submitting documents to the FAS folks or to one another

22   saying take headers off, take footers off and so forth, he's

23   knows exactly what he's doing.  They know exactly they don't

24   want the government agency to know that they are not

25   independent operators.  They don't want to be subjected to

1    any kind of scrutiny.

2         THE COURT:  You said the rented model isn't

3    illegal.

4         MR. DURHAM:  That's a different question.

5         THE COURT:  It is a different question.  Removing

6    headers and footers those are fax things, right?  Faxes that

7    shows where something was faxed from.  It doesn't change the

8    bill of lading.

9         MR. DURHAM:  These are instances in which they don't

10   want -- they intentionally are avoiding having the government

11   entity know that they are related because they are not taking

12   faxes off, they are taking addresses off.

13        THE COURT:  Let's go back to the copy original

14   thing.  You read me the email he knows it has to be.

15        MR. DURHAM:  Has to be copies of original bills of

16   lading.

17        THE COURT:  Copy of an original BL.

18        MR. DURHAM:  Yes.

19        THE COURT:  So what does he do that's fraud with

20   respect to -- he's submitting things that are not copies of

21   original bills of lading?

22        MR. DURHAM:  He's altering.  In the instances we're

23   talking about, they didn't have an original copy, they would

24   change it to make it a copy.  They would take the

25   nonnegotiable --

1          THE COURT:  What kind of copy would they have to

2     start with?

3          MR. DURHAM:  Nonnegotiable copy.

4          THE COURT:  What makes something a nonnegotiable

5     copy?

6          MR. DURHAM: The letter of credit requires a copy of

7     an original.  They don't have an original.

8          THE COURT:  This will be interesting in the days of

9     electronic exhibits because I don't know how anybody is going

10    to know what's an original or what's a copy.

11         MR. DURHAM:  They are stamped, your Honor.

12         THE COURT:  I can put a stamp on anything and Xerox

13    it.  Obviously that's part of what you are arguing about the

14    defendants' conduct.

15         MR. DURHAM:  That's what the system relies on is the

16    integrity of the documents.  They understand that. That's why

17    they altered the documents.

18         THE COURT:  When product is shipped, there's a bill

19    of lading issued, correct?  Presumably at some point in some

20    electronic sense there's an original of that?

21         MR. DURHAM:  Correct.

22         THE COURT:  You are saying these regs call for a

23    copy of the original?

24         MR. DURHAM:  Yes, your Honor.

25         THE COURT:  Is it a certified copy?  How do I know

1    it is the copy of the original that meets the regs?

2            MR. DURHAM:  That's the issue here, your Honor.

3            THE COURT:  I know.  That's why I'm trying to

4    understand.

5            MR. DURHAM:  The system relies on the honesty of

6    what's being submitted to the banks. The defendants know

7    that.  That's why they alter that.

8            I think Special Agent West is close enough to

9    answering your Honor's question as I am.  In some instances,

10    they stamp the original as being the certified original.

11    They weren't.  All they had was, for example, a nonnegotiable

12    copy.  That was not going to meet the letter of credit so

13    they altered the document.

14            THE COURT:  The copy wouldn't meet the letter of

15    credit.  But if they said stamped an original and then made a

16    copy, then that meets the requirements, something like that?

17            MR. DURHAM:  That's true.

18            THE COURT:  I know you have alleged they took off

19    headers and footers.  You are now telling me if I go back and

20    reread the indictment again, I will be able to focus better

21    on this aspect of your allegations.

22            They altered copies of bills of lading to make them

23    appear to qualify to be part of this program when, in fact,

24    what they had in hand originally did not qualify?

25            MR. DURHAM:  That's right.  Another example to try

1  to put in context and make it clear.  January 12, 2010, this

2  is from Defendant Lillemoe to someone by the name of Robert

3  Nathan, one of the particular actual exporters of food, for

4  us we need bills of lading that "original" and that are

5  signed.  Then he tells Mr. Nathan we'll simply white out the

6  "copy nonnegotiable" on the signed copies and stamp

7  "original" ourselves.  So they --

8          THE COURT:  That was what I just gave as the

9  example.

10          MR. DURHAM:  That's exactly what they were doing in

11  some instances.

12          THE COURT:  One last question on the specific

13  request of Mr. Caldaron.  Number three, he asked for records

14  of meetings. These are the specific things that we have

15  already talked about. What I'm concerned about is your

16  response at 12.  You represent you have effectively asked the

17  USDA for these documents but have we finally come to

18  agreement that you didn't ask for documents before '07?

19          MR. DURHAM:  Can you repeat that one, your Honor?

20          THE COURT:  Request 3, the one about these meetings

21  between the defendants and certain FAS personnel some

22  dates that we spent time talking about.  What I'm asking you

23  about now is the government's opposition on page 12, you

24  state, quote, we have effectively asked the USDA for these

25  documents but I don't think that can be true.  Maybe you did,

1    if you did, fine, tell me.  I thought elsewhere you tell me

2    that you didn't ask for anything before '07 from USDA.  The

3    request is at Caldaron brief document 87-1, page 15.  Your

4    request is at the bottom of page 12 of your opposition, third

5    request you list it and say "the" government has already

6    effectively asked the USDA for those records and turned them

7    over to the defendants.  Elsewhere in correspondence I

8    thought you told the defendants you weren't going to produce

9    anything before '07 so I'm confused.

10                MR. DURHAM:  I think what we asked them to do

11   Mr. Bonner's people is look for anything relating to Mr.

12   Lillemoe that might relate.

13                THE COURT:  So that's that answer.

14                MR. DURHAM:  If the Court wants we can go ask for

15   things.

16                THE COURT:  I think you said that you have searched

17   on the computer, but you -- the next search is in Stone

18   Mountain which is an enormous undertaking.  If it is Brady, I

19   suppose it will have to be.  But I would like to turn --

20   we're going to not run out of town, but we're getting there.

21   Do you want to add something?

22                MR. DURHAM:  We have asked them to check records

23   from Smith, Longwell and Keplinger is deceased.

24                THE COURT:  These are the FAS people.

25                MR. DURHAM:  Yes, your Honor.

1          MR. TWEEN:  Ms. Keplinger is alive but retired.

2     She's going to be very unhappy if she sees the transcript.

3          MR. DURHAM:  I thought Mr. Bonner indicated she's

4     deceased.  If not, I apologize.

5          THE COURT:  She probably would be happy to hear

6     she's alive.  If she were me, she might not feel that way.

7          MR. DURHAM:  So the records, the hard copy records

8     for Smith, Longwell and Ms. Keplinger there was a search.

9          THE COURT:  How far back?

10         MR. DURHAM:  I think back in time.

11         THE COURT:  That doesn't help me.  To me '09 was

12    back in time.

13         MR. DURHAM:  We'll check to make sure they went back

14    as far as 2002.

15         THE COURT:  A couple of counsel were on their feet.

16    Attorneys McSwain and Tween while the government was

17    answering my questions about the specific Caldaron

18    requests.

19         MR. TWEEN:  Before you get entrenched in this notion

20    that the program regulations require originals or copies of

21    originals or copies of copies or anything like, nowhere in

22    the regs is there anything as to what is required and that's

23    going to be an issue that's very hotly contested at trial as

24    to exactly what the programs require and what was material or

25    not in that respect so I want to flag that for you now.

1          THE COURT:  But I presume -- let's say I walk down

2     Church Street this afternoon and there happens to be a bill

3     of lading blowing in the wind and I pick it up.  You would

4     agree with me that FAS shouldn't accept that bill of lading

5     as part of that application to get a guarantee for the

6     shipment of agricultural products, if it had on it used and

7     whited that out and send it in to them.  Had the words used,

8     already used on it?

9          MR. TWEEN:  No, your Honor.  I agree that the

10    questions of materiality on that bill of lading are going to

11    be is it genuine U.S. product.  Is it in the quantity that's

12    claimed under the guarantee.  Is it shipped to an appropriate

13    destination under the program one of the qualifying

14    countries.  Is it in the amount, the quantity, that is

15    represented under the guarantee and does it fall within the

16    open date range of the program guarantee and the bill of

17    lading. If it meets those five things and did the person who

18    is presenting it have the right to present it?  In other

19    words,  had they either purchased those rights from the

20    exporter, from the importer, from somebody.  Did the person

21    who is presenting it have the right to present it?  If it had

22    been previously presented under another program then it would

23    be invalid but otherwise if it meets the five criteria, the

24    date, the amount, the places, and so forth then it can be

25    used.

1          THE COURT:  On the fifth criterion, if the bill of

2    lading I picked up on the street said previously used, I

3    couldn't submit that and get a guarantee?

4          MR. TWEEN:  That's right.  You could not

5    intentionally submit that.  If you did it knowingly and

6    intentionally, that would be a crime.

7          THE COURT:  Thank you.  I would like to change the

8    subject.  It's possible that I have -- what's the right word?

9    Verklempt, agitated, whatever the right word is about

10   something that maybe I shouldn't be so I will give the

11   government a chance to explain how it is on July 3 of last

12   year.  I asked how many transactions were at issue in the

13   case that you would likely prove up and admittedly on your

14   feet cold, not expecting the question maybe, should have, but

15   whatever, I think you told me 8 to 10.  I asked you to think

16   about it.  Look at the file and write a letter I think I said

17   to the defendants but copy me if I recall correctly when you

18   were more thoughtful about it how many would it be.  It was

19   33 at that point.  The defendants of were apoplectic.  That

20   was a long time ago.  They had a lot of time and got

21   discovery from you presumably to the 33.

22          Now, I think I understand that in connection with

23   the production in February the number is up to 64.  Along

24   with the statement by the government that it's subject to

25   alteration.  Have I got that wrong?  Any of that wrong?

1      MR. DURHAM:  I think 64.

2      THE COURT:  Ms. Zirbes' counsel makes that

3  representation.  If you make it, Attorney Flannery, in your

4  memo, you say the government says there's 64.  We had trouble

5  finding where the government said it was 64 or finding the

6  basis for your saying it was 64 so maybe you can tell me if

7  you think it is 64 transaction now that the government is

8  claiming they might introduce at trial to prove up the crime

9  charged.  If so, where did you get the snub.

10      MS. FLANNERY:  If I added wrong, I apologize.  Here

11  is where I got it from.  Mr. Durham finally after we had been

12  inquiring for months as to why they were -- why the 33

13  included certain transactions that weren't GTR Only after we

14  filed our discovery motion, did we get an email from

15  Mr. Durham that listed.  Now I have counted 64 transactions

16  which he explained eight of which including the two -- 10 of

17  which including the two in the indictment had to do with

18  alteration of documents.  And then if you look at page 6 of

19  his reply.

20      THE COURT:  Whose reply?  His opposition?  The

21  government's opposition?

22      MS. FLANNERY:  Yes.  Your Honor, I apologize if I

23  made a math error.

24      THE COURT:  That's fine.  That's why I'm asking.

25      MS. FLANNERY:  Here is where I got the numbers and

```
 1   if the numbers are wrong, I still stand by my point that
 2   these have to do with something completely different than
 3   what's alleged in the indictment.  On page 6 of his -- on
 4   pages 5 and 6.
 5            THE COURT:  There's a box chart.
 6            MS. FLANNERY:  There are in the first column I
 7   believe a total of 21 transactions, 10 on the first page and
 8   11 on the second.
 9            THE COURT:  I got about 61 so we're near the
10   ballpark, Let's say more than 60 transactions.  Thank you,
11   Attorney Flannery.
12            So I'm back to my question.  Have I accurately
13   described the progression of the government's proof from two
14   transactions in the time to 8 to 10 on the record to 33, to
15   60 plus?
16            MR. MCGARRY:  So the short answer is yes.
17            THE COURT:  That's good because I was just about to
18   say after you gave me a long answer, if you ask me during
19   trial to direct a witness on cross to answer yes or no, I
20   don't think I will do it.
21            MR. MCGARRY: Now do I have the right?
22            THE COURT:  Yes, now you may still have that right.
23   You may not have lost that, Attorney McGarry.  So the short
24   answer is yes.
25            My understanding if I read your memo correctly is
```

```
 1    that many -- many of the transactions disclosed, in other

 2    words, the second column of pages 6 and 5 of your opposition,

 3    are transactions in which bills of lading are used to secure

 4    a guarantee and which subsequently the defendants made a

 5    repeated use of that bill of lading to obtain a guarantee, is

 6    that a fair statement?

 7            MR. MCGARRY:  I believe that's correct.  The reason

 8    I qualified a little bit is I think that's correct.  I think

 9    you hit the nail on the head.  I think also the point is that

10    these are -- there's kind of double counting because

11    basically what we have is this is an ADM bill of lading used

12    by GTR.  This is Bunge bill of lading used by GTR.

13            THE COURT:  That doesn't help me.  It seems to me

14    there could be ADM Cargill could have a bill of lading.

15    Could own it in effect and before using it or submitting it

16    to FAS it chooses to sell it to one of the defendants and

17    they use it at the Department of Agriculture presumably that

18    certainly doesn't violate the way by way of double use.

19    Right?  Only being used once.  May have other problems but

20    doesn't violate the double use.  To say it is a Cargill bill

21    of lading, I assume you mean a bill of lading that Cargill

22    used to obtain a guarantee.

23            MR. MCGARRY:  I think that's right, yes.  But again

24    you use the word sell it.  Are they selling the product?

25            THE COURT:  I don't know if they can do that.  I'm
```

1    saying they don't use it for themselves.

