# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 3:15-CR-00025-JCH |
| | : | |
| v. | : | |
| | : | |
| BRETT C. LILLEMOE, | : | |
| PABLO CALDERON, | : | August 26, 2016 |
| and | : | |
| SARAH ZIRBES, | : | |
| | : | |
| Defendants. | : | |

## GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE DEFENDANTS FROM OFFERING EVIDENCE CONCERNING THE CONDUCT OF OTHER PARTIES

The Government moves this Court, *in limine*, to preclude the defendants from offering evidence related to other companies' practices in connection with the GSM-102 program. The extent to which other companies or individuals engaged in misconduct related to the program is irrelevant to the fraud charges brought against each defendant here. For it to be relevant as to the defendants' good faith, the defendants would have to show that the conduct was substantially similar to their own misconduct, the USDA and the U.S. financial institutions knew and approved of the conduct, and the defendants were aware of their approval. The defendants have made no such showing. Similarly, for other entities' conduct to be relevant as to the materiality of the misrepresentations, the defendants would have to show that the conduct was substantially similar to their own misconduct, the USDA and the U.S. financial institutions knew and approved of the conduct. The defendants have made no such showing. Also, evidence regarding the conduct of third parties would likely mislead and confuse the jury and be more prejudicial than probative. Therefore, pursuant to Fed. Rs. Evid. 401 and 403, the Government respectfully requests that the Court grant its motion *in limine*.

1

I.      **BACKGROUND**

On February 20, 2015, a Grand Jury sitting in New Haven, CT returned a twenty-three

count indictment against the defendants Brett C. Lillemoe, Pablo Calderon, and Sarah Zirbes, in

relation to their participation in a scheme to defraud the United States Department of Agriculture

("USDA") through the USDA's Export Credit Guarantee Program (GSM-102) ("the Program" or

"the GSM-102 program").

a.   The Export Credit Guarantee Program

The United States Department of Agriculture provides credit guarantees through a

program referred to as the Export Credit Guarantee Program (GSM-102), which is designed to

encourage financing of U.S. agricultural commercial exports while also providing competitive

credit terms to buyers.  The GSM-102 program guarantees credit extended by private banks in

the United States to approved foreign banks.

The Commodity Credit Corporation ("CCC") is an agency and instrumentality of the

United States within the Department of Agriculture and subject to the general supervision and

direction of the Secretary of Agriculture.  The CCC enters into payment guarantees (or credit

guarantees) as part of the GSM-102 program.  Payment guarantees are agreements under which

the CCC, in consideration of a fee paid and in reliance upon the statements and declarations of an

exporter, agrees that – in the event of a default by a foreign bank on its payment obligation under

the foreign bank's letter of credit issued in connection with a guaranteed sale – the CCC will pay

the exporter or an exporter's assignee.  The payment guarantees cover ninety-eight percent of the

value of the payment obligation of the foreign bank.

The credit guarantees are designed to encourage exports to buyers in foreign countries –

mainly developing countries – that have sufficient financial strength to have foreign exchange

2

available for scheduled payments.  The program operates in situations where U.S. financial institutions might be otherwise unwilling to provide financing without the guarantee and where credit is necessary in order to increase or maintain U.S. exports to a foreign market.  The purpose of the credit guarantee is to expand market opportunities for U.S. agricultural exporters and assist in long-term market development for U.S. agricultural commodities.

In order to participate in the credit Guaranty Program, the U.S. exporters apply for guarantees through the USDA's Foreign Agricultural Service (FAS), which administers the program on behalf of the CCC.  Since the Program generally receives more applications for guarantees than there are guarantees available, the Program administrator distributes guarantees among the qualified U.S. exporters who have applied for the guarantees.  In order to qualify for participation in the Program a U.S. exporter must meet the following requirements: (1) the exporter must have a business office in the United States; (2) the exporter must not be disbarred or suspended; and (3) the exporter must have a sale contract in place.  If a U.S. exporter meets the qualification requirements, pays the registration fee, and is selected to receive a guarantee, the USDA FAS will issue the guarantee to the U.S. exporter.