2         MR. MCGARRY:  Presumably doesn't have the

3    authorization to use it, whether or not they --

4         THE COURT:  I'm trying to find out how the heck

5    we're over 60 transactions.  How you expect to prove that in

6    time period allotted for this trial.  If in fact we're really

7    talking about half as many transaction of the defendants.

8         MR. MCGARRY:  I think that's right.

9         THE COURT:  Then we're back to more where we were in

10   July when you told them 33.  I count 21 of I will call it

11   registration of the defendant, that's the left column; is

12   that correct?

13        MR. MCGARRY:  That's correct.  If I can have a

14   minute.  It is accurate to say, you said there were two in

15   the indictment and then they were eight and 21, that's about

16   33.  What I believe what we're doing is in some sense, your

17   Honor, we're spoon feeding them or giving them guidance in

18   the sense that look, this is -- these match up with these and

19   Mr. Durham went through the email as Ms. Flannery said this

20   is the ADM one that matches up to the GTR one which again.

21   We're marshalling the evidence for them well before trial if

22   we did a search of somebody's office whether it is Ponzi

23   scheme or another fraud, we said there are hundreds of

24   properties that we can pick from.  As we're getting closer we

25   allege a couple in the indictment, but these are the

1    ones that we're focusing on and we're getting them well

2    before the exhibit list.

3         THE COURT:  If you are multiplying by two every time

4    you give them a list, it is a little -- it is bothersome to

5    me because it means by September your list but for this

6    duplication explanation, take that off the table, say you

7    from two in the indictment to eight to 10 on the record to 33

8    to 64 defendant transactions by September, we'll be at 150.

9    All right.  Then it is going to be very troublesome to the

10   Court.  But if what I'm hearing you put two examples in the

11   indictment, you don't have to plead all of your evidence.  I

12   understand that.

13        Then when I ask you, even though we were not then

14   but a ways from trial, it wasn't a year and a half at that

15   point.  Last July I asked does the government have an idea?

16   Can you start to narrow it down for the defendants?  I

17   appreciate you said yes.  You gave me a ballpark number which

18   was much higher, decided to look more closely and gave a

19   written response.  That's fine.  It doesn't sound like the 33

20   that you identified in mid July of last year is a whole lot

21   different than the 31 we're now working with, the 21 in that

22   box thing of Attorney Durham plus the two plus the original

23   eight.  Am I correct?

24        MR. DURHAM:  That's right.  Attorney McGarry was on

25   trial when I sent that email out.  My recollection, counsel

1    can correct me if I'm wrong.  My recollection is what appears

2    on pages 5 and 6 of the response, I thought, they'll correct

3    me if I'm wrong, I thought that was generated because counsel

4    was not able to or having difficulty mirroring up the

5    numbers.

6            THE COURT:  Right.  The nondefendant transactions

7    did the government think was a duplication the defendant was

8    a duplication of that.  I understand that.  That's what I was

9    trying to confirm was my understanding correct.  There's only

10   21 defendant transactions in that chart, right?  The 5 and 6

11   chart.

12           MR. DURHAM:  Yes, your Honor.

13           THE COURT:  Then your agent I think whispered to

14   Attorney McGarry.  I have to add my two in the indictment and

15   eight identified last summer so I'm at 31.  You are probably

16   at 33 which is what you disclosed in the summer as well but

17   that's fine.  We're in the same ballpark.

18           On the subject of it being subject to the government

19   changing it.

20           MR. DURHAM:  Yes, your Honor.  With respect to that,

21   it seems reasonable to assert that defendants can't have it

22   both ways.  They can't, for example, ask to go find all kind

23   of documents for them, we don't think they are Brady.  Then

24   not review documents and we have been reviewing documents

25   that we've gotten at their request.  We continue to review

1   the thousand of documents we obtained by way of subpoena

2   during the course of the investigation.  As we come across a

3   document that shows clear intent on the defendant's part to

4   deceive or mislead, we identify them.  We identify the GSM

5   number.

6           As I think the Court wants us to do, although I'm

7   not sure we're required to do it.  I think it helps expedite

8   things.  We disclose that to the defense.  That's what we

9   have done here.  Will there be other documents we'll find

10  where they intentionally defrauded the government, there may

11  be.  Relating to some other guarantee, that may very well be.

12  We'll disclose it if and when we find it.  That's essentially

13  what we have been doing and intend to continue to do.  What

14  defense counsel wants to do by raising this 64 things oh, my

15  God, the sky is falling, is to cabin the government's

16  evidence in some fashion say that's it.  You can have this

17  number and no more.  We respectfully submit to the court

18  that's not reasonable.

19          Take the analogy of a mortgage fraud case.  If a

20  person is engaged in a series of frauds related to the

21  mortgage and you came across here's another one in a false

22  statement in a loan application, wouldn't be you can't use it

23  that because you didn't find it too late in time.  Here we're

24  disclosing it if and when we find it to counsel.

25          The further point, your Honor, is I don't want the

1    Court to be mislead into thinking that we necessarily on our

2    case in chief are going to offer documents or evidence

3    concerning all these GSM numbers.  It was our understanding

4    that the Court wanted us to look at the universe of GSM

5    numbers we have and disclose those as to what numbers might

6    come up during the course of the trial.  That's what we have

7    been doing.  Some of these will not and undoubtedly will not

8    be used in the government's case in chief.  They may be

9    relevant during the course of the rebuttal case or

10   cross-examination of the defense witnesses and the like.  If

11   we fail to disclose them then the argument will be the

12   government didn't disclose that contrary to the Court's

13   order.  That's what's the argument would be down the road.

14   We're trying to be inclusive in what we're disclosing to the

15   defense of GSM numbers that might come up.  It is that simple

16   and that straight forward.

17        THE COURT:  If it is so simple why did it take two

18   pages of transcript to tell me about it?  That really sounded

19   nice, Attorney Durham.

20        MR. DURHAM:  That's because I'm long winded.

21        THE COURT:  You used the expression you come across

22   transactions.  Is there any sense of diligence to that

23   expression you come across transactions?  For example, when

24   are we set for jury selection?  October 1, something like

25   that.  Assume it is October 1.  On September 28 if you came

1    across quote unquote 37 transactions, is that okay?  Is that

2    what you mean when you say subject to the government?

3            MR. DURHAM:  So long as we have disclosed the

4    information to the defense, I would say yes.  It would be

5    okay.

6            THE COURT:  When did you disclose the information

7    about the transactions which it is now the government's

8    position are transactions which evidence the fraudulent

9    conspiracy, the 30, 31, 33, whatever that number is.  When

10   did you disclose the evidence concerning those?

11           MR. DURHAM:  That would have been disclosed in the

12   normal course of discovery, whatever the discovery dates

13   were.

14           THE COURT:  Last summer or whatever it was.

15           MR. DURHAM:  Yes.  In terms of  --

16           THE COURT:  How much of the paperwork is represented

17   by those transactions versus the rest of the disclosure?  Is

18   it a mountain with a mole hill in it?

19           MR. DURHAM:  I don't think it is a mountain.  Bear

20   in mind a lot of this information that we're disclosing the

21   defendants already have.

22           THE COURT:  They don't have the government's view of

23   what's fraudulent.  I'm sure they have thousands of

24   transactions they did, right?  That's not helpful to say they

25   have it.  They don't think any of them are fraudulent.

1          MR. DURHAM:  I don't think it is the government's

2     obligation to marshal its evidence for the defense.  It is

3     true that pursuant to the Court's order, we'll have to give

4     an exhibit list at an appropriate time, a witness list and

5     the like.  I don't think there's anything in the --

6          THE COURT:  Can you tell me where in the indictment

7     it allegations I will call it duplicative use of bills of

8     lading is a part of the fraudulent scheme or method?

9          MR. DURHAM:  That's not specifically alleged in the

10     indictment.

11          THE COURT:  So why is it in a variance which you

12     produced on September 28 will surely be prejudicial.

13          MR. DURHAM:  I don't know that when it comes to the

14     variance if it is a manner and method, but it is not

15     specifically alleged in the indictment.

16          THE COURT:  Are the two transactions alleged of that

17     nature are they duplicative use?

18          MR. DURHAM:  The two in the indictment are not.

19          THE COURT:  You don't think that's a problem?

20          MR. DURHAM:  No.  Your Honor is asking is that a

21     problem in something of a vacuum.

22          THE COURT:  I didn't ask it in a vacuum.  I

23     described let's assume you disclosed the transactions that

24     were duplicative use of bill of lading in September less than

25     a months before trial and you disclosed 20 of them and you

1    previously disclosed 8 or 10, they were not in that nature.

2    They were in the nature of the two pled in the indictment.

3    You don't think that that would be a prejudicial variance of

4    proof from the indictment?

5         MR. DURHAM:  The court would have to rule as to

6    whether or not it would come in.  Is that a variance, no.

7    That's not a variance from the indictment.  The Court would

8    have to make the assessment at the time based on the record

9    the Court had before it as to whether or not that's material

10   and relevant to the charges that are contained.

11        THE COURT:  I respectfully suggest that's why I

12   worry about your reservation of the right to continue to

13   disclose transactions because to the extent they differ from

14   the indictment transactions and I think your disclosure of 20

15   transactions that are duplicative use this far in the advance

16   of trial, you are right I have to look at the issue at that

17   time.  I would say given how soon or how early you disclose

18   those is not a problem.  I do think I will look at the issue

19   at the time.  If you did that in September with a trial in

20   October, I think you would be in trouble.

21        MR. DURHAM:  I would appreciate that.  That

22   government is obviously on notice.  In terms of diligence, I

23   know it is true the Court, the Court has other trials to do

24   as do we and agents have them but in terms of diligence in

25   this case, there's been considerable effort undertaken

1    here.

2           THE COURT:  It strikes me the agency started this in

3    '09 or '10, the OIG looks at it in '10, goes to the FBI in

4    '11, that's five years ago.

5           MR. DURHAM:  I should indicate while I have been in

6    court here, Special Agent West took upon himself to find out

7    what's the opening date of the FBI's file was.  It is March

8    9th, 2011.

9           THE COURT:  So you have been at this nearly five

10   years, four and a half?

11          MR. DURHAM:  There's been A portion of the time that

12   we have been at this, yes, your Honor.  It was indicted

13   within what the statute of limitations permits.

14          THE COURT:  I understand that. THAT'S why I asked my

15   question about isn't a there a diligence aspect to this.

16          MR. DURHAM:  Yes, your Honor.

17          MS. FLANNERY:  May I, your Honor?  We are absolutely

18   prejudiced at this point in time.

19          THE COURT:  At this point in time?  These are

20   transactions they told you about last year.

21          MS. FLANNERY:  They listed those transactions.  They

22   did not tell us why they were listing those transactions.

23   Dual registration is not in the indictment.  Mr. Durham.

24   Mr. Durham and Mr. McGarry would not answer our questions.

25   Since last July we have been asking why are these other

1    non-GTR transactions listed on your list.  We got answers

2    like I don't know off the top of my head, you are not going

3    to cabin our proof, we don't have to give you our theory.  So

4    we have not been able to study these transactions and

5    obtain.

6            THE COURT:  Are you entitled to receive the

7    government's theory?  I thought Bortnovsky says you're not.

8            MS. FLANNERY:  When it is a completely different

9    allegation, I would suggest we're entitled to a grand jury

10   indictment on it.

11           THE COURT:  Why?  It is fraud, isn't it, to purport

12   to submit a bill of lading which you respect qualifies for

13   the program, assuming you already knew it had been used.  It

14   is like a check that's already been cashed, right?

15           MS. FLANNERY:  Mr. Durham acknowledged that

16   allegation is not in the indictment, your Honor.

17           THE COURT:  They allegation there's fraud in

18   connection with your participation in the program.

19           MS. FLANNERY:  If all the sudden they came up

20   tomorrow and said or the day before trial or whenever and

21   said oh, here's a new avenue of fraud we just discovered.

22           THE COURT:  I agree with you on that.  I've already

23   run him over the September disclosure but these were

24   disclosures last July.  You are saying you didn't know why.

25   They wouldn't answer.  Now you know because the emails were

1    exchanged and it's in their brief in this proceeding.  Now

2    you know.  It is February and the trial is in October.  How

3    are you prejudiced?