In connection with the Program, a foreign importer that has contracted to buy U.S. agricultural products applies for a letter of credit ("LOC" or "LC") from a foreign bank that the USDA FAS has approved.  The foreign bank then issues a LOC in favor of the U.S. exporter. Then, consistent with Program requirements, the U.S. exporter presents proper shipping documents to an approved U.S. financial institution.   Proper shipping documents include a copy of the original bill of lading, certificate of origin, and evidence of export report.  The U.S. financial institution then provides funds to the U.S. exporter which, in exchange, assigns the

rights to the proceeds payable under the LOC to the U.S. financial institution in the same dollar-denominated amount, less any fees.

After the U.S. exporter assigns the rights to the proceeds payable under the LOC to the U.S financial institution, the foreign bank must repay the U.S. financial institution.  If the foreign bank defaults on its payments to the U.S. financial institution, the U.S. financial institution may submit a claim to the USDA FAS.  Under the guarantee, the U.S. financial institution may obtain up to ninety-eight percent of the payment amount owed at the time of default.  The U.S. financial institution then assigns its right to payment on the LOC to the USDA, which can try to collect from the foreign financial institution.

b.  <u>Entities Involved</u>

The defendants controlled several entities in order to carry out their scheme.  Each of the entities that the defendants controlled were used to enter into contracts and agreements in connection with the defendants obtaining and using guarantees from the Program.

Lillemoe controlled four of the entities involved: GTR, LLC ("GTR"), using an address in St. Paul, Minnesota; RRT Protein Technology ("RRT Protein"), using an address in Darien, Connecticut; A. Charles Trading, using an address located in London, England; and EviTrade Ltd. ("EviTrade"), using an address in the Cayman Islands.  EviTrade was operated as a wholly-owned subsidiary of GTR.

Calderon also controlled four entities involved in the scheme: Southern Cross Advisors, LLC ("Southern Cross"), using an address in Darien, Connecticut; Lynx Trading, LLC ("Lynx"), using the same Darien, Connecticut address; Xangbo America, LLC ("Xangbo"), using the same

Darien, Connecticut address; and Dean Street Exports, LLC ("Dean Street"), using the same Darien, Connecticut address.[1]

Although Zirbes did not control any of the entities involved in the scheme, she did work for, and had authorization to act on behalf of, several of the entities involved.  Most notably, Zirbes served as the head of operations for GTR.

Several other entities, which the defendants did not control, were also involved in the scheme.  The defendants contacted these entities in order to acquire bills of lading or to enter into agreements in connection with the defendants' participation in the Program.  These other entities include the following: ONA Foods, Inc. ("ONA Foods"), a U.S. export company based in Atlanta, Georgia and controlled by a OOO Produkty Pitania Kombinat, with a business address in Kaliningrad, Russia; Axios Trading, Ltd. ("Axios Trading"), located on Moscow, Russia; and Grove Services, Inc. ("Grove Services"), located in Newton, Massachusetts.

The defendants also managed various bank accounts in their own names and in the names of the entities that they controlled.  These bank accounts were located at numerous financial institutions which are engaged in, and the activities of which affect, interstate and foreign commerce.  The banks include Wells Fargo Bank, N.A. and the bank formerly doing business as Wachovia Bank, N.A.  The Federal Deposit Insurance Corporation insured both banks.

In connection with the Program, the defendants transacted business and received transfers of funds from various U.S. financial institutions, which are engaged in, and the activities of which affect, interstate and foreign commerce.  The institutions include Deutsche Bank A.G., a

---

[1] In fact, all of the entities that Calderon controlled and RRT Protein, which Lillemoe controlled, had the same Darien, Connecticut address: 7 Old Parish Road, Darien, Connecticut.

federally insured financial institution, and CoBank, ACB ("CoBank"), an Agricultural Credit Bank headquartered in Colorado (collectively, "U.S. financial institutions").

    c.  <u>The Fraudulent Scheme</u>

From September 2007 through January 2012, the defendants conspired to commit the offenses charged in the Indictment.  Specifically, the defendants devised and carried out a scheme to defraud the USDA and U.S. financial institutions, using materially false and fraudulent pretenses, representations, and promises.  Through this fraudulent scheme, the defendants were able to obtain money and property.