4        MS. FLANNERY:  We learned this at the end of

5    February, your Honor.  That's after the USDA search terms

6    were constructed.  They expressly declined to search for any

7    transactions other than the defendants.  Even though they are

8    lining these other companies' transactions up with our

9    company's transactions, those companies' transactions are

10   relevant and discovery on those transactions are relevant.

11   This allegation of dual registration.

12        THE COURT:  You didn't get discovery of the other

13   transactions?

14        MS. FLANNERY:  No.  We have very little discovery on

15   those.

16        THE COURT:  Attorney Durham, you represented to me

17   two minutes they got discovery on the duplicative

18   transactions which I understood you to be telling me they got

19   discovery not only on their side of the duplication

20   transaction but also on Cargills, ADM's, et cetera.  Was I

21   misunderstanding you?

22        MR. DURHAM:  I think that was in April of 2015.  We

23   hadn't mirrored the numbers up.

24        THE COURT:  You produced the paper work when Cargill

25   submitted 818995, for example, which is, I don't know, six or

eight one in that column on page five.

        MR. DURHAM:  Whatever analysis we're able to do to
try to put this together.

        April 23, 2015.

        THE COURT:  What did you do on April 23, 2015.

        MR. DURHAM:  One of the things we had disclosed on
that date, using that as an example, Cargill, documents
relating to the USDA CCC'S export credit guarantee program
GSM 102 including bills of lading form CCC 67 contract and
invoices.  That's on April 23, 2015.

        THE COURT:  For all the transactions that are listed
in the columns on five and six in the middle column?

        MR. DURHAM:  We would have to go back and check the
Bates Numbers on that, your Honor.

        MS. FLANNERY:  Very little was produced on those
transactions, your Honor.

        THE COURT:  I don't know what very little means.  I
don't know if there's only very little to produce.  What was
produced for the corresponding transaction of your client to
Cargill 818995.  That's yellow corn to Columbia which is the
eighth box down.  There's GTR819716 what was produced about
that?  Very little or a lot?

        MS. FLANNERY:  Very little.

        THE COURT:  That means there isn't a lot to produce
to show the transaction.

1          MS. FLANNERY:  To put this in context, your Honor,

2     when we're talking about dual registration, we're talking

3     about whether or not our client's company had the right to

4     use those bills of lading in the GSM transaction.  Very, very

5     different from whether original or copy is stamped on it.

6     Every bill of lading has rights that go with it.  Has the

7     right to be used in a GSM transaction if it meets the other

8     criteria, the shipper or the consignee controls those rights

9     from the outset.  They can contract those rights away.  They

10    can sell the bill of lading.  They can sell the use of those

11    rights.  Whoever receives the use of those rights can

12    transfer it again.

13         To answer an allegation of dual registration, we

14    need discovery, we need documents pertaining to the contracts

15    that the other companies had or that the original shipper

16    had.  The discovery that's necessary to answer those

17    allegations that go back.  These transactions are seven or

18    eight years old, your Honor.  Many of the contractual

19    documents that are relevant are overseas.  To spring this on

20    us at this point in time.

21         THE COURT:  There's certain -- I'm sorry but there's

22    certain catch phrases that you are using very little, spring

23    it on us that are not helpful to me.  I was told by the

24    government a moment ago that they produced bills of lading,

25    CCC form contract 67 and invoices relating to a particular

1    date of that transaction.

2         MS. FLANNERY:  That doesn't go to the question of

3    who had the right to use that bill of lading.  It is not the

4    discovery that we need.

5         THE COURT:  So is your defense that your client had

6    the right to use it and that Cargill or ADM, whoever is

7    paired up in this chart was the one that committing the

8    fraud.

9         MS. FLANNERY:  That may well be.

10        THE COURT:  Then your client would have the

11   documents that would show the contracts or the transfers,

12   right?

13        MS. FLANNERY:  No.

14        THE COURT:  They couldn't prove it was their right

15   to use the bill of lading?

16        MS. FLANNERY:  The government would -- well, the

17   documents that show that --

18        THE COURT:  Are within your control on your side.

19        MS. FLANNERY:  No, they may be overseas with

20   somebody that our client dealt with seven or eight years ago.

21   It is not a form that comes with every transaction, your

22   Honor.  These are in the contractual relationships with the

23   shippers who in these cases are in South America.

24        THE COURT:  Is your client a party to that

25   contractual relationship if they get the right to use the

1    bill of lading at FAS?  Somehow they become a party to a

2    contract which says I have the right to use this bill of

3    lading, correct?

4         MS. FLANNERY:  They may not have that documentation

5    or the person that they bought it from may have had that

6    documentation.

7         THE COURT:  How do they know they can use it then?

8         MS. FLANNERY:  At the time they knew they can use

9    it.

10        THE COURT:  How?  Do they this verbally?  They don't

11   have any paperwork that shows that they have a contractual

12   right to use it?  Seems to me it is based on your

13   transaction.  I understand you don't have the Cargill's or

14   ADM's but on yours, I would think you would have it.

15        MS. FLANNERY:  Our clients -- what the government is

16   saying is that ADM or the other companies had the rights to

17   it.

18        THE COURT:  Clearly that's their position.

19        MS. FLANNERY:  That documentation is not in the

20   discovery.

21        THE COURT:  I said that.  That side of the discovery

22   you wouldn't have.  Presumably you would have your side of

23   the transaction, your use of whatever the bill of lading was

24   that was in GTR819694.

25        MS. FLANNERY:  I don't believe that's true.  I don't

1    want to make a representation --

2         THE COURT:  If it is not true for your client, then

3    it is not going to be true for Cargill and ADM.

4         MS. FLANNERY:  May I have a moment, your Honor?

5         THE COURT:  Sure.  I would like to understand this

6    better.

7         (Discussion Off the Record.)

8         MS. FLANNERY:  I think the fundamental problem is

9    that we're going back seven or eight years on these

10   transactions.  There's no magic form that says you have the

11   right or you don't have the right.  There were oral

12   communications and oral contracts, oral agreements back at

13   the time.  To subpoena people in South America.  This is

14   beyond what is reasonable and possible to do at this point in

15   time, your Honor, and the government has hidden the ball on

16   this since last July and now they can say in many cases, the

17   time between the end of February, beginning of March and a

18   trial at the beginning of October would be a great deal of

19   time.  In this kind of case, we're talking about overseas

20   evidence and dated evidence.  If they came up with this

21   allegation as a wire fraud scheme that the defendants used

22   dual registrations on transactions seven or eight years ago,

23   it would be outside the statute of limitations.  And there's

24   reason for the statute of limitations.  Evidence is dated,

25   evidence is difficult to get.  For that reason, your Honor,

1     we're prejudiced by the addition of this to the indictment.

2     I see your Honor is thinking --

3            THE COURT:  I'm waiting to ask the government

4     questions when you finish.

5            MS. FLANNERY:  I'm stung by this because it seems to

6     me clearly outside the scope of the allegations in the

7     indictment.  The indictment allegations that shipping

8     documents were altered and now the government on what in a

9     case of this type involving transactions this old, overseas

10    transactions, oral contracts.  To bring up at this point an

11    entirely new allegation having to do with shipping rights

12    with GSM rights and bills of lading rather than the

13    allegations that are set forth in the indictment is -- makes

14    it impossible to prepare for this trial, your Honor.  It is

15    extremely prejudicial to the defendants.

16           MR. TWEEN:  Just quickly to clarify something.  In

17    some instances we have written representations from our

18    sources that they were selling us the bill of lading with GSM

19    rights fully attached.  In some emails saying essentially the

20    same thing.  In some there's a course of dealing with a

21    pattern of oral representations on which our clients would

22    have relied.  We have visibility into those so in other

23    words, our source where we were able to buy a bill of lading,

24    we have visibility into that.  Where we have no visibility

25    and where we need discovery and it is going to take a while,

1    is into whether or not Cargill had the rights and if they

2    did, what they did with those and the reason that the

3    discovery that the government is giving us on the nonGTR

4    guarantees is very minimal is essentially because the

5    government didn't go out and ask for the back up or subpoena

6    and get the back up on all of those nonGTR transactions.

7         So there's not the bills of lading and the

8    guarantees and the letters of credit and all of the other

9    supporting paperwork that would identify what Cargill, for

10   instance, did with those rights and whether or not Cargill or

11   Bunge sold those rights which sometimes they did. That's the

12   piece that's missing and is really the critical piece of the

13   puzzle.

14        THE COURT:  That's fine.  The first question I have,

15   Attorney Durham, Attorney Flannery on behalf on Ms. Zirbes

16   correct when she says, although you disclosed, now they know

17   in July of 2015, that among the 33 transactions you disclosed

18   were nonGTR nondefendant transactions on the theory that

19   fraud was committed by presenting what I'm calling a second

20   time or duplicative presentation of bills of lading by the

21   defendant.  That they inquired why were you disclosing

22   nondefendant transactions and you did not respond to inquiry?

23        MR. DURHAM:  She did not have that conversation with

24   me.

25        THE COURT:  I think I remember seeing an email we're

1    not going to tell you about the theory of our case.

2         MR. DURHAM:  I'm sure we told them that because I

3    don't think we're obligated to.

4         THE COURT:  I don't think if you don't allege it in

5    your indictment, I don't think just giving them papers in

6    discovery and saying you figure it out, satisfies your

7    obligations.  For example, let's assume we went to trial on

8    this indictment without a bill of particulars.  You don't get

9    a guilty verdict.  You reindict them on theory of duplicative

10   presentation of BOL's, how could they argue it is double

11   jeopardy.  You didn't plead it.  You didn't identify it as

12   the theory.  So what.  You get another shot, right?

13        MR. DURHAM:  We have disclosed that.  And we have

14   due process on that.

15        THE COURT:  Why didn't you do that last summer?

16        MR. DURHAM:  I think of last summer we weren't aware

17   of the confusion on the numbers.  I think that's when it came

18   to our attention.

19        THE COURT:  If the indictment alleges altering of

20   documents by the defendants, their own documents, why would

21   you ever disclose transactions that aren't their

22   transactions?  They can't have destroyed or altered or

23   fraudulently amended their own submissions if it's not their

24   submission, right?  How would Cargill transaction disclosed

25   by you last summer have any relevance to the indictment as

1   pled?

2          Let me try it again.  How would a Cargill

3   transaction of which you disclosed a number last summer I

4   understand, how would that ever be relevant to the indictment

5   as pled which pleads that what they did at the heart of their

6   fraud was to alter documents they submitted to the United

7   States Department of Agriculture?  Why would a transaction by

8   another company which they had no involvement in, be a part

9   of that method or scheme?

10          MR. DURHAM:  The method and scheme is to deceive the

11   government as to what they were actually doing including they

12   are not exporting anything.  They were simply buying

13   documents.  They were engaged in the fraud of steps being

14   taken to deceive the government as to what they were doing,

15   they have had obtained these guarantees and upon further

16   investigation and examination, it turns out there were

17   duplicative registration of those particular guarantees.

18          THE COURT:  But certainly a submission by Cargill is

19   not a means and method by these defendants.  Would you agree

20   with me?

21          MR. DURHAM:  I would agree that Cargill's submission

22   that would be not their manner or means.

23          THE COURT:  When you produce a transaction by

24   Cargill last summer and the defendant says why are you doing

25   this, don't you think they deserved an explanation?

1          MR. DURHAM:  If you look at paragraph 34 which is on

2     page 9 of the indictment in this matter.

3          THE COURT:  That isn't what these duplicative

4     transactions were.

5          MR. DURHAM:  There would be evidence in paragraph 34

6     it is alleged that essentially the defendants would seek --

7     access bills of lading and other shipping documents for

8     shipment of agricultural products that did not physically

9     ship to which they did not participate in the physical

10    movement of the products in any capacity by among other ways

11    sending emails to various exporters offering them contracts

12    and the like.

13         The fact that they obtain in some fashion obtained

14    these bills of lading that they subsequently submitted only

15    to find out they had been used by the entities that did the

16    shipping ADM, Cargill, I think Bunge, not on the list that I

17    have, would be evidence that would tend to go to prove they

18    weren't physically shipping anything, that they didn't

19    participate in the physical movement of any of those

20    products.

21         All they were doing is getting the bills of lading

22    in these examples which I said our current intend to use in

23    rebuttal, not in the case in chief, would be evidence of that

24    fact.  They weren't moving anything.  They were buying bills

25    of lading.  These instances that are outlined on pages 5 and

```
1    6 in those instance they were duplicates.
2            THE COURT:  If I asked to you do a bill of
3    particular, you would not tell me that the basis of the
4    criminal liability of the defendant here includes,
5    duplicative use of bills of lading?  In other words, the
6    offer of the duplicative uses is to support the allegations
7    that are in the indictment already, but because I don't see
8    any allegation in the indictment that these defendants
9    improperly reused a bill of lading after it had already been
10   used or was to be used by the person who had the proper
11   position to use it, they, in fact, used it in a duplicative
12   sense.  I didn't understand that to be from reading the
13   indictment, the theory.  I understand this part of the
14   indictment but --
15           MR. DURHAM:  I don't want -- I'm not sure I
16   understand the Court's question, but it is not the
17   government's claim that the defendants used those bills of
18   lading knowing they had already been used.  That's not the
19   claim.
20           THE COURT:  Okay.  So let me back up.  I may need a
21   break here because -- how many transactions, if any, in
22   addition to the two in the indictment will the government
23   present to the jury in its case in chief to prove the
24   conspiracy crime alleged in the indictment?  Did I hear 200?
25           MR. DURHAM:  We would have to sit down and figure
```

1    that out.  I don't want to give you a number now.