To carry out the fraudulent scheme, the defendants established the aforementioned entities.  The entities were created with the appearance that they were operated and controlled independently.  For example, the entities had different names and some of the entities had a different business address.  Additionally, some of the communications between the defendants show that the defendants altered the footers on various documents in order to conceal the fact that multiple entities shared the same business address.  This was intended to prevent the Program administrators from detecting that the defendants and their co-conspirators were acting in coordination and to obtain a larger share of the Program guarantees.

Along with the separate entities, the defendants also established separate bank accounts. The defendants held bank accounts in their names and also in the names of the entities that they controlled.  The banks where accounts were held include Wells Fargo Bank, N.A. and the bank formerly doing business as Wachovia Bank, N.A.  The defendants applied for guarantees through the Program, using the multiple entities and bank accounts to pay registration fees.

In order to execute the fraudulent scheme, the defendants sought and obtained bills of lading and other shipping documents.  The shipping documents, however, were for agricultural

products that the defendants did not physically ship, and did not participate in the physical movement of, in any capacity.

The defendants purchased copies of shipping documents, some of which were the bills of lading marked "Copy non-negotiable."  In order satisfy the terms and conditions of the relevant letters of credit and federal regulations, the defendants and their co-conspirators in certain instances materially altered the shipping documents by whiting out the portions marked "Copy non-negotiable" and stamping the word "original" on the documents.  The defendants also shaded certain sections of the bills of lading and changed the dates of shipment.  Furthermore, the defendants prepared and executed documents termed "commercial invoices," which represented fictitious sales of agricultural commodities between entities that they controlled, as well as between entities that they controlled and other entities.

Additionally, Lillemoe sent emails to foreign banks, including International Industrial Bank ("IIB") in Russia, and offered to enter into agreements that would provide the banks with capital.  The capital would be made available to the foreign bank from a U.S. financial institution through the use of the GSM-102 Program.  As a result, Lillemoe would enter into agreements with foreign banks, including IIB, and would obtain LOCs from the foreign banks.  The LOCs would be used in connection with shipping documents and guarantees from the Program to obtain capital for the foreign banks from U.S. financial institutions.

After entering into agreements with foreign banks and altering the shipping documents received from U.S. exporters, the defendants submitted the materially altered documents and "commercial invoices" to U.S. financial institutions.  As a result, the defendants obtained a large amount of capital from the U.S. financial institutions for foreign banks.  The defendants' receipt of capital from U.S. financial institutions was based, in large part, on the materially altered

shipping documents that the defendants submitted in connection with the Program.  The
defendants then provided the capital to the foreign banks in exchange for a percentage fee that
the defendants kept for themselves and their various entities.

The foreign banks were then obligated to repay the funds to the U.S. financial in
accordance with the terms of the LOCs issued on behalf of the U.S. financial institutions.  In a
number of instances, however, the foreign banks failed to repay the U.S. financial institution,
triggering the Program guarantee.  Despite the foreign banks' default, the defendants and their
various entities retained the millions of dollars in fees that they had collected in connection with
the Program.

The fraudulent scheme was used to defraud entities such as Deutsche Bank, A.G. and
CoBank to obtain moneys, funds, assets, credits, and other property that Deutsche Bank, A.G.
owned or controlled.  The property that was obtained from Deutsche Bank, A.G. or CoBank was
obtained through materially false or fraudulent pretenses, representations, or promises.  In order
to execute the scheme, the defendants presented Deutsche Bank, A.G. and CoBank with altered
and falsified shipping documents; including altered bills of lading.  The shipping documents
were altered and falsified in connection with securing funding on a loan backed by a foreign
LOC and guaranteed by the Program.