2          THE COURT:  I thought I asked you last July you said

3    you would tell me.

4          MR. DURHAM:  That's what we're estimating.  The

5    estimate would be the same.

6          THE COURT:  The same as eight or 10 or the 33

7    because the 33 includes many of these duplicative

8    transactions I will call them from now on by the defendants.

9    But you just told me those are only being used to prove the

10   sort of cover up or false front kinds of conduct, state of

11   mind, that's the rebuttal that like 34 tends to reflect.

12   Those aren't actually the transactions that made the

13   defendants conduct criminal.  It is like it's getting in a

14   car to go to the robbery, that's not criminal, but it is part

15   of the scheme to conspire to rob the bank, right?  So I'm

16   trying to understand at some point conspiracy to defraud the

17   Department of Agriculture happened?  Okay.

18          MR. DURHAM:  Yes, your Honor.

19          THE COURT:  And did it happen because somebody

20   whited out and altered documents and submitted fraudulent

21   documents?

22          MR. DURHAM:  That's certainly part of it, yes, your

23   Honor.

24          THE COURT:  Was it because they used the bill of

25   lading that was being used by somebody else?  Is that the

1    fraud or is that -- give me a minute.  Not telling the

2    government that they weren't actually shipping product?

3            MR. DURHAM:  The fraud is laid out in Counts 2

4    through 20 of the indictment.  That's where we're saying the

5    substantive fraud is.

6            THE COURT:  2 through 20.  Each of those counts is

7    itself a fraud, in mail wire.  Then Count One is the

8    conspiracy which includes presumably all of those acts along

9    with many other acts, some of which could be noncriminal if

10   done by themselves but as part of an overall scheme adds to

11   the criminality.

12           MR. DURHAM: Right.

13           THE COURT:  I still don't know, though, 2 through 20

14   are not transactions.  They are steps to effectuate obtaining

15   a guarantee I will call it.  I will call it transaction to

16   get whatever it is you want from the FAS.

17           MR. DURHAM:  In each one of those instances they

18   were the use of interstate wires to carry out the fraud.  So

19   each one of those individual counts is an individual wire

20   that was used in the scheme that's alleged in Count One.

21           THE COURT:  Right, but, for example, Count Two is an

22   email from Zirbes to Lillemoe how do you want me to monkey

23   the numbers.  That's not a transaction.  That's not an

24   application for a guarantee per se.  It may be part of a deal

25   they were putting together.  If I went through the 20 counts,

```
 1   if I were a defendant, I could identify the transactions
 2   these acts related to?
 3           MR. MCGARRY:  Your Honor.
 4           MR. DURHAM:  The short answer is yes.
 5           MR. MCGARRY:  I think they probably could.  Let's
 6   not confuse with the use of the facility of interstate
 7   commerce in execution of the scheme which is what the statute
 8   calls for opposed to having necessarily having related to a
 9   transaction.
10           THE COURT:  Which statute?  1349?
11           MR. MCGARRY:  That's Count One.
12           THE COURT:  Or 1957?
13           MR. MCGARRY:  1343, use of the wires.  Whoever
14   conceives a scheme and artifice to defraud or obtain money
15   and property by means of materially false and fraudulent
16   means.
17           THE COURT:  I understand that.  It doesn't have to
18   be the transaction.  I understand that.  But I'm asking you
19   how does the defendant know what transactions you are going
20   to tell the jury were obtained, the guarantees were obtained
21   with fraud?
22           MR. MCGARRY:  Sure.  The short answer is -- well,
23   your Honor, there's a scheme.  We need to prove that there
24   was a scheme and artifice to defraud and in execution of the
25   scheme, that the wires were used.  There can be a scheme.
```

1          THE COURT:  What's the scheme?

2          MR. MCGARRY:  The scheme is obtain money and

3     property by means of materially false and fraudulent

4     pretenses, representations and promises.  The false pretenses

5     are --

6          THE COURT:  So when you plead two transactions which

7     are of a certain nature altering documents and no other type

8     of means to defraud in the transaction, you can prove any act

9     including other transactions that were accomplished using

10    other fraud and it is unlimited in that represent.

11         MR. MCGARRY:  For instance if there's a wire, an

12    email from Mr. Caldaron in Connecticut to Mr. Lillemoe in

13    Minnesota that says call me at 8:00 tonight, it doesn't

14    mention a particular GSM transaction, it is call me.  Call me

15    so we can talk about the guarantees.  Call me so we can talk

16    about the Deutsche Bank.

17         THE COURT:  Let's say they have a conversation that

18    you and the Department of Agriculture were listening in on

19    would find nothing wrong with.  It is not part of the

20    scheme.

21         MR. MCGARRY:  I think that would be up to the jury.

22    If it was call me at 8:00 tonight to talk about Deutsche

23    Bank, is that in furtherance of the scheme?

24         THE COURT:  I don't know. How are you going to prove

25    it is in furtherance?  I don't know that that's helpful.

1    Let's back up to my question.

2          Is it your position that because it is a conspiracy

3    charge and the charge is -- that's the purpose.  Conspiracy,

4    to devise an intent to devise a scheme or artifice to

5    defraud, et cetera, by means of a wire and to the scheme as

6    far as Deutsche Bank as to means, false representations

7    et cetera, and attempting to execute the scheme and artifice

8    did knowingly present Deutsche Bank altered and falsified

9    shipping documents including altered bills of lading in

10   connection with securing funds on a loan.

11         With respect to paragraph 27b, if you were only

12   trying to prove 27b, would you agree with me that offering as

13   direct proof of 27b, the submission of what I will call

14   duplicate bills of lading would not be relevant to the 27b,

15   would be at variance with the indictment, whatever, however

16   you want to look at that, would you agree with me?

17         MR. MCGARRY:  I'm sorry.

18         THE COURT:  27b says there was a conspiracy to

19   devise a scheme or fraud to defraud Deutsche Bank by doing

20   altered and falsified shipping documents including altered

21   bills of lading.  Lets assume the duplicate transaction at

22   issue didn't involve altering any documents at all.  Involved

23   representing we're authorized to use this and they weren't.

24   Would you agree with me that you cannot use that transaction

25   to prove 27b?

1          MR. MCGARRY:  If they represented to Deutsche Bank

2     they were authorized to use them and they weren't, and they

3     submitted to deutsche Bank to get a guarantee, then the

4     duplicate registration of something that's already used

5     because the wind blew it and it said already been used, that

6     would be defrauding Deutsche Bang that they made material

7     misrepresentation to Deutsche Bank.

8          THE COURT:  Read the rest of paragraph b.  You are

9     very particular.  They did this.  They had a scheme to

10    defraud and to obtain money by materially false pretenses.

11    For the purpose of executing and attempting to execute that

12    scheme, they knowingly presented, et cetera, et cetera.  You

13    are telling me if that's the only paragraph, A was not in

14    this indictment, that you are marshal evidence in front of

15    this jury of 21 transactions in which not one altered bill of

16    lading was submitted but merely proof, not merely, I take

17    that back, proof of duplicative use of a bill of lading?

18         MR. DURHAM:  Let's assume that one of those

19    duplications does have an alteration, I think that would be

20    the evidence.

21         THE COURT:  That's not helping me.  I want the

22    answer to assume -- I want you to assume there are no

23    alterations on these duplicative transactions.

24         MR. MCGARRY:  I really think what your question is

25    asking, your Honor, is as this is pled, it would require the

1    presentation of a duplicative or a duplicatively used bill of

2    lading to Deutsche Bank for paragraph B and again and I'm

3    looking at it.

4         THE COURT:  Let me try one more time.  Assume that A

5    is not in the indictment, 27A, and all you have is B, would

6    it not be either a constructive amendment or a prejudicial

7    variance if you stood up at trial and offered the duplicative

8    transactions I will call them, to prove this indictment B?

9    Assuming there's no altered documents in the duplicative

10   transaction you sought to introduce into evidence in your

11   case in chief.

12        MR. MCGARRY:  Cold standing on my feet I guess I

13   would submit that there's a scheme and artifice to defraud

14   Deutsche Bank and to obtain money and property and you are

15   going to make material false and fraudulent pretenses to

16   that.  The false pretense could be I have the right to use

17   this bill of lading to apply for a guarantee from you guys,

18   Deutsche Bank, it's good.

19        THE COURT:  When you allege in the indictment or the

20   grand jury alleges in the middle of that paragraph "And For

21   the purpose of executing and attempting to execute the scheme

22   and artifice" that that is only in a ven diagram one dot in a

23   large ocean which ocean is defined by the first half of B?

24   You can drive anything into that big ocean without being

25   defined by the dot that represents altering documents to

1   Deutsche Bank?

2         MR. MCGARRY:  Yes.  The first part describes the

3   scheme.  The materially false or fraudulent pretenses,

4   representations or promises.

5         THE COURT:  It doesn't describe any scheme at all.

6   It recounts the statute.  It does have the victim's name of

7   Deutsche Bank.  Otherwise I can get this out the statute I

8   think.

9         MR. MCGARRY:  Which is why there are 20-odd

10  paragraphs before it laying out or after it, laying out the

11  manner and means of the scheme.

12        THE COURT:  Nowhere in any of those many paragraphs

13  will I find the use of exhausted bills of lading by way of a

14  duplicative submission, will I?

15        MR. MCGARRY:  I think the answer is no, but again

16  one does not necessarily need to allege each and every single

17  aspect of a fraud scheme when you are laying out a scheme.

18  THE COURT:  That's true.  Let's assume hypothetically that

19  the defendants actually are right in what they are suggesting

20  to me today, and that is they had the right or at least a

21  good faith belief they had the right to use the bill of

22  lading in these duplicative transactions and it is really

23  Cargill and ADM and the other people who were wrongly using

24  them a second time, or they were misleading the good faith

25  purchaser into believing they were still good and hadn't been

```
 1    canceled by prior use.  Let's assume that's true.  Let's

 2    assume that you are right you don't have to tell the

 3    defendant your theories.  You come the trial and start

 4    introducing these duplicative transactions, how is the

 5    defendant supposed to defend in October of this year when

 6    they learn about that?

 7          MR. MCGARRY:  The answer to your question, if we

 8    were to allege just the statute and there weren't all of

 9    these letters and discussions.

10          THE COURT:  You produced a mountain of papers I.

11    Would order a bill of particulars.

12          MR. MCGARRY:  They would get in a bill of

13    particulars either in prior to your ruling a bill of

14    particulars a letter like the one Mr. Durham sent.

15          THE COURT:  He sent a lot of letters.

16          MR. MCGARRY:  He's a good letter writer.

17          THE COURT:  He didn't answer the question that was

18    asked last summer that maybe would have been helpful.  I

19    don't think he answered it.

20          MR. MCGARRY:  We don't what they talk with their

21    clients about, the point is they can certainly talk to their

22    clients about what are these 60 transactions.  Why are they

23    focused on these especially because Judge Merriam allowed the

24    defendants to talk among themselves in order to review the

25    documents without the presence of counsel over our objection.
```

1    Presumably they could have spent countless hours without

2    counsel going through the 60 and matching them up like the

3    prosecution team did. Leaving that aside, if it was just the

4    statute and there was a bill of particulars order. Yes, you

5    must give a bill of particulars because you allege the words

6    to the statute, then I think we would be required in a bill

7    of particulars to set forth what has been set forth in the

8    letter from Mr. Durham as well as the others.

9            THE COURT:  Which letter?

10           MR. MCGARRY:  Certainly the one these cut and pasted

11   in our response in the motion. I was on trial. The email

12   that was sent to the defendants that was then included in our

13   response.

14           THE COURT:  So on February 29, the government

15   explained in an email to counsel the potential relevance of

16   the transactions that it had identified.

17           MR. MCGARRY:  That would be the bill of particulars

18   to avoid any prejudice in October of not being enough

19   specificity as to what the evidence is going to prove as to

20   the scheme.

21           THE COURT:  One, have you provided to the defendant

22   each and every shred of paper that you have on these

23   transactions by the nondefendants?

24           MR. MCGARRY:  I believe so.  I mean.

25           THE COURT:  How do you answer the defendant's

1   argument that they have an answer for these duplicative

2   transactions.  That they did them properly, they had the

3   authority to use the bill of lading, they acted in good faith

4   or they were misled.  How are they used to now on February 26

5   of 2016 obtain discovery from third parties who are outside

6   the United States on 33 transactions?