## II.    <u>Discussion</u>

Throughout their filings and representations to the Court, the defendants appear to be
planning a defense based in part upon the theory that other parties engaged in similar conduct.
For instance, in their memorandum in support of their motion for subpoenas, defendants sought
information from third parties to "show how other participants communicated their business
practices to the USDA and the Program administrators" and information that "will show that

relevant practices were employed by other Program participants within the Program with the acceptance of the USDA, and will contribute directly to the Defendants' 'good faith' defense." Doc. 103-1 at 7–8.  Similarly, the subpoenas recently served on the USDA-Foreign Agricultural Service seek, among other documents, "bills of lading and the related letters of credit that were submitted to FAS as part of a GSM-102 compliance review or audit from 2010 – 2014 that a) were stamped or otherwise marked explicitly as 'copy,' 'photocopy,' 'certified copy,' . . . ." without any limitation regarding which company or entity was involved in the review or audit. Additionally, the subpoenas seek "communications between USDA personnel and Karla Hennessey of Cargill, Inc. from 2008–2011 [and] Simon Brotherton of Bungee North America, Inc., from 2012–2013 . . . ."  Based on the foregoing, it appears the defendants plan to raise the 'everybody-else-does-it' defense.

The defendants should be precluded from making this argument at trial.  The conduct of other companies is irrelevant.  The defendants are on trial, not other GSM-102 program participants.  The purported conduct of the other companies is wholly irrelevant in determining the culpability of the defendants here.  The Government has alleged that Defendants conducted a scheme to defraud the USDA and certain U.S. financial institutions by materially altering documents submitted under the GSM-102 program and using multiple entities and bank accounts to disguise their true relationships.  In that context it is completely irrelevant how other companies conducted their business with the USDA and other U.S. financial institutions.

Nor can the defendants rely upon the conduct of others to establish a defense of good faith.  For any such evidence to be (arguably) admissible, the defendants would have to establish that other companies engaged in similar misconduct –*i.e.* concealing their identities, shading documents and stamping 'original' on copies of bills of lading they had purchased, and that the

decision making officials at the USDA and the U.S. financial institutions involved in the transactions were aware of the practice and condoned it.  The defendants would also have to show that they were aware that the U.S. financial institutions and the USDA had condoned the other parties' fraudulent actions and did so contrary to the relevant laws and regulations.[2]  Short of that, the conduct of other companies simply cannot demonstrate that the defendants acted in "good faith."  *Cf. United States v. Litvak*, 808 F.3d 160, 188–89 (2d Cir. 2015) (defendant had knowledge of the way his co-workers conducted themselves and his supervisors' approval of behavior); *see also* Hearing Tr. 26:4–26:9, 26:21–27:11 (June 17, 2016).

Finally, the defendants cannot rely upon the conduct of others to argue that the misrepresentations were not material.  As with the good faith defense above, the defendants would have to demonstrate that other companies engaged in similar misconduct –*i.e.* concealing their identities, shading documents and stamping 'original' on copies of bills of lading they had purchased, and that the decision making officials at the USDA and the U.S. financial institutions involved in the transactions were aware of the practice and condoned it.

A.  Evidence Regarding Other Companies' Conduct Is Irrelevant.

Evidence is admissible only if it is relevant. Fed. R. Evid. 402; *see United States v. Diaz*, 176 F.3d 52, 81 (2d Cir. (2d Cir. 1999) (affirming the exclusion of proffered defense evidence because it was irrelevant).  "Evidence is relevant if: it has a tendency to make a fact more or less probable than it would be without the evidence; and the fact is one of consequence in determining the action." Fed. R. Evid. 401; *see United States v. Schipani*, 289 F. Supp. 43, 56

---

[2] Moreover, the defendants would presumably have to take the stand and testify that their good faith belief was informed by what they then personally knew regarding the conduct of other entities and their basis for such an understanding.  Without such testimony, the attempt to blame the industry would be an improper defense.

(E.D.N.Y. 1968) (finding that evidence is relevant if "a reasonable man might have his assessment of the probabilities of a material position changed by the piece of evidence sought to be admitted.").

"Implicit in [the definition of relevance] are two distinct requirements: (1) the evidence must be probative of the proposition it is offered to prove, and (2) the proposition to be proved must be one that is of consequence to the determination of the action." *United States v. Diaz*, 878 F.2d 608, 614 (2d Cir. 1989). Although "relevant evidence" has a broad definition, it is not limitless. *See United States v. Hollister*, 746 F.2d 420, 422 (8th Cir. 1984). Most notably, the "threshold requirement for the admission of evidence is that it have some probative value." *United States v. Larranaga*, 787 F.2d 489, 499 (10th Cir. 1986).