7           MR. MCGARRY:  This case is somewhat different than

8   other cases because we sat for hours and hours with Mr.

9   Lillemoe's prior counsel as well as Mr. Caldaron's current

10  counsel.  The defendants' entities were served with subpoenas

11  because the entities, of course, don't have a Fifth Amendment

12  right, so presumably if the entities had control of those

13  documents, they would have been produced to the grand jury

14  prior to an indictment being returned, and we would have been

15  directed to those.

16          THE COURT:  That only goes to their side of the

17  transaction.  It doesn't go to what Attorney Flannery has

18  argued which is Cargill, ADR, whoever you want to pick on

19  those transactions, they didn't have the authority to use the

20  bill of lading, we did.  We didn't get the Cargill documents

21  from the defendants.

22          MR. MCGARRY:  But where in the documents that were

23  produced to the grand jury by the entities are their side of

24  the transactions.

25          THE COURT:  Attorney Tween I think stood up and said

there's some documentation to that.  The rest is going to

come out of the mouth of the defendants that they had oral

relationships, oral transactions, whatever you want to call

them, agreements, understandings, I don't know, but they

certainly don't have the paperwork that would show the

Cargill transactions, the nondefendant transactions, were

either proper or not proper.  In other words, were they the

first to use the bill of lading with the right and authority

to use it or were the defendants?  They don't have the

documents on the nondefendant transactions other than what

you have given them, which they say, which I think repeated

what Attorney Durham described, something about the form of

contract number 67 invoices, the guarantee, the bill of

lading, it was a limited litany of legal documents.

MR. MCGARRY:  It was a description of the April

production which is an attempt by us to describe --

THE COURT:  April 23 production.

MR. MCGARRY:  What's in Cargill.  It was not

attempted to be exhaustive or Descriptive of what you will

find in this page range.

The question is we indicted a case last week that's

set for a June trial.  Totally unrelated.  It was not

assigned to your Honor as much as we hoped it would be.  It

went to Judge Chatigny.  It is set for June trial.  It is a

fraud case, a Ponzi scheme.  There are probably 25 to 50

1    victims and some are charged in the indictment, some are

2    going to be witnesses, some of the 50 victims are going to be

3    called as witnesses and their investment files and their

4    documents, we're producing them, then we'll pick which

5    witnesses will come to trial.  So we now are standing here on

6    April 11 for an October trial and certainly I think domestic

7    documents, all the documents we have, we turned over.  If

8    they think --

9         THE COURT:  You don't have any current intention to

10   attempt to obtain any further documents from non-parties at

11   this point?

12        MR. MCGARRY: There's no MLATs outstanding.  We're

13   not attempting to collect foreign evidence.  We're not

14   working with Legats in foreign countries.  To the extent, if

15   we interview somebody from the Bunge or Cargill and say hey,

16   we have some evidence these were your documents.  They might

17   call you on that.  Somebody says I have proof of that.  You

18   better give me a subpoena.  It is our business records.  We

19   give them a trial subpoena and it's returned early, we'll

20   turn it over when we get it.

21        THE COURT:  Are any of the companies listed in the

22   middle column of Attorney Durham's email of February, page 5

23   to six of your opposition, are any of those companies

24   exclusively nonU.S. located?  In other words, you can't reach

25   them with a U.S. subpoena?

1          MR. MCGARRY:  I don't believe so.  I think ADM is in

2     the U.S., Cargill has presence in the U.S., Bunge has a

3     presence in the U.S.

4          THE COURT:  All right.  One last question all of

5     these nondefendant transactions occurred during the period of

6     conspiracy alleged, the time period?

7          MR. MCGARRY:  I believes that is correct, yes, your

8     Honor.

9          THE COURT:  One minute before I go back to Attorney

10    Flannery.

11         MR. MCGARRY: I do think Ms. Zirbes so the record is

12    clear, Ms. Zirbes, the individual, was not ever served a

13    subpoena because she was not a custodian of record of any of

14    the entities so to the extent we wouldn't have any records --

15    and I believe --

16         THE COURT:  I don't know what that has to do.

17         MR. MCGARRY:  Ms. Flannery was talking about where

18    the documents, who has documents so her client we do not

19    believe was a custodian of any of the entities that were

20    subpoenaed.

21         One other point is that Mr. Caldaron was interviewed

22    in November of 2012 on the topic of duplicate use of the

23    bills of lading and the 302s talk about them so to the extent

24    that the 302's were also produced in discovery, if there's an

25    issue of was this ever on the government's radar, then it was

1    discussed with him with counsel.

2           THE COURT:  The duplicate transactions?

3           MR. MCGARRY:  The issue of that.

4           THE COURT:  What's the date of the 302?

5           MR. DURHAM:  The interview was November 2012.  It

6    would have been generated around that time.

7           MR. MCGARRY:  It would have been produced I believe

8    in that April production.

9           THE COURT:  One last question before I turn to the

10   defense counsel.  Because I have heard different things

11   during this afternoon, mostly from Attorney Durham on this

12   question so I will ask it flat out.  Is it the government's

13   intention to use what I have been calling the duplicative

14   transactions in their case in chief?

15          MR. MCGARRY:  Mr. Durham and I have talked about

16   this.  We agreed and disagreed.  Assuming there are opening

17   statements, if the defendants were to open either on the

18   opening statement or in through their questioning, intimate

19   or flat out say there was nothing wrong and in some way make

20   this a bigger issue, I think we would reserve the right to

21   say this is an opportunity based on what he said or she said

22   to talk about the duplicate use, the double registration if

23   you will, if and when an appropriate witness either from

24   Cargill or Bunge or the FSA, the CCC FAS witness is on the

25   stand.

1          THE COURT:  Attorney Durham, did you understand what

2     your colleague said?

3          MR. DURHAM:  Yes.  I don't think we're likely to

4     offer in the case in chief.  What Attorney McGarry is talking

5     about --

6          THE COURT:  Make what a big issue?

7          MR. DURHAM:  The duplication portion.

8          THE COURT:  Why would they do that?  I'm asking you.

9     You have the burden.  You have to come forward and prove the

10    crime.  Do you intend to offer in your case in chief in proof

11    of the crimes alleged, transactions that are duplicative

12    transactions as I have described that and that you are

13    offering them because they are duplicative transactions.  In

14    other words, they have no altered documents otherwise.

15         MR. MCGARRY:  There's one that has an altered

16    document.

17         THE COURT:  Can I get an answer to my question,

18    Attorney McGarry?  You didn't answer it not to my

19    comprehension.

20         MR. DURHAM:  The government does not intend to offer

21    in its case in chief.  What Attorney McGarry is referring to

22    is if the defense for their own tactical reasons introduce it

23    or make reference to it either in their opening statements or

24    in cross-examination of the government witnesses in the

25    case.

1          THE COURT:  Make reference to "it", would you spell

2     that out?  To duplicative transactions.

3          MR. DURHAM:  Correct.

4          THE COURT:  Why in God's name would they do that?

5          MR. DURHAM:  I don't know but your Honor has been on

6     the bench a long time.  I'm sure you have seen a lot of

7     strange things.

8          THE COURT: Let's assume the defense took the posture

9     at trial saying not a word and stood up at closing and said

10    we weren't said a word because the government's case is

11    garbage, they haven't proved anything, et cetera.  That's the

12    whole theory of their defense so they are not going to say a

13    word.  They are not going to cross-examine your witnesses,

14    they are aren't going to do a thing, would you be offering in

15    your case in chief as evidence of fraud upon the Department

16    of Agriculture, the submission of duplicative transactions?

17         MR. DURHAM:  You are saying or the banks?

18         THE COURT:  Yes, I guess.  Yes.

19         MR. DURHAM:  That is not our intention to offer it.

20         THE COURT:  I will start with Attorney Flannery.  In

21    your reply to the government's opposition, you argue that the

22    government has either constructively amended the indictment

23    or alternatively that there's a prejudicial variance.  Let's

24    start with the constructive amendment.  I don't understand.

25    Let's assume the answer to that question was yes, we're

1    offering these in your case in chief, these dual

2    transactions, duplicative transactions, how is that a new

3    crime?  It is still part of a conspiracy. It is still fraud

4    or attempted fraud as part of the conspiracy with a means or

5    method.  I don't understand why that's a new crime.

6         MS. FLANNERY:  It is of such a different nature,

7    your Honor, than what's charged in the conspiracy count, the

8    conspiracy count --

9         THE COURT:  Give me your best case that demonstrates

10   by analogy the facts in that case you are going to give me

11   show that this type of allegation is so different from what's

12   in this lengthy indictment that with lots of examples and

13   theories of schemes and artifices, that it is so different,

14   that it would be a new crime.  I'm not talking variance.  I'm

15   asking you about constructive amendment that they have

16   alleged a new crime.

17        MS. FLANNERY:  It is essentially theft of contract

18   rights, your Honor.

19        THE COURT:  It might be vis-a-vis Cargill or whoever

20   else truthfully owned the bill of lading but that isn't the

21   way the government would have offer the evidence.  They are

22   offering it to show more fraud by your clients.  They are

23   purporting to say we have a right to use this.  Like Attorney

24   Tween said, that's the fifth thing of the criteria.  You have

25   a right to use this.  You are representing when you submit

1  the bill of lading I have a right to use it.  In fact in

2  these cases, the government would argue you didn't.  I don't

3  see why that's not a new crime.

4        MS. FLANNERY:  If you read the indictment and I

5  think your Honor made this point in your questioning of the

6  government.  You have to be a mind reader to read this

7  allegation into this conspiracy count.

8        THE COURT:  I don't agree with you.  I don't think I

9  would know reading the indictment that part of their proof

10  was going to be duplicative transactions.  I don't know that

11  to a deal.  I don't know that they are going to show a

12  transaction from April of 2010.  I don't know that either.

13  They didn't list every one.  But I know the nature and theory

14  of the crime they allege is first and foremost a conspiracy

15  to commit fraud in connection with this program.  I think you

16  have a right to know, maybe the government doesn't agree we

17  me on this but they've acted in a way that says they agree

18  with me about these transactions and you do know about them.

19  Whether it is a variance from the indictment that may be, but

20  it is not a new crime.  This submission of a duplicative

21  transaction is a scheme or fraud.  It is a fraudulent scheme

22  to get money under this program.

23        MS. FLANNERY:  Your Honor, it is a scheme defraud

24  the other companies as you said.  It is a different victim of

25  the crime.

1     THE COURT:  No.  They got to do their transaction.

2  They got the money they wanted.  The harm occurs when they

3  use this paper.  It is basically like taking a canceled

4  check, covering up the cancellation stamp and submitting it

5  again to the bank.  The writer of the check -- it's a

6  terrible analogy.  Strike that.  How is it Cargill gets hurt?

7  They got their transaction.  They got their money.  It is the

8  Department of Agriculture and the banks that are part of the

9  program gave out money to your client on the assumption that

10  you had a bill of lading that represents crops that were

11  going to move in international trade.  They, therefore, would

12  give a guarantee and do everything else that your client

13  wanted them to do when you didn't have the right to have

14  that.  That's the allegation.

15     MS. FLANNERY:  My response to your Honor is by my

16  reading of that that is a very different crime than

17  alleged.

18     THE COURT:  I think they can do the following: They

19  can supersede tomorrow and all they would do is after the

20  paragraph that says they materially altered documents.  I

21  can't remember what numbers that is.  43.  It was further

22  part of the conspiracy they would and did submit materially

23  altered shipping documents including bills of lading.  They

24  could have address 43a and it was further part of this

25  conspiracy they submitted bills of lading that they had no

1    right to submit because they didn't that fancy language

2    Attorney Tween is going to educate me on.  Again it is the

3    same conspiracy.  The crime is certainly the same.  It would

4    be pled under the same statute.  I think it is a bridge too

5    far for me to even think it is arguable as a constructive

6    have amendment.  It is a variance perhaps, but then you have

7    to prove prejudice.  That's why I was hammering Attorney

8    Durham.  If he does this in September and comes up with a

9    whole nother type of transactions that tends to prove this

10   fraudulent scheme, he's right I have to look at it at the

11   time and hear from you folks but at that time I have to make

12   a judgment are you prejudiced in September to find out about

13   new kind of transactions, I probably would find yes.  But I

14   don't know that I can say that to you when you knew about

15   these last summer.  You didn't get an answer.  You may be

16   could have figured it out on your own but now you know it in

17   February.

18           MS. FLANNERY:  I will respectfully disagree with your

19   Honor.  I believe the grand jury didn't vote on that crime.

20   In terms of prejudice, a prejudicial variance we are

21   prejudiced, your Honor, and we did not know about this theory

22   last summer when we asked.  We have asked numerous times.  We

23   brought it up in two hearings in court.  One in person.  One

24   on the phone that the government was not answering the

25   question about these transactions.  For whatever reason, they

1    were not telling us why these nonGTR transactions were on

2    their list.  At this point in time, given not only that seven

3    month gap but the seven year gap.