Courts regularly exclude irrelevant evidence offered by defendants in criminal cases. *See Diaz*, 176 F.3d at 81 (proper to exclude irrelevant defense evidence that a third party committed a separate uncharged murder, as such evidence did not make it more or less probable that the third party, rather than the defendant, committed the charged murder and murder conspiracy); *United States v. Poland*, 659 F.2d 884, 894 (9th Cir. 1981) (affirming the exclusion of defense evidence as irrelevant, as it may have implicated others, but it did not exonerate the defendants); *United States v. Johnson*, 904 F. Supp. 1303, 1311 (M.D. Ala. 1995) (granting government's motion *in limine* to exclude proffered defense evidence that a person other than the defendant was present at the crime scene, which did not exculpate the defendant, and was therefore irrelevant).

Any evidence that the defendants may seek to offer regarding the conduct of other entities or how other entities interacted with the USDA or U.S. financial institutions is irrelevant. The defendants are charged with conspiracy to commit wire fraud and bank fraud, wire fraud,

11

money laundering, and making a false statement.  These charges stem from the defendants'
alteration of bills of lading and how they presented themselves to the USDA and the U.S.
financial institutions. What other companies did makes it no more or less probable that the
defendants conspired to, and in fact did, devise a fraudulent scheme from which the defendants
obtained millions of dollars by submitting fraudulently manipulated documents to U.S. financial
institutions.  In other words, but for the defendants' material alterations of shipping documents,
the defendants would not have received the program guarantees, and thus, would not have
obtained capital from the U.S. financial institutions.  Whether other parties participating in the
GSM-102 program engaged in similar misconduct is irrelevant to the charged fraud scheme.  *See
Diaz*, 176 F.3d at 81 (proper to exclude irrelevant defense evidence that a third party committed
a separate uncharged murder, as such evidence did not make it more or less probable that the
third party, rather than the defendant, committed the charged murder and murder conspiracy);
*see also United States v. Dempsey*, 768 F. Supp. 1277, 1289 (N.D. Ill. 1991) ("[T]he 'everybody-
else-does-it' defense is not a justification for conduct that the jury found to be illegal.  On the
contrary . . . it justifies the government's . . . investigation[.]").  Therefore, the Government's
motion in *limine* should be granted.

> a.  Evidence Regarding Other Company's Conduct Is Not Probative Of Good
>     Faith.

The defendants' claim that evidence of the other parties' conduct demonstrates that the
defendants acted in good faith is not persuasive.  *See, e.g.*, Hearing Tr. 25:18–23 (June 17, 2016)
("THE COURT: Is there a good faith defense?  MS. DEMPSEY:  There is, your Honor.  It is the
defendants' position that evidence that other parties submitted similar bills of lading for similar
transactions, those documents were approved by the USDA goes to the defendants' good faith.").
The only possible means by which other parties' conduct could be admissible to demonstrate the

defendants acted in good faith is if the defendants could show: 1) other companies engaged in this sort of misconduct – that is, they also manipulated bills of lading, obscured the true nature of their companies, and engaged in the misconduct alleged in the indictment; 2) the decision makers at the U.S. financial intuitions and at the USDA was aware of and condoned the other company's actions; and 3) the defendants were aware of the other company's actions and the USDA's approval such that it could have impacted their state of mind.  *See United States v. Litvak*, 808 F.3d 160, 188–89 (2d Cir. 2015); *see also generally Cheek v. U.S.,* 498 U.S. 192 (1991).