4         THE COURT:  How about the government's answer they

5    aren't going to use them in their case in chief.  If you want

6    to stand up in opening and say we did all kind of wonderful

7    things including we submitted bills of lading a second time,

8    then you've opened the door.  They have a right to put it in

9    I think whether they told you about it or not.  They did tell

10   you about it.  Even if they hadn't, they probably could

11   introduce it as rebuttal, they would want to ask me ahead of

12   time, have they opened the door so I can do it now instead of

13   later, Judge, I would probably say yes but I would listen to

14   you first.  But at the end of the day, they are not going to

15   use these to prove the conspiracy unless you folks somehow

16   which I cannot comprehend, but Attorney Durham is right.

17   Defendants do odd things sometimes, at least odd from this

18   perspective.  You start talking about them.  I don't know why

19   you would if they're not talking about them.  In which case

20   you are not prejudiced and there's not a problem.  That's

21   what he's just represented to me, right?

22        MR. DURHAM:  Correct, your Honor.

23        THE COURT:  Thank you.  Attorney Tween, you had a

24   request for a bill of particulars.  As I understand it, the

25   Second Circuit's long standing case law the purpose of a bill

1    of particulars is to identify with sufficient particularity

2    the nature of the charges pending against the defendant.  It

3    is enough under this case Bartnovsky that you receive that

4    information even if it is not in the indictment, in some

5    other form.  If you received that, then you don't need a bill

6    of particulars.  Why do you need a bill of particulars in

7    light of the position the government has taken in light of my

8    questions?

9              MR. TWEEN:  I think in light of what we have heard

10   today, your Honor, I don't need a bill of particulars.  To

11   the extent this hearing today has addressed the issues, I

12   think it is mooted it.

13             One thing I will say, I want to make sure that I

14   have a complete understanding as to exactly what would open

15   the door to the government putting in duplicatives.  I think

16   I understand that it would be somehow we raise the issue of

17   duplication which I agree with you we will not do.

18             THE COURT:  Say for example, you have a FAS manager

19   on the stand.  The government asked them about, you know, do

20   you rely on this bill of lading you got in this transaction.

21   If you had known it was really a copy of a copy of a copy.

22   It wasn't a copy of an original, whatever else this system

23   seems to inquire, would it maybe altered your decision to

24   approve it?  Yes.  If you knew these three entities were part

25   of the same group of people, whatever questions they ask like

1    that.  You stand up or your co-defense counsel stands up and

2    says well, you have been critical of how -- you seem to be

3    critical of how we operated our business, but it is true it

4    is all right if we submit a bill of lading a second time

5    after it's been used by somebody else, right?  I would think

6    that would open the door.  In the government's view they

7    would want to come back and show maybe by redirect, you know,

8    that isn't acceptable.  Whatever.  I'm being silly in a way.

9    It may be more subtle but I don't think it is much more

10   subtle than that.

11        MR. TWEEN:  If we were to argue that we did not

12   physically ship product and we were to argue that FAS was not

13   deceived by multiple related entities and we were to argue

14   that any alleged alterations were not material, none of that

15   opens the door to duplication issue?

16        THE COURT:  I think and I will ask the government to

17   answer it. I will say what I think.  I'm trying to test what

18   I follow what people are saying.  I'm trying to learn about

19   this business also.  It is possible that the government may

20   use one of these duplicative transactions from the bucket of

21   duplicative transactions but not use it because it is a

22   duplicative transaction, but because it tends to answer or

23   address or challenge something that you just said.  But I

24   think that I heard earlier most of what you just -- the

25   multiple related transaction, they are going to try to show

1    that was material and you are going to try to show it wasn't

2    and so it seems I can conceive of the government pulling from

3    their bucket of transactions that are multiple or duplicative

4    transactions a transaction.  But they are not pulling it they

5    are going to argue or ask the witness this was submitted by

6    Cargill isn't that terrible.  They are going to ask the

7    witness but you didn't look at this transaction.  This was

8    defendant A.  Did you know the next day it was the defendant

9    c and defendant c.  These line up.  Look at all of these.  On

10   a prorated basis, would you have approved all of these?  The

11   government is going to hope the answer is no.  I can see them

12   using the transactions that way but not because they are

13   duplicative.  The whole duplicative issue that Attorney

14   Flannery is complaining she doesn't have enough discovery on,

15   it isn't going to challenge the fifth thing that you

16   mentioned to me.  It is going to prove how many of these you

17   submitted in what period of time and how did that affect or

18   not affect or lack of knowledge of that relatedness affected

19   the FAS person.  Was that a good answer, Attorney Durham?

20          MR. DURHAM:  In part, yes, your Honor.

21          THE COURT:  What would you add to satisfy Attorney

22   Tween or to answer him?

23          MR. DURHAM:  I'm not sure I will be able to satisfy

24   Mr. Tween in that regard.

25          THE COURT:  We don't need to be snippy, Attorney

1    Durham.  I know you are smiling.  There's enough of that from
2    me from time to time.
3         MR. DURHAM:  What I want to say I don't suspect that
4    the question that your Honor posed would be a question
5    defense counsel would ask.  That makes a specific reference
6    to duplication.
7         THE COURT:  I think they are saying they are not
8    going to.
9         MR. DURHAM:  They may very well ask other kinds of
10   questions that would open the door.
11        THE COURT:  Like what?  He said they are going to
12   argue, you heard them say that the fact they don't physically
13   ship product doesn't matter to agriculture.  This whole
14   program everybody knows people don't ship product and lots of
15   people participate in the program. That's what they are going
16   to argue. Does that open the door to duplicative
17   transactions?
18        MR. DURHAM:  I think it depends how that's asked.
19   If the suggestion in the cross-examination, the opening
20   statement is everything that GTR is doing is perfectly legal
21   and appropriate that might open the door.
22        THE COURT:  They are not going to ask it that way.
23   They are going to say to this FAS witness you have put on the
24   stand.  They are going to ask isn't it true that FAS or your
25   organization, your agency whatever, you, and you have been

1    there forever, were aware that many people participated in

2    this program. Many entities did not actually ship product.

3    They were basically paper transactions.  You knew that,

4    didn't you?  Is that opening the door to the duplicative

5    transaction?

6            It might open the door to your using one of their

7    transactions that happens to have duplicative in the

8    duplicative bucket, but you are not using it because it is

9    duplicative.  You are using it to somehow rehabilitate the

10   witness about if you had known this company was related and

11   this company, it is one of those.  Then I can see you using

12   it.  That line of question has nothing to do with duplicative

13   transactions I don't think.

14           MR. DURHAM:  That's the clarification we were

15   looking for.

16           MR. TWEEN:  We withdraw then -- I think given his

17   representations, we withdraw the bill of particular motion.

18           THE COURT:  That's fine.

19           MR. TWEEN:  There's one other point I want to raise

20   because I just heard something from Mr. Durham a while ago

21   that kind of gave me the chills.  That was his representation

22   that it was deceptive practice by the defendants that we were

23   not actively shipping product.  This goes back to the whole

24   third party business that I thought we disposed of.  If the

25   government is going to argue the USDA, FAS and banks and

1    whoever were deceived and defrauded by the fact that the

2    defendants were not physically shipping product, we are -- it

3    is a very different case.  I thought we had resolved and

4    gotten past that.  But if that's something that the

5    government opens on, we'll have a motion for a mistrial right

6    away.

7              THE COURT:  That's an allegation of their scheme.

8    You may think it is like buying a car.  It is not an illegal

9    act.  They may think it is an illegal act but I don't know

10   why that's a dismissal of the indictment or directed verdict

11   or mistrial.  But let me ask Attorney Durham.  You said to me

12   a long time ago this afternoon that the government was not

13   going to argue that their trade model was per se illegal.

14   Maybe I should have asked what do you mean by trade model.

15   That was their words and you agreed to it.  I assume the

16   trade model includes this third party paper role, right, so

17   he shouldn't have got the chill he got?

18             MR. DURHAM:  I may have misspoke.  I think that one

19   of the difficulties is that what the third party model.

20   There's different names used and so forth and so on.  I'm not

21   sure there's a single model they are talking about.  If I

22   said we're going to claim they didn't ship anything and

23   therefore it's deceptive.  It is in the context we talked

24   about before they are making representations to the

25   Department of Agriculture that they are doing that.  They are

1    for example --

2          THE COURT:  In other words, they didn't have to ship

3    but they lied about what they did.

4          MR. DURHAM:  Essentially, yes, your Honor.

5          THE COURT:  I don't know if that sends chills down

6    your back or not.  You folks have been harping since last

7    summer about is this program on trial.  I heard the

8    government say not in that respect it's not on trial but

9    what's on trial the defendant.  I had a trial last summer

10   which I will get to do again this summer and that defendant

11   actually lied just claimed it wasn't material and he said

12   more than he needed to say.  In other words, if he kept his

13   mouth shut and said I will sell it to you for X, the

14   government could not have charged and definitely couldn't

15   have convicted him of a crime.  What he said I can only get

16   it a y.  Therefore I sell it to you at y plus my commission

17   and that wasn't true.  He got it at y minus one or y minus

18   two so he volunteered a lie which led the buyer to act in a

19   certain way which witnesses said that's material to them.  I

20   presume that's the government's proof here.  You didn't have

21   the ship anything and you don't have to say to the government

22   our corn is sitting at the harbor or the dockside.  We can't

23   move it.  Can we have four more days.  You didn't have to say

24   that.  You may say that didn't really misrepresent anything.

25   They knew what that meant is the corn behind my paper was

1    sitting somewhere.  I guess you can say that, too.  The

2    government is going to argue you didn't have to be a shipper

3    of corn.  You misrepresented what you were and that had that

4    material effect upon the government.  Is that a fair

5    statement government?

6              MR. DURHAM:  That's a fair representation.

7              MR. MCGARRY:  Yes.

8              THE COURT:  The program is not on trial.  Your

9    client's conduct is on trial.

10             MR. MCSWAIN:  I had the same concern.  Attorney

11   McGarry at the last hearing explained it where he said if

12   we're saying we're a supplier or we're a shipper or something

13   like that, we understand that they may allege that was

14   deceptive and we're prepared to present evidence it is not

15   deceptive and --

16             THE COURT:  I understand that.  You are going to say

17   that's the jargon, that's the way people talk, agriculture

18   understood it.  There was no misunderstanding.  Let alone no

19   fraud.  I get all of that.  Then there's no need for chills

20   on people's backs.

21             Attorney Flannery, I don't know if you had anything

22   more on variance bill of particulars  because you joined in

23   the bill of particulars that was just withdrawn.  If you have

24   anything else you want to add.  I need to wrap up.

25             MS. FLANNERY:  I understand it we're down to two

1    transactions in the indictment and eight others that they

2    identified to us.  But what they have not done is identified

3    what documents within those eight they allege have been

4    falsified.

5         THE COURT:  I don't know that they have to do that.

6         MS. FLANNERY:  There are 100 some bills of lading in

7    those eight transaction, your Honor.  I will refer your Honor

8    to I believe it is the Jones case in my brief.  I don't think

9    it is fair for us to have to defend against.  We need to know

10   what they allege is falsified.  We need to know what

11   documentation they allege was falsified.  If a document was

12   falsified almost by definition we can't look at it and tell

13   whether it is.

14        THE COURT:  The government would say you will know

15   if you falsified it.  That's not a very good answer.  Don't

16   bother giving me that one.  Why doesn't the Jones case say

17   she's right if there's 100 documents at issue in a single

18   transaction, you have somewhere between eight or 10 that are

19   the non-duplicative that will be in your case in chief

20   apparently.  If that's not right, correct me.  Why don't you

21   need to tell them what was falsified or which ones were

22   falsified.

23        MR. MCGARRY:  At some point the defendant attorney

24   have to do some work.  She can identify 100 pieces of paper.

25   She can look at them and well before we give over our exhibit

1    list, figure out which documents are at issue.  If she needs

2    to wait until the exhibit list, she'll get the exist list.

3    I'm surprised frankly with the caliber of attorneys that we

4    have representing Ms. Zirbes that we're asked in April to

5    tell us which particular pieces of paper she has to look at

6    after they are asking us to get more and more documents that

7    we're also being asked at the same hearing of the documents

8    we have already given them and the transactions we have

9    already told them about and the specificity of which we're

10   being nailed down to that we know have to be telling her

11   which pieces on the paper she has to look at.  I think that

12   goes beyond what's required at this point.

13        THE COURT:  You list two parts of overt acts

14   relating to the two transactions that we keep talking about

15   that are in the indictment.  You set forth various acts in

16   the furtherance I suppose of the scheme.  And they go on for

17   pages.  I suppose each of those relates to or might relate to

18   a document and it identifies in what way it is false.  I also

19   assume that in each of those two transactions there are other

20   documents that were not falsified or aren't fraudulent or

21   don't contain the misrepresentation.  Would all of that be

22   reasonable?