*Litvak*, upon which the defendants have relied heavily throughout its filings, is instructive.  As the Court is aware, in *Litvak* the defendant was charged with securities fraud arising from his alleged misrepresentations to customers of his employer concerning the resale price and cost to purchase residential mortgage-backed securities.  808 F.3d at 166.  The defendant sought to introduce evidence that purportedly demonstrated that his supervisors approved of his coworkers making similar misrepresentations to his employer's customers.  *Id.* at 188–89.  The defendant claimed that this evidence demonstrated his good faith – that he did not possess the intent to defraud because his conduct was a widely used sales tactic at his firm and approved by his supervisors.  *Id.*  The Second Circuit ultimately agreed.  Importantly, in *Litvak*, the defendant purportedly had personal knowledge of the way his co-workers conducted themselves and his supervisors' approval of their behavior.  *See id.* at 190.  In other words – the defendant claimed he was aware that others engaged in the same sort of conduct that he was and that his supervisors approved.  As a result, he claimed to have had an honestly held belief that he was acting in good faith.  *See id.*

Applying these principles to the instant case, the only way that other entities' conduct would be admissible here is if the defendants can demonstrate that the other companies engaged

13

in substantially similar, if not identical,[3] misconduct – *i.e.* manipulated documents and obscured their true identities – the USDA and U.S. financial institutions approved of that misconduct and the defendants were aware of it.  The Government has seen no indication that the defendants can make such a showing

First, the Government has seen nothing to suggest there is any evidence that other companies engaged in this sort of misconduct.  To the contrary, during the June 17, 2016 Motion to Quash Hearing, the other entities that the defendants subpoenaed disclaimed ever manipulating bills of lading or obfuscating their true identities.  *See, e.g.*, Hearing Tr. 68:25–69:7 (June 17, 2016) ("MS. GALANT: But, your Honor, isn't the claim here they altered documents, they whited out the word copy and stamped them original?   THE COURT: It is.  MS. GALANT: There's no evidence that I'm aware of that suggests that Louis Dreyfus ever did that.  There's no claim that they did and defendants haven't claimed that that happened here.").

Even assuming that other entities took steps to obscure their true identities or manipulate documents, the Government is not aware of any evidence that suggests the USDA or the U.S. financial institutions at issue were aware and approved of this conduct.[4]

---

[3] *See Litvak*, 808 F.3d at 189 (noting that Litvak sought to introduce evidence that supervisors "regularly approved of conduct *identical* to that with which Litvak was charged") (emphasis added).

[4] At the June 17, 2015 hearing, the defendants represented that they had identified a single instance out of multiple hundreds where a payment had been made on a document stamped copy rather than original.  Hearing Tr. 76:10–77:5 (June 17, 2016).  This document has not been identified for Government counsel.  Regardless, it is not clear from the representations on the record whether a copy sufficed for the purposes of that particular transaction.  Even assuming it had not, however, one slip by the USDA or the U.S. financial institutions does not constitute a policy shift, nor does it mean that the USDA or U.S. financial institutions approved the manipulation of documentation more broadly.  Nor would it permit the wholesale introduction of otherwise irrelevant evidence.

Finally, even assuming that other companies manipulated documents and took steps to conceal their true identities and the USDA and financial institutions at issue were aware and approved of this conduct, there is no evidence that the defendants were aware of this approval. In fact, that the defendants served such broad subpoenas on other GSM-102 program participants and the USDA suggests that defendants had no idea what the specific business practices of the other entities were.  If they had been aware of specific instances where the other entities manipulated the program the same way that the defendants had done, they could have subpoenaed those specific records.  They did not.

In sum, unless the defendants can demonstrate: (1) other entities engaged in the same misconduct that the defendants did; (2) the USDA and U.S. financial institutions knew and approved of it; and (3) that the defendants were aware of the misconduct and approval, the conduct of other entities is not probative of whether the defendants acted in good faith.  The defendants have not and cannot make such a showing.  Evidence of other entities' conduct should therefore be excluded.

> b.   Evidence Regarding Other Companies' Conduct Is Not Probative Of Materiality.

"[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."  *Neder v. United States*, 527 U.S. 1, 25 (1999).   "A false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed."  *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007); *see also United States v. Litvak*, 808 F.3d 160, 170 (2d Cir. 2015) (similar); *Autori*, 212 F.3d at 118 ("To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction.").  Demonstrating materiality in the context of these statutes generally involves proving that the defendant made a misrepresentation

in an effort to persuade another to make a discretionary decision in a way that benefits the defendant.  *See Rigas*, 490 F.3d at 234.