23        MR. MCGARRY:  I believe so.

24        THE COURT:  So what she's asking for and just

25   because I'm asking you, I'm not saying I agree with her.  I

1    will have to look at the Jones case.  Certainly she's

2    entitled to the discovery you've described.  You produced the

3    documents about the transaction that we're talking about the

4    eight or ten.  But my question is and I will look at Jones.

5    Why isn't she -- tell me why when I look at Jones I will see

6    she's not entitled to getting like the allegations in overt

7    acts, a description of which of the documents at issue in a

8    transaction are in fact the false ones?

9            MR. MCGARRY:  Your Honor, in all candor, I did not

10   review Jones that closely today.  I think I looked at it when

11   the pleadings came in a little while ago.  I can't direct you

12   why in the Jones case but it seems to me with the dates and

13   the descriptions that are provided, that there's certainly

14   enough specificity.

15           The other transactions the eight or ten other

16   transactions, I think some of those false documents are

17   attached to emails, where the emails themselves provide from

18   one defendant to the other defendant kind of a cover memo of

19   like here it is.  Tell me what you think about it.

20           THE COURT:  I will have to look at case law.

21           MS. FLANNERY:  It is June, June and Bortnovsky which

22   I surprised they are right on point.  The government can't

23   give us a mountain of documents and expect to know which

24   document was falsified.  The defense in order to prepare for

25   trial is entitled to know what document.

1          THE COURT:  I understand the mountain one, but I

2     don't know that it is a mountain.  They told you a

3     transaction.  Each transaction has I guess 100 bills of

4     lading.  Then less than that.  You may be got a mountain but

5     I think they've already narrowed it down to a particular path

6     on the mountain as to the eight or ten transactions we're

7     talking about.  It isn't as detailed as the indictment on the

8     two but I'm not sure that you are entitled to an iteration of

9     every false statement.

10          MR. MCGARRY:  The eight or ten.

11          THE COURT:  I will have to look at it.

12          MR. MCGARRY:  The eight or ten transaction have a

13     date and the dates and the emails related to those dates have

14     documents around that time which I think satisfies by any

15     stretch enough information for them to traverse the mountain

16     up and down.

17          THE COURT:  This case that you are citing is it in

18     your reply, Attorney Flannery?

19          MS. FLANNERY:  Yes.  Reply on page 7.  I don't

20     understand the hiding the ball here, your Honor.  I just

21     doesn't understand.

22          THE COURT:  I don't know that it is hiding the ball.

23     I'm not sure.  I will ask the government.  They prepared down

24     to each document.  They may know some falsities.  They don't

25     want to made to say these four documents are false.  Then

when they are sit down with the witness in the summer to
prepare for trial they point out four other falsities and you
will be screaming.  I agree with Attorney Durham this often
happens from the defense counsel they told me four, now
there's six.  I can't possibly be ready for trial. It is not
fair.  It is the prejudicial.  I think I heard those things
today even though we're talking about a trial in October.  It
might be -- the government in this district often does things
earlier than they need to do in response to the Court's
request.  I will take a look at June and get a better sense
of cases like this case whether in effect a bill of lading
shall we say for every false statement in every transaction
they are going to prove has to be given to you in April.  I
don't know that I'm going to find cases that support that,
Attorney Flannery, but I will look at June.

          MS. FLANNERY:  There's a difference between giving
us every document and giving us the ones they know of
already.

          THE COURT:  If I did that would you promise never to
say they didn't identify this next document, Judge, that's
not fair?  I don't think you would.  You would be a unique
defense counsel if you did.  Maybe if you would agree to
that, but I mean I kind of did that last summer.  I remember
I said to the government how transactions they said eight or
ten.  Why don't you look more carefully.  Tell the defendants

1    what ones you might be using.  They came back with the 33 and

2    now there's a big kerfuffle.  That's 33 and we didn't know

3    what they were and how they are going took used.  It becomes

4    a whole side show when I don't know it was necessary.

5         MS. FLANNERY:  In that same transcript, Mr. Durham

6    says he identified transactions.  They will identify to us

7    the hot documents.  The documents that they believe are

8    falsified.  That's not been done.

9         THE COURT:  Did you say that, Attorney Durham?  I

10   don't remember that but you might have.

11        MS. FLANNERY:  It is quoted in my brief.

12        THE COURT:  I have the transcript.  I remember other

13   parts of the transcript.

14        MR. DURHAM:  I may very well have said that.  That's

15   why we marshalled the transactions mirroring up the GTR and

16   the chart.

17        THE COURT:  She's talking now about the ball is

18   moving.  Of the eight or ten case-in-chief transactions of

19   fraud that you are going to introduce.  The two in the

20   indictment we already have that road map.  The other eight we

21   have a lot of bills of lading, lots of pieces of paper.  We

22   don't know where the fraud is that you claim.

23        Attorney McGarry's answer very smooth answer.  It

24   isn't a complete answer. The defendants know because they

25   wrote emails about some of their fraud.  Okay.  That doesn't

1    mean that you have it also with the aid of USDA, FAS, whoever

2    else haven't identified other documents besides those

3    attached to emails that are also going to be claimed by the

4    government to be fraudulent.  That's what she said I need to

5    know.  You have given me a pile of 100 or how many documents

6    that relate to that transaction and I don't know which ones

7    are false.

8            MR. DURHAM:  Very competent defense counsel can sort

9    through 100 documents.

10           THE COURT:  They can sort through them.  Their

11   clients are telling them we didn't lie in any of these

12   documents.  This wasn't false.  The ones that have the emails

13   that it is not material to agriculture that we changed this.

14   How would they know when they read the bills of lading or

15   whatever it is that's supposed to be false, what's false?

16           MR. DURHAM:  Your Honor hasn't had the benefit of

17   looking at a lot of documents then they are saying we should

18   get a stamp that --

19           THE COURT:  I saw that one.

20           MR. DURHAM:  That's a hot document.  We'll identify

21   that's a hot document.

22           THE COURT:  Is the government going to limit its

23   proof of fraud to portions of documents identified in emails

24   by the defendant that suggest a fraudulent state of mind?  I

25   think the answer to that question, Attorney Durham, will be

1    no?

2              MR. DURHAM:  Correct.

3              THE COURT:  You are going to offer others.  All that

4    Attorney Flannery is saying if you know what those false

5    things are now, you should tell us and she's never going to

6    say when you find another false statement when you interview

7    that Ag witness in August and he says you missed these three

8    bills of lading. They are full of fraud.  You tell her then

9    she's never going to say to me, Judge, you just told me about

10   all these fraud he never told me before because all you are

11   telling her is what you know now.  That's what she says.

12             MR. DURHAM:  I can only tell what I know now.

13             THE COURT:  Correct.  Why don't you?

14             MR. DURHAM:  I don't think I'm obligated to.  We

15   provided the documents.  What counsel wants to do is cabin

16   the government's evidence.  That's our opinion because.

17             THE COURT:  No.  What you provided has cabined the

18   evidence.

19             MR. DURHAM:  I will read the June case as well.

20             THE COURT:  I need to deal with some other pending

21   motions.  There's a number of motions to seal portions of

22   memoranda in Exhibits 84, 86, 96, 99.  I think I mentioned

23   all of them.  Is there any objection to the motions to seal

24   by the government?

25             MR. MCGARRY:  No objection.

1      THE COURT:  So those motions are granted, Diahann.

2  I will take under advisement except for the withdrawn motion

3  for a bill of particulars the various Brady, I will call them

4  Brady motions, motions for disclosure they have got different

5  names.  Each defendant had a motion.

6      The next question is the motion to alter the

7  schedule that I will comment interestingly enough everybody

8  gets more time except the Court.  Do counsel have some idea

9  what these substantive motions are going to be?  I'm asking.

10  I know you don't want to the tell the government what you are

11  planning. I'm really asking because the question is whether

12  in 10 days from when they are joined, I will have time to be

13  prepared to do an argument and be ready to rule.

14      MR. MCSWAIN: I think I filed that motion, your

15  Honor.  Otherwise the substantive motions will be due this

16  Friday.  Because of the fact that we're dealing with all of

17  these discovery issues, honestly defense counsel hasn't had

18  time to put our heads together.  I don't anticipate a lot of

19  motions, perhaps none, but we wanted some more time to

20  consider that.  Actually having the benefit of your guidance

21  today, is going to help.  I can imagine motions to the double

22  registration is now moot.

23      THE COURT:  You seem to be the role player for

24  telling me how helpful sessions that we have are going to be.

25  I like to hear that when you say it.  It sounds good.  Then

we come back for another question we have what happened this

afternoon of he said no, he represented that and it is like I

don't know that I really did accomplish anything but that was

a rhetorical statement.  Sorry, sir.  You asked for until May

6.  Do you really need it?

          MR. TWEEN: I think we do, your Honor.

          THE COURT:  Obviously I will not hold you to the

15th.  That's three weeks from now.  It is more than that.

It is really this week plus three weeks.  Can I shave two

days of it and make you be the fourth and make the government

move up to whatever that Wednesday would be.

          MR. TWEEN:  That's fine with me, your Honor.  Unless

my colleagues have any comments.

          THE COURT:  The 4, the 25 and the 1st would be the

dates.  Is that all right with all of the defense counsel?

          MS. FLANNERY:  Yes.

          MR. TWEEN:  Yes.

          THE COURT:  How about the government?

          MR. MCGARRY:  That's the 4th of May, the 25 of May

when the government would be due.  It squeezes Mr. Durham a

little bit.  We'll have to soldier on without him.

          THE COURT:  Who are you on trial with?

          MR. DURHAM:  Vicar murder case with Judge

Arterton.

          THE COURT:  You will be readily accessible to give

1    direction to Attorney McGarry every night.

2            I will grant 95 in part and the deadlines are May 4

3    for the original motion, substantive motions, government's

4    op, the 25 and the defendants is reply June 1.  We'll hold

5    the argument date on the 13th.

6            I received a motion over the weekend for the service

7    of subpoenas.  I don't have the subpoenas I think you told me

8    you would give me hard copies of them.  I asked the

9    government is there objection to my granting the motion for

10   subpoenas to be issued I presume either to some of the

11   non-party -- who were the subpoenas going to be directed to?

12           MR. TWEEN:  I can speak to that, your Honor.

13           MS. FLANNERY:  For medical reasons I need to take a

14   quick break.

15           THE COURT:  Go ahead.  We'll wait for you.

16           MR. TWEEN:  We specifically --

17           THE COURT:  I will wait for her to come back.  Do

18   you have the subpoenas the hard copies of what you proposed?

19   I could be looking at those.

20           MR. TWEEN:  I have a copy.  I believe we Fedexed a

21   copy to your chambers.

22           THE COURT:  That would require both Bernadette and

23   Caleb to have missed it.  That's unlikely.

24           MR. TWEEN:  We sent it out on Friday so it would

25   arrive today.  We filed the motion on Friday so it probably

1     didn't arrive before you took the bench.

2          THE COURT:  I will have some lovely motion practice

3     as a result of these.  No worries.  I should have taken a

4     break and I will during trial, trust me.  I worry about the

5     jury.  Terri didn't need a break so I was forging on.  I did

6     ask in your absence for counsel to hand up a copy of the

7     subpoenas because I haven't seen them so the motion is very

8     vague.  I wanted some idea.  I have a sense to whom they are

9     addressed, the type of person they are addressed to.

10         MR. TWEEN:  I can give some background, your Honor,

11    so we filed the motion and the motion as you stated got some

12    general information that the government has a copy of the

13    motion to file under seal.  We did provide a copy of the

14    subpoenas to the government.  As we state in our footnote we

15    believe the subpoenas looked at as a whole are protected, but

16    what we did in putting these subpoenas together, we did not

17    presume anything about the results of today's hearing.  We

18    didn't have any subpoenas to the government.  No subpoenas to

19    FAS or CCC or anybody like that.  We wanted to get the

20    benefit of your ruling first to see if we needed to take that

21    step later or not.

22         THE COURT:  Is it fair to say there are some

23    requests that are clearly reflective of conversations we had

24    here today discussions that you will look at the subpoena and

25    alter it sort of in light of what the government has stated

1    and committed to, what I ruled or stated or questioned?

2         MR. TWEEN:  I think the answer to that is no because

3    we specifically did not put anything in these subpoenas

4    having to do with the double registrations.  We wanted to

5    have the benefit of your ruling on that.  These have to do

6    with specific requests that go to the theories that we

7    believe the parties have agreed are going to be part of the

8    case, things like the multiple entities that we talked about.

9    Things like use of the word supplier and the like, having to

10   do with providing the third party model context and.

11        THE COURT:  I thought we agreed that wasn't going to

12   be contested at trial.  This third party or non-agricultural

13   participant doing paper transactions is not being

14   questioned.