The purported misconduct of other entities does not tend to show that the falsifications the defendants made had no "natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed."  *Rigas*, 490 F.3d at 231.  In other words, once more, the 'everybody-else-does-it' defense is impermissible.  *See Diaz*, 176 F.3d at 81 (proper to exclude irrelevant defense evidence that a third party committed a separate uncharged murder, as such evidence did not make it more or less probable that the third party, rather than the defendant, committed the charged murder and murder conspiracy).

Similar to good faith, the only way that the purported misconduct of other entities could possibly impact the materiality of the manipulations is if other companies did, in fact, engage in the misconduct the same as or similar to that of the defendants and the decision makers within the USDA or U.S. financial institutions were aware of such misconduct and condoned it.  Only in those circumstances could the defendants conceivably argue that the misrepresentations did not have a natural tendency to influence the decision of the decision making bodies to which they were made, in this case the USDA and the U.S. financial institutions.[5]  *See Rigas*, 490 F.3d at 231.  As discussed above, however, the Government has seen no such evidence.

It bears mentioning that an occasional slip-up or a mistake by the U.S. financial institutions or the USDA *does not* mean that the USDA and/or the U.S. financial institutions condoned the widespread submission of manipulated documents.[6]  This is especially so where individuals, such as the defendants, doctored non-negotiable copies to look like originals.

---

[5] Of course, then why bother manipulating the documents?
[6] *See* note 4 above.

Further, raising the occasional slip-up or mistake by the U.S. financial institutions or USDA runs afoul of the longstanding legal doctrine prohibiting fraudsters from blaming the victims of their fraud by claiming the victims were negligent or not vigilant as discussed in the Government's Motion *in Limine* to Preclude Defendants from Offering Evidence or Argument Blaming the Victims or Improperly Arguing Good Faith.  Instead, the defendants would have to demonstrate that other program Participants engaged in a largescale disregard of the program regulations and letter of credit requirements, including by altering bills of lading and obfuscating their true identities, and did so with the approval of the appropriate individuals at the USDA and U.S. financial institutions.  The defendants have not and cannot make such a showing.

      B.  <u>Evidence Regarding Other Parties' Conduct Is Inadmissible Under Fed. R. Evid. 403.</u>

Even if the evidence is relevant, the court may exclude the evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Rule 403 "is designed principally to promote the twin policies of assuring correct factual determinations in individual cases and actual and perceived fairness in the judicial process as a whole."  *United States v. Robinson*, 544 F.2d 611, 613 (2d Cir. 1976).

Even assuming that evidence regarding other companies' conduct is relevant – and it is not – such evidence should be excluded under Fed. R. Evid. 403.  Any testimony or presentation about what other companies did and how they interacted with the USDA would cause the jury to confuse the issues and would likely mislead the jury, causing it to focus on issues that have no bearing on the defendants' guilt or innocence of the crime charged.  Defense counsel would have to spend a great deal of time presenting evidence about the practices of other companies.  Such

evidence would shift the jury's attention away from whether the defendants committed fraud, and to whether the other companies committed fraud. Additionally, the jury could be misled into thinking that because other program participants also engaged in criminal misconduct, the defendants here did not commit a crime. Therefore, the danger of causing the jury to confuse the issues and misleading the jury substantially outweighs the minimal, if any, probative value that the evidence may hold.

## III.   Conclusion

Accordingly, the Government respectfully requests that the Court grant its motion *in limine*.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY


_____/s/_____
JOHN T. PIERPONT, JR.
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv07973
John.Pierpont@usdoj.gov

MICHAEL MCGARRY
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT25713
Michael.McGarry@usdoj.gov

JOHN DURHAM
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT05087
John.Durham@usdoj.gov

157 Church Street, 25th Floor
New Haven, Connecticut 06510
Tel: (203) 821-3735

18

<u>CERTIFICATION</u>

I hereby certify that on August 26, 2016, a copy of the foregoing was filed electronically with the court and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


_____/s/_____

JOHN T. PIERPONT, JR.
ASSISTANT UNITED STATES ATTORNEY