15        MR. TWEEN:  We understand it is not going to be

16   presented that the model -- the renting of the trade flows is

17   going to be a better way of describing it than third party

18   model but the renting of trade flows is not going to be

19   alleged be per se illegal but the government is going to

20   present what they said the context of paragraphs 44 to 39 in

21   the indictment.  We also need the present our counter context

22   to put all the evidence in its proper perspective.

23        THE COURT:  The time period you are requesting is

24   much broader than the government's evidence will be.  How

25   does 2001 put something in perspective to counter the

1    government?

2         MR. TWEEN:  I think the relevant time period is

3    defined as 2007.  There are a few examples of earlier dates,

4    but they go to what we have talked about having to do with

5    our good faith defense.  About the defendants being involved

6    in transactions --

7         THE COURT:  If your client received one of these

8    subpoenas, you wouldn't be in here moving to quash it in

9    about an nanosecond as overly broad and unduly burdensome

10   impact upon a non-party?

11        MR. TWEEN:  I think the subpoenas are quite

12   specific.  I know it is a lot to digest right now.

13        THE COURT:  Produce all documents and communication

14   related to an Cargill GSM transaction involving guarantees

15   and Request 10 specifying the following information that goes

16   from A to I and occupies more than half a page single

17   space.

18        MR. TWEEN:  It is very specific.  We have exhibits

19   in there.  We have specific transactions.  We have GSM

20   numbers.

21        THE COURT:  I will write that down.  I can assure

22   that in whatever time the return date on the subpoenas are

23   going to be which you haven't told me and I need to know that

24   as well.  I can assure you that there will be someone looking

25   an awful lot like you standing up and arguing about how broad

1    and burdensome and nonspecific and abusive the requests are.

2         MR. TWEEN:  We asked for a return date of May 20,

3    your Honor, in the motion.  Tried to pick out what would be a

4    reasonable time if we're able to serve them quickly.  I'm

5    sure there will be back and forth with these entities with

6    some of them.  We need to get the process started now.  There

7    will be some motion practice.

8         THE COURT:  Does the government have objection?  You

9    did suggest they could subpoena third parties so do you have

10   objection to my granting the motion to issue subpoenas?

11        MR. MCGARRY:  We don't object with the following

12   caveats, your Honor.  One is that we aren't obviously joining

13   in the motion so I don't want to stamp the imprimatur of the

14   U.S. Attorney's Office on there.

15        THE COURT:  I can very well see you coming in on the

16   other side because I suspect recipients will go to you and

17   show you the subpoenas and say what are they asking for and

18   you will tell them how they can argue it is not relevant.

19        MR. MCGARRY:  We don't know what they are asking for

20   so may or may not be relevant.  We also I want to put this

21   out there the court mentioned I think it was in this case.

22   It may have been in the New Stream case that overlapped this

23   investigation, but that if everybody is speeding on the

24   Merritt Parkway doesn't necessarily make it a defense so

25   understanding kind of what I think they are going for, we're

1    not necessarily going to agree that it is an okay defense to

2    say everybody was doing it.  And again I don't know how broad

3    they are because I don't know the subpoena to reiterate what

4    I said before we're being accused of giving them a mountain

5    of evidence and there's no way they can go through hundreds

6    of pages of documents, now they want more documents.

7              THE COURT:  That's their problem.

8              MR. MCGARRY:  Fair enough.

9              THE COURT:  I will grant Number 103 a motion for

10   subpoenas.  I think that you need to file the proposed

11   subpoenas under seal I guess what you have shown me.

12   Ex-parte, not under seal, ex-parte, which I will permit it.

13   I would suggest the return date be May 13 on the assumption

14   you get the subpoenas in the hand by someone on the 13 and

15   serve them by the 15.  That gives them four weeks.  Obviously

16   you can agree I think to extend the return date if you are

17   working with someone in good faith blah, blah, blah, but if

18   not, if somebody digs in their heels, ABC Company you contact

19   them and they are laughing at you on day one next Monday the

20   18.  We're not complying with this, then I think I want a

21   motion right away on the due date, the 13th, from you that

22   they haven't complied or even in advance if they say they

23   aren't going to comply, right?

24             MR. TWEEN:  Thank you, your Honor.

25             THE COURT:  Maybe make it the 6th with the cover

1    letter saying the court indicated to us that if we're in good

2    faith discussion about compliance, it is taking time to

3    gather documents or discuss what's appropriate, that date can

4    be moved as a compliance date.  If there's going to be

5    objection to the subpoena, that's the date to object.

6            MR. TWEEN:  The sooner we get it going the better.

7            MR. MCGARRY:  Should I cross move that if and when

8    they get the documents, we would want them to be produced to

9    us within however long it reasonably takes to make electronic

10   copies and serve them.  I don't want to be accused of not

11   being formalistic enough.

12           THE COURT:  We need to be in this case.  Do you have

13   any objection to the government obtaining copies of the

14   documents you get from the subpoenas or should they issue

15   their own subpoenas?

16           MR. TWEEN:  I don't think they need to issue their

17   own subpoenas.  I know we have reciprocal.

18           THE COURT:  You are saying this relates to your good

19   faith defense lack of mens rea, lack of materiality I would

20   think.

21           MR. TWEEN:  We would intend to comply with our

22   reciprocal discovery obligation.  If that means giving them

23   copies of everything, we receive we'll do that.  I don't know

24   if that requires a motion.

25           THE COURT:  You better make a motion.

1        MR. MCGARRY:  I will move that we get everything

2    they get.  I don't want some attorney to dig into their bag

3    and pull out a document.

4        MR. TWEEN:  Now that I thought about it for 10

5    seconds, I don't have a problem with it.  We'll give them a

6    copy of everything.

7        THE COURT:  Then you don't need to make a motion.

8    It is on the record.

9        MR. MCGARRY:  We hope to get it within a week.

10       MR. TWEEN:  As soon as we get it.

11       THE COURT:  I assume you will get it in a reasonable

12   time.

13       MR. MCGARRY:  I'm guessing Drinker Biddle and Reath

14   might have a better computer system than our little shop

15   upstairs.

16       THE COURT:  You are just the United States of

17   America, that's at all.

18       MR. DURHAM:  The court's preference to reciprocal

19   discovery, I don't believe we received any and we would just

20   reaffirm our interest in getting reciprocal discovery at this

21   point in time on a rolling basis or otherwise.  Just as it

22   takes the defense counsel time to go through documents we

23   provided, the same to going the other way so as I say, we

24   received no reciprocal discovery.  I would ask that that be

25   provided in a timely fashion.

1          THE COURT:  Defense counsel who would like to take

2     that?

3          MR. MCSWAIN:  I'll take that and speak on behalf of

4     Mr. Caldaron, we have produced to our knowledge every

5     business document that he possess.

6          THE COURT:  Did you do that preindictment or in

7     connection with the grand jury subpoenas?

8          MR. MCSWAIN:  Correct.

9          MR. DURHAM:  So we're clear so the court could

10    inquire whether or not counsel has complied with Rule 16.  We

11    subpoenaed documents.

12         THE COURT:  I understand that.  I was thinking about

13    that so we'll pull out Rule 16.

14         I guess Rule 16b(a)(ii) says that if the defendant

15    intends to use an item in the Defendant's case in chief at

16    trial, you must produce it and I don't think, Attorney Tween,

17    you can tell me if I'm wrong.  If the cases say I'm wrong but

18    I don't think that means producing in response to a subpoena

19    every business record you have satisfies that.  I don't

20    imagine you are going to use at trial every single business

21    record.  Every defendant would say we don't know yet what

22    we're going to use at trial.  At some point you will so will

23    your co-counsel and I assume given all the time you spend on

24    this case, all the complaining that the government hasn't

25    done what they are supposed to do that you are getting to a

1    point that you have an idea of what you want to us.  Again

2    not limiting to everything that you will use.

3         MR. MCSWAIN:  There's nothing else I'm aware of that

4    we intend to use in our case in chief that has not been

5    produced.

6         THE COURT:  You are missing my point.  I think Rule

7    16 requires you to even if you produced a mountain of papers,

8    Rule 16 tells you to produce the documents you are going to

9    use at trial.  Just like Attorney Flannery cited me to that

10   case whose name I have now forgotten, the government cannot

11   turn over a mountain of documents and say you have everything

12   we might use.  That's a grounds to give a bill of

13   particulars.  You have some right to know generally what's

14   within that pile that's going to be used a evidence at some

15   point.  I think the same is true for the defense.  I think it

16   is a correct statement you do not intend to use at your case

17   in chief every piece of paper you turned over in response to

18   your subpoena, do you?

19        MR. MCSWAIN:  That's a correct statement.

20        THE COURT:  Then the government has a mountain.  But

21   it doesn't have the documents you intend to use.  It has them

22   but they are not identified as them.

23        MR. MCSWAIN:  I recall from your Honor's other rules

24   there's an exchange of exhibits.

25        THE COURT:  There is but I don't think that meets

1    your Rule 16 obligation.  The government is going to give you

2    their exhibit list and exhibits at some point down the line,

3    you have been yelling for discovery documents going back a

4    year now.  That's their discovery obligation.  You have one

5    as well.

6        MR. MCSWAIN:  I want to make sure that I understand

7    your Honor.  The government has in its possession every

8    business document of Mr. Caldaron's.  We would be producing

9    to the government some point sufficiently in advance of trial

10   our premarked exhibits.  Is it the practice that Rule 16

11   would require us to hand over hot documents other than those

12   we would mark as exhibits?

13       THE COURT:  No.  I think Rule 16 says any documents

14   you intend to use at trial.  You have may not know the final

15   list of those until the deadline where I say defendant step

16   up to the plate and give me your exhibit list but clearly a

17   week before then you know 95 percent of those documents, a

18   month before then you know 50 percent of the documents that

19   you are going to use at trial, and six months before then you

20   probably know five or six documents you are likely to use at

21   trial.  I think Rule 16 says when you know there's a document

22   you have you are going to use in your defense in chief, you

23   have to tell the government even if that's six months before

24   the exchange of exhibit lists or the disclosure of exhibit

25   lists.  That's how I read 16.  If I'm wrong, I would

1    appreciate a letter with a couple of cases I can read to

2    educate myself about Rule 16.

3            As I say, most defense lawyers say I don't know yet,

4    judge, and they get away with it but I always say to defense

5    counsel I found it hard to believe a week before the exhibit

6    list, you didn't know anything, so I read the rule may be

7    more strictly than other people do.  I think the government

8    is right they are entitled to that disclosure.

9            MR. MCSWAIN:  Okay.  That's clear.

10           MR. DURHAM:  Your Honor --

11           THE COURT:  You said one more thing 15 minutes ago.

12   I have Attorney Ward back there.  He's wasting his valuable

13   time listening to me expose my ignorance of criminal

14   procedure.

15           MR. DURHAM:  This is not a new question.

16           THE COURT:  None of the questions are new.  It is

17   always the same issue.  We're going around.

18           MR. DURHAM:  Counsel just made at least twice, three

19   times to every business record.  I'm not sure that's a term

20   of art or Not.  We're not asking for business records.  If

21   there's records that are disclosable under Rule 16 whether we

22   identify them as business or some other way, we assume just

23   to make sure that isn't being used in a particular fashion.

24           THE COURT:  If he had a pen pal that he wrote to on

25   Sunday mornings at the Department of Agriculture.  In that

1   correspondence there's something that's going to help the

2   defense, you want that disclosed under 16.  I understand

3   that.  I assume counsel understands it.  I took the reference

4   to every business record to mean he would view that as a

5   business record, anything to do with the matters at issue in

6   this case.  He thinks he's been stripped of already by you.

7   You already have it.  I don't think, as you heard me, that's

8   enough under 16.  Counsel has indicated he heard me.

9          MR. DURHAM:  If he's going to put on character

10  evidence, that's not a business record.

11         THE COURT:  Absolutely.  I agree not in the strict

12  sense that's not a business record.  Usually character

13  witness might be a witness, not a document.  I suppose if

14  there's a document about it, you are right.  You have an

15  email that you are going to say that's total fraud by Mr.

16  Caldaron and he has documents from Gmail that show that on

17  that date his can GMAIL was hijacked and infiltrated, totally

18  corrupted, he had no control over it, somebody from Romania

19  was running that account that day and wrote all of those

20  emails, I think that would be Rule 16.  I don't know if they

21  are business records or not but they are going to be

22  produced.  Everybody all right?  Stand in recess.

23         (Whereupon, the above hearing adjourned at 05:46

24  p.m.)

25

1

2

3

4

5

6   COURT REPORTER'S TRANSCRIPT CERTIFICATE

7   I hereby certify that the within and foregoing is a true and

8   correct transcript taken from the proceedings in the

9   above-entitled matter.

10

11   /s/  Terri Fidanza

12   Terri Fidanza, RPR

13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